UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
ROUBEN MADIKIANS,                       )
                                        )
             Plaintiff,                 )
                                        )
v.                                      )    No. 1:04-cv-12451-JLT
                                        )
AMERICAN AIRLINES ASSOCIATION           )
OF PROFESSIONAL FLIGHT                   )
ATTENDANTS ("APFA"), et al.,            )
                                        )
             Defendants.                )
_____)


UNION DEFENDANTS' MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS SECOND AMENDED COMPLAINT


     Defendants Association of Professional Flight Attendants

("APFA"),[1] Julia Carrigan, and Amy Milenkovic ("Union

defendants") submit this memorandum in support of their motion

to dismiss plaintiff's Second Amended Complaint ("Complaint").

Plaintiff's attempt to amend his original complaint to state a

claim arising under federal law has been unsuccessful.[2]  None of

1. ──────────────

     [1] APFA is misidentified in plaintiff's pleadings as
"American Airlines Association of Professional Flight
Attendants."  Its correct name is as stated in text.

     [2] Defendant Carrigan previously moved to dismiss the
original complaint.  After plaintiff filed his First Amended
Complaint, the Court dismissed Carrigan's motion without
prejudice to refiling a motion to dismiss the amended complaint.
Before defendants responded to the First Amended Complaint,
plaintiff superseded it with his Second Amended Complaint.

the federal causes of action in the Complaint – Counts I, IV, V
and VI – states a claim upon which relief can be granted.  The
Court should therefore dismiss those claims and decline to
exercise supplemental jurisdiction over the state law claims of
Counts II, III, VII and VIII.

We submit with this memorandum several documents in support
of the motion to dismiss.  With a single exception, these are
documents that plaintiff has referred to in his Complaint and
upon which the Complaint's factual allegations are dependent.[3]
The Court can properly consider these documents in ruling on the
motion to dismiss without converting that motion into a motion
for summary judgment.  Beddall v. State Street Bank & Trust Co.,
137 F.3d 12, 17 (1st Cir. 1998).[4]

1.  _____

[3] These documents include the APFA Constitution (Exh. A),
see Complaint ¶ 52; Article 28 of the collective bargaining
agreement between APFA and American Airlines (Exh. B), see
Complaint ¶ 46; the "formal charges . . . demanding an
investigation of Carrigan" that Madikians filed with APFA on
February 25, 2004 (Exh. C), see Complaint ¶ 16; the "further
grievance" Madikians filed against Carrigan on March 21, 2004
(Exh. D), see Complaint ¶ 18; APFA's letter of June 10, 2004
setting forth the disposition of Madikians' charges against
Carrigan (Exh. E), see Complaint ¶ 20; and the "Winter 2004 Base
Brief" containing allegedly defamatory statements about
plaintiff (Exh. F), see Complaint ¶ 13.

[4] The one exception is the Declaration of Brett Durkin (Exh.
G), which is submitted as an alternative basis for disposing of
one of Madikians' claims.  See infra note 8.  Should the Court
find it necessary to consider this declaration, it can do so by

- 2 -

BACKGROUND

While the Union defendants vigorously dispute many of the
Complaint's factual allegations, there is no occasion to address
those factual issues here.  On this motion to dismiss, we accept
– as we must – the facts as alleged in the Complaint,
supplemented by the documents upon which the Complaint relies.

Plaintiff Rouben Madikians was at all relevant times a
flight attendant employed by defendant American Airlines ("AA")
in a collective bargaining unit represented by APFA.  Complaint
¶¶ 2-3.  He brought this lawsuit against APFA, AA, an AA
management employee (Kelly Cox), and two individuals affiliated
with AFPA:  Julia Carrigan, then APFA's Boston Domestic Chair,
and Amy Milenkovic, then a Boston-based professional standards
representative appointed by Carrigan.  Id., ¶¶ 3-7, 12.

In his Complaint, Madikians alleges that in December 2003
he launched a petition campaign to remove Carrigan from her
union office, in the course of which he obtained and
disseminated information about the dates and times of Carrigan's
travel.  Id., ¶¶ 9-11.  Madikians subsequently became aware of
what he describes as a "smear" campaign directed against him by
Carrigan and Milenkovic, who "were maliciously and falsely
stating that Madikians had been stalking Carrigan's family and

1. ————————————————————————————

converting the motion to dismiss into a motion for summary

minor son." Id., ¶¶ 12-13, 17.  Apparently as part of this
campaign, Carrigan, with the approval of AA, disseminated to
APFA members a newsletter – the "Winter 2004 Base Brief" – that
included these allegations.  Id., ¶ 13.  (The "Base Brief" is
attached hereto as Exhibit F.)

Madikians "demanded that AA conduct an investigation" into
its approval of the Base Brief, and notified APFA of this
complaint to AA.  Complaint ¶ 15.  Madikians then filed internal
union disciplinary charges against Carrigan on February 25,
which he supplemented on March 21.  Id. ¶¶ 16, 18; see Exh. C,
D.  In June 2004 he learned that his charges against Carrigan
had been dismissed.  Complaint ¶ 20; see Exh. E.

ARGUMENT

Plaintiff Madikians seeks redress for statements made about
him by a union leader in the context of his campaign to remove
her from office, and for the failure of the union (and the
employer) to do anything about it.  In his original complaint,
Madikians asserted claims of "retaliation" (Count I), defamation
(Count II), intentional infliction of emotional distress (Count
III), and breach of the duty of fair representation (Count IV).
As amended, the Complaint recasts Count I as a claim for
violation of the Labor-Management Reporting and Disclosure Act,

1. ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

judgment, as permitted by Rule 12(b).

and adds claims that APFA breached its collective bargaining
agreement (Count V) and its constitution (Count VI), as well as
claims of employment discrimination and vicarious liability
under Massachusetts law (Counts VII and VIII).[5]

Only Counts I, IV, V and VI purport to provide a basis for
federal jurisdiction.  None of them states a claim upon which
relief can be granted, however, and these counts must therefore
be dismissed.  That being the case, the Court should decline to
exercise supplemental jurisdiction over the remaining state law
claims, and the Complaint should accordingly be dismissed in its
entirety.

I.   COUNT I STATES NO CLAIM UNDER THE LMRDA

The Labor-Management Reporting and Disclosure Act of 1959
("LMRDA"), 29 U.S.C. §§ 401 et seq., is the principal federal
statute regulating the internal affairs of labor unions.  The
Complaint alleges in Count I that Madikians initiated a petition
to remove Carrigan from her office as APFA Boston Domestic
Chair; that Carrigan and others responded with defamatory
statements about him; and that Madikians notified APFA, which

1. ━━━━━━━━

[5] Counts IV, V and VI are brought against APFA alone, while
Counts I, II, III and VII name Carrigan and Milenkovic in
addition to APFA.  Count VIII is brought only against AA, which
is also named in Count II.  AA management employee Kelly Cox is
a defendant to Counts II and VII.

failed to take any action.  Complaint ¶¶ 27-30.  These
allegations state no claim under the LMRDA.

Analysis of this issue is complicated by the Complaint's
failure to specify what provisions of the LMRDA allegedly were
violated, but plaintiff's memorandum filed in opposition to
defendant Carrigan's initial motion to dismiss makes clear that
his claim is brought under LMRDA § 101(a)(1) and (a)(5), 29
U.S.C. § 411 (a)(1), (a)(5).  See Plaintiff's Opposition to
Julia Carrigan's Motion to Dismiss (Docket #12) ("Pl. Opp."), at
5.  Neither subsection provides a basis for the claim.

A.    Plaintiff's initial theory is that the Union
defendants violated LMRDA § 101(a)(1) – which inter alia
protects union members' equal right to vote in union elections
and referenda – "by arbitrarily and discriminatorily denying
members the right to vote for the officer of their choice."  Pl.
Opp. at 5.  But the factual allegations of the Complaint do not
support such an assertion.  There is no allegation that any APFA
member was denied the right to sign Madikians' petition, to vote
in any election or referendum, or otherwise to participate in
the union's affairs.

Rather, what is alleged is that Carrigan responded to
Madikians' political campaign against her with statements
critical of him.  The LMRDA does not disable union officials
from responding to their political rivals.  Criticism of

- 6 -

political opponents – without any threats of physical harm, legal proceedings, union discipline, or loss of membership benefits – does not constitute "retaliation" that violates the statute.  Commer v. Keller, 64 F. Supp. 2d 266, 271-72, 274 (S.D.N.Y. 1999) ("critical statements in the union newsletter and at chapter meetings" against union president's political rivals not actionable as infringement of rights protected by LMRDA); see also Martin H. Malin, Individual Rights Within the Union 71 (1988) ("Retaliatory acts that courts have found violated the statute include having a dissident arrested, refusing to restore a dissident to full membership status, refusing a dissident job referrals, and refusing to process a dissident's grievance.").

It is hardly surprising that criticism of a political opponent does not constitute actionable "retaliation," for to hold that union officers could not say anything critical of their political opponents would paralyze the internal union democracy that the LMRDA is designed to protect.  "Permitting such speech to be the basis of a cause of action would be anathema to the entire purpose" of the LMRDA.  Commer, 64 F. Supp. 2d at 274 (citing United Steelworkers v. Sadlowski, 457 U.S. 102, 112 (1982)).

The only allegation in the Complaint that goes at all beyond the unremarkable fact that Carrigan defended herself

against Madikians' campaign to remove her from office is the assertion that certain statements made by or in support of her were defamatory. But even assuming the truth of this allegation for purposes of the motion to dismiss, it is irrelevant to plaintiff's claim under the LMRDA, which does not provide union members with a right of action for defamatory statements made by the union or its officers. Harrison v. Local 54, AFSCME, 518 F.2d 1276, 1282 (3d Cir. 1975).

In short, the Complaint states no claim for violation of any right protected by LMRDA § 101(a)(1).

B.    Plaintiff's claim under § 101(a)(5) – based on alleged "retaliation against him for initiating the petition against Carrigan," Pl. Opp. at 5 – is easily disposed of as well. Section 101(a)(5) provides that a union member may not be "fined, suspended, expelled, or otherwise disciplined" without being afforded certain procedural safeguards. Madikians was not, of course, fined, suspended, or expelled from APFA, and he does not contend otherwise. Nor was he "otherwise disciplined," for the Supreme Court has held that,

> by using the phrase "otherwise discipline," Congress
> did not intend to include all acts that deterred the
> exercise of rights protected under the LMRDA, but
> rather meant instead to denote only punishment
> authorized by the union as a collective entity to
> enforce its rules.

Breininger v. Sheet Metal Workers Int'l Ass'n, 493 U.S. 67, 91
(1989).  Section 101(a)(5), the Court made clear, thus applies
only to an "established disciplinary process rather than ad hoc
retaliation by individual union officers."  Id. at 91-92; see
also Linnane v. General Electric Co., 948 F.2d 69, 70-72 (1st
Cir. 1991).[6]  No more than such "ad hoc retaliation" is alleged
here, and it states no claim under LMRDA § 101(a)(5).

    II.   COUNTS IV AND V STATE NO CLAIM FOR BREACH OF THE
          UNION'S DUTY OF FAIR REPRESENTATION OR OF THE
          COLLECTIVE BARGAINING AGREEMENT

    We address Counts IV and V together because the latter,
although purporting to state a claim for breach by APFA of its
collective bargaining agreement with AA, in fact comes closer to
articulating a duty of fair representation claim than does the
former.  We first explain why neither count states a claim for
breach of the duty of fair representation, and then address the
breach of contract claim that Count V purports to assert.

    A.   The duty of fair representation ("DFR") under federal
labor law is a judicially created doctrine that the Supreme
Court has held to be implicit in federal labor-relations

1. _____

    [6] In his memorandum, Madikians cites Fiori v. Truck Drivers,
Local 170, 354 F.3d 84 (1st Cir. 2004), for the proposition that
"a union cannot retaliate against a member for exercising
[ LMRDA] rights."  Pl. Opp. at 6.  But Fiori, unlike the instant
case, did involve union disciplinary proceedings, and it
provides no basis for plaintiff's invocation of § 101(a)(5) in
this context.

statutes – such as section 2, Fourth, of the Railway Labor Act ("RLA"), 45 U.S.C. § 152, Fourth[7] – that provide for certification of a union as the exclusive bargaining representative of all employees in a particular bargaining unit. Steele v. Louisville & Nashville R.R. Co., 323 U.S. 192 (1944). As the Supreme Court has explained:  "[A]s the exclusive bargaining representative of the employees in [a] bargaining unit, the Union ha[s] a statutory duty fairly to represent all of those employees, both in its collective bargaining with [the employer], . . . and in its enforcement of the resulting collective bargaining agreement . . . ."  Vaca v. Sipes, 386 U.S. 171, 177 (1967).

DFR claims in the latter context – the union's enforcement of the collective bargaining agreement – are typically "hybrid" claims combining an allegation that the employer breached the agreement with an allegation that the union failed to represent the employee fairly in enforcing the agreement through its grievance and arbitration procedures.  See DelCostello v. International Bhd. of Teamsters, 462 U.S. 151, 163-65 (1983); Miller v. USPS, 985 F.2d 9, 11 (1st Cir. 1993).

1. ────────────────────────────────────

[7] Labor relations in the airline industry are governed by the RLA.  See RLA § 201, 45 U.S.C. § 181.

There are three reasons why the Complaint states no claim that APFA violated its duty of fair representation.

1.    Nowhere in the Complaint is there any allegation that the employer violated the collective bargaining agreement.  But even if only the union is sued, a hybrid claim can succeed only if the employee pleads and proves both the employer's violation of the contract and the union's failure to represent him fairly in attempting to remedy that breach through the grievance procedure:  "[F]ailure to prove either one of them results in failure of the entire hybrid action."  Miller, 985 F.2d at 11.

2.    Article 28 of the collective bargaining agreement between APFA and AA (attached as Exhibit B), which governs dispute resolution and grievance procedures, contains specific procedures to be followed by a flight attendant wishing to initiate the grievance process.  For an "individual dispute" such as plaintiff's, the employee initiates the process by filing a Notice of Dispute ("NOD"), "in person or through an APFA representative," with AA's Manager of Flight Service.  Art. 28(A)(3)(a).  The NOD "must be signed by the individual Flight Attendant(s) affected who is filing the dispute" – or, if submitted through the union, must be accompanied by a signed authorization designating APFA as the employee's representative for purposes of the dispute.  Art. 28(A)(3)(b).

Nowhere does the Complaint allege that Madikians either filed a NOD or asked APFA to do so on his behalf.[8]  Having failed to take the necessary steps to initiate the grievance process, Madikians cannot be heard to complain that the union failed to represent him in that process.

3.   The DFR is intended to protect employees in a union workplace who have been "stripped of traditional forms of redress by the provisions of federal labor law."  Vaca, 386 U.S. at 182.  Thus, "[w]hen a labor contract provides, as many do, that the processing of employee-employer disputes under the grievance-arbitration procedure is to be handled solely by the

1.   ─────────────────

[8] The Complaint does assert that Madikians "notified defendant APFA of a dispute between him and employer-AA," ¶ 42, and "filed a grievance with employer AA," ¶ 46, but these assertions appear to relate to the allegations in ¶ 15 that Madikians asked AA to conduct an investigation into the events surrounding its approval of the "base brief" and that he "notified APFA of his complaint with AA."  An employee's request that the employer investigate certain facts, and his notification to the union that he has done so, obviously do not constitute an invocation of the dispute resolution procedures of the collective bargaining agreement.  Nor does the Complaint allege that Madikians requested that APFA take any particular action in connection with "his complaint with AA."

To the extent, moreover, that the Complaint could be read as asserting that Madikians initiated the grievance procedure under Article 28 of the collective bargaining agreement, that assertion is simply wrong as a factual matter.  See Declaration of Brett Durkin (attached as Exhibit G).  While we believe this issue can be resolved on the face of the Complaint, the Court can consider Mr. Durkin's declaration, should it deem it necessary to do so, by converting the motion to dismiss into a motion for summary judgment with respect to this issue.

union, individual employees are required to follow the contract's commands; they cannot seek redress on their own." Freeman v. Local Union No. 135, 746 F.2d 1316, 1321 (7th Cir. 1984).  When, on the other hand, the collective bargaining agreement leaves the individual employee free to pursue grievance procedures without the union's involvement, "the fundamental reason for applying the doctrine of fair representation does not exist."  American Fed'n of Gov't Employees v. FLRA, 812 F.2d 1326, 1328 (10th Cir. 1987).

That is the situation here.  Article 28(A) allows the employee to pursue the dispute resolution process on his or her own, with or without union representation:  "Employees covered by this Agreement may be represented at a Dispute Resolution Conference by such person as they may choose and designate . . . ."  Art. 28(A)(3)(b).  Indeed, as noted above, individual disputes may be initiated by the union – rather than by the individual employee – only with the employee's signed authorization.  Id.

Madikians was, therefore, free to pursue the dispute resolution process on his own, or with representation from another person of his choice, rather than relying on the union. Under these circumstances, "the fundamental reason for applying

1. ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

the doctrine of fair representation does not exist." American
Fed'n of Gov't Employees, 812 F.2d at 1328.

     B.   In Count V, Madikians attempts to recast his DFR claim
as a claim for breach of contract – that is, for breach by the
union of its collective bargaining agreement by failing to
represent Madikians in a grievance with the employer.  See
Complaint ¶¶ 46-48.  That is, however, a classic DFR claim,
which – like any hybrid DFR claim – is based on the union's
alleged failure to represent the employee in the grievance
process as set out in the collective bargaining agreement.

     Plaintiff's suggestion that the grievance procedures of the
collective bargaining agreement give rise to some obligation on
the part of the union other than the duty of fair representation
created by federal labor law – presumably some obligation under
state contract law – is untenable.  The duty of fair
representation "completely governs the duties owed by an
exclusive collective bargaining representative to those within
the bargaining unit," and thus completely preempts other causes
of action.  BIW Deceived v. Local S6, Indus. Union of Marine
Workers, 132 F.3d 824, 831 (1st Cir. 1997).  See also Condon v.
Local 2944, USWA, 683 F.2d 590, 595 (1st Cir. 1982) (any state-
law obligation preempted "unless it could be shown to arise
wholly outside the ambit of those obligations circumscribed by a
union's duty of fair representation under the collective

bargaining agreement").[9]  Plaintiff's attempt to recast his DFR
claim as an action for breach of contract thus has no merit.

### III. COUNT VI STATES NO CLAIM THAT APFA VIOLATED ITS CONSTITUTION

Count VI advances the claim that APFA breached a duty to
Madikians under its constitution, in violation of § 301 of the
Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185.  There
are two reasons why this claim must be dismissed.  First, the
Complaint fails to allege facts that constitute a breach of the
APFA Constitution.  Second, APFA's Constitution – unlike most
national union constitutions – is not a contract between labor
organizations, the breach of which is actionable under § 301.

A.   The allegations of Count VI are that Madikians filed
internal union disciplinary charges against Carrigan under
Article VII, § 2 of the APFA Constitution (attached as Exhibit
A), and that APFA breached its Constitution by failing to take
unspecified "steps" in response to those charges.  Complaint
¶ 55.  Article VII provides that upon receipt of charges, the

1. ────────────────

[9] While, as a matter of federal law, a union can through a
collective bargaining agreement assume a duty to the employees
it represents going beyond the duty of fair representation, an
employee claiming such a duty "must be able to point to language
in the collective-bargaining agreement specifically indicating
an intent to create obligations enforceable against the union by
the individual employees." United Steelworkers v. Rawson, 495
U.S. 362, 374 (1990). Nothing in Article 28 of the APFA-AA
agreement "creates rights directly enforceable by the individual
employees against the Union." Id.

APFA Executive Committee reviews them and makes an initial determination as to whether the charges are to be dismissed or referred to an arbitrator.  See Art. VII, § 3.  In particular, the Constitution specifically provides that "[c]harges may be deemed invalid and dismissed if the Executive Committee determines that . . . they fail to state a proper claim under Section 1 of this Article VII."  Art. VII, § 3(D).

Nowhere in the Complaint does Madikians allege that the Executive Committee failed to undertake this initial review; indeed, the Complaint appears to admit that plaintiff's charges were indeed reviewed – and rejected.  See Complaint ¶ 20 ("APFA informed Madikians that it would not accept his grievance [sic].").  And the June 10, 2004 letter informing the parties of the disposition of Madikians' charges, on which plaintiff relies in ¶ 20 of the Complaint, confirms that this was the case.  See Exh. E.

The Executive Committee's consideration and rejection of Madikians' charges against Carrigan is entirely consistent with its obligations under the Constitution.  Article VII gives APFA members the right to initiate charges against other members and officers, but it does not guarantee them success in that endeavor.  Madikians may not like the outcome of the Executive Committee's consideration of his charges against Carrigan, but he has no basis for asserting that the Executive Committee's

dismissal of his charges as invalid violated his rights under the union Constitution.

What is more, Madikians did not avail himself of his right under Article VII, § 3(D) of the Constitution to appeal the Executive Committee's dismissal of his charges to an arbitrator, who would have had the authority to overrule the Executive Committee's determination and order that the charges go forward. See Exh. E.  Madikians was required under Article VII, § 8 to exhaust his internal union remedies, and his failure to appeal the Executive Committee's decision would thus preclude recourse to courts under § 301, even if his claim had a factual basis. See Stevens v. Northwest Ind. Dist. Council, 20 F.3d 720, 731-32 (7th Cir. 1994); Ackley v. Western Conference of Teamsters, 958 F.2d 1463, 1477 (9th Cir. 1992).

B.    Quite apart from the merits of plaintiff's assertions on this question, it is clear that there is no federal jurisdiction for the claim that APFA violated its Constitution. LMRA § 301 grants the federal courts jurisdiction over "[s]uits for violation of contracts between an employer and a labor organization . . . or between . . . labor organizations."  29 U.S.C. § 185(a) (emphasis added).  The Supreme Court has held that § 301 can apply to suits for breach of union constitutions, insofar as these are "documents that prescribe the legal relationship and the rights and obligations between the parent

and affiliated locals." United Ass'n of Journeymen v. Local 334, 452 U.S. 615, 624 (1981); see also Wooddell v. International Bhd. of Elec. Workers, Local 71, 502 U.S. 93, 98-103 (1991). But the Court made clear that this holding applies "only if it is charged that the breach alleged violates a contract between two labor organizations." Id. at 98-99 n.3 (emphasis added).

The lower courts have uniformly declined to apply Journeymen and Wooddell when that condition is not met. See Korzen v. Local Union 705, Int'l Bhd. of Teamsters, 75 F.3d 285, 288 (7th Cir. 1996); Messina v. Local 1199, 205 F. Supp. 2d 111, 126 (S.D.N.Y. 2002); Johnson v. Kay, 742 F. Supp. 822, 828 n.1 (S.D.N.Y. 1990); International Bhd. of Elec. Workers, Local 640 v. Dueck, 148 F. Supp. 2d 955, 962-63 (D. Ariz. 2000); Commer v. District Council 37, 990 F. Supp. 311, 321 n.13 (S.D.N.Y. 1998). That is most commonly the case with local union constitutions, which are generally contracts only between the local union and its members, and do not govern the relationship between the local and its parent union or any other labor organization.

It is also true of the APFA Constitution. Because APFA – unlike most national and international unions – is a single entity that has no local unions with which it is contractually affiliated, the APFA Constitution contains no provisions governing the relationship between it and any other labor

organization.  See Exh. A.  It is, therefore, not a "contract
between labor organizations," and its alleged breach is
therefore not actionable under LMRA § 301.  Even if, therefore,
there were a factual basis for plaintiff's claim of breach of
the union Constitution, such a claim could be brought only as a
state-law contract action and would provide no basis for federal
jurisdiction over this lawsuit.

> IV.  ABSENT ANY VIABLE CLAIM ARISING UNDER FEDERAL
>      LAW, THE COURT SHOULD DECLINE TO EXERCISE
>      SUPPLEMENTAL JURISDICTION OVER PLAINTIFF'S STATE
>      LAW CLAIMS

There remain plaintiff's claims under Massachusetts law,
articulated in Counts II, III and VII, for defamation,
intentional infliction of emotional distress, and employment
discrimination on the basis of plaintiff's sexual orientation.
(Count VIII does not concern the Union defendants, but it too is
based solely on state law.)  If, as we urge, the Court dismisses
all of the Complaint's federal claims, the assertion of
supplemental jurisdiction over these state law claims would be
inappropriate.

The federal supplemental jurisdiction statute provides that
the Court "may decline to exercise supplemental jurisdiction
over a claim" if, inter alia, "the district court has dismissed
all claims over which it has original jurisdiction."  28 U.S.C.
§ 1367(c)(3).  That is the proper course here.  "When federal

claims are dismissed before trial, state claims are normally dismissed as well." McInnis-Misenor v. Maine Med. Ctr., 319 F.3d 63, 74 (1st Cir. 2003); see also O'Connor v. Commonwealth Gas Co., 251 F.3d 262, 272 (1st Cir. 2001) ("Courts generally decline to exercise supplemental jurisdiction over state claims if the federal predicate is dismissed early in the litigation."); Camelio v. American Fed'n, 137 F.3d 666, 672 (1st Cir. 1998) (setting out relevant considerations and concluding that "the balance of competing factors ordinarily will weigh strongly in favor of declining jurisdiction over state law claims where the foundational federal claims have been dismissed at an early stage in the litigation").

Here, the federal claims will – if the Court agrees with our analysis above – be dismissed at a very early stage, even before the pleadings are closed.  As no countervailing consideration is apparent, the Court should decline to exercise supplemental jurisdiction over plaintiff's state law claims.

CONCLUSION

For the reasons set forth above, the Complaint should be dismissed.

Respectfully submitted,


_____/s/ David B. Rome_____
DAVID B. ROME, BBO #426400
Pyle, Rome, Lichten, Ehrenberg
  & Liss-Riordan, P.C.
18 Tremont Street, Suite 500
Boston, Massachusetts 02108
(617) 367-7200
(617) 367-4820 (fax)

JOHN M. WEST (pro hac vice)
Bredhoff & Kaiser, P.L.L.C.
805 Fifteenth Street, N.W.
Suite 1000
Washington, DC 20005
(202) 842-2600
Dated:  March 31, 2005        (202) 842-1888 (fax)

Counsel for the Union Defendants

CERTIFICATE OF SERVICE

I hereby certify that the foregoing Union Defendants'
Memorandum in Support of Motion to Dismiss Second Amended
Complaint was served by first-class mail, postage prepaid, this
31st day of March, 2005, as follows:

David D. Nielson
Daniel J. Ciccariello
15 Cottage Avenue, Suite 301
Quincy, MA 02169

Michael A. Fitzhugh
Fitzhugh, Parker & Alvaro LLP
155 Federal Street
Suite 1700
Boston, MA 02110-1727

/s/ David B. Rome
David B. Rome

EXHIBIT A



# THE
# CONSTITUTION
## OF THE
# ASSOCIATION
## OF
# PROFESSIONAL
# FLIGHT
# ATTENDANTS

*Ratified by the APFA Membership*
*September 11, 1991*
*and*
*Amended by the APFA Membership*
*October 24, 1994*
*and*
*June 13, 1995*

# APFA CONSTITUTION

## TABLE OF CONTENTS

TITLE PAGE
TABLE OF CONTENTS
ARTICLE 1   General.................................1
Sec. 1   Name..........................................1
Sec. 2   Objectives of the APFA..............1
Sec. 3   Insignia......................................2
Sec. 4   Office Location..........................2
Sec. 5   Duration.....................................2
Sec. 6   Parliamentary Law.....................2
Sec. 7   Definitions..................................2
Sec. 8   Requirements..............................6

ARTICLE II   Membership.........................7
Sec. 1   Eligibility for Membership..........7
Sec. 2   Obligations of Members..............7
Sec. 3   Bill of Rights of Members............7
Sec. 4   Classification of Membership—Active...7
Sec. 5   Classification of Membership—Inactive...8
Sec. 6   Membership Credentials...............9

ARTICLE III   Government of the APFA.....10
Sec. 1   The APFA Constitution................10
Sec. 2   Governing Bodies and Policies....10
Sec. 3   Board of Directors.......................11
Sec. 4   Executive Committee...................14
Sec. 5   Teleconference Meetings.............19
Sec. 6   Officers........................................21
Sec. 7   Base Councils/Base Representatives....25
Sec. 8   OAL Operation Advisory Panel....28

ARTICLE IV   Finances.............................29
Sec. 1   Dues and Assessments................29
Sec. 2   Initiation Fee..............................29
Sec. 3   Delinquent Dues, Assessments and Initiation Fee(s).....29
Sec. 4   Financial Procedures...................30
Sec. 5   Bonding......................................31
Sec. 6   Savings/Reserves........................31
Sec. 7   Retention of Records...................31

ARTICLE V   Expenses and Salaries..........32
Sec. 1   Expenses.....................................32
Sec. 2   Compensation for National Officers and Division Representatives...32
Sec. 3   Other Compensation....................32

ARTICLE VI   Nominations and Elections ......33
Sec. 1   Nominations.................................33
Sec. 2   Willingness to Serve....................33
Sec. 3   Terms of Office............................34
Sec. 4   Eligibility to Vote........................34
Sec. 5   Balloting.....................................34
Sec. 6   Election Contest for Office...........36
Sec. 7   Vacancy in Office, National Officers...37
Sec. 8   Vacancy in Office, Base Representatives...38

ARTICLE VII   Hearings and Disciplinary Procedures.......40
Sec. 1   Grounds for Charges....................40
Sec. 2   Filing of Charges.........................40
Sec. 3   Review of Charges.......................41
Sec. 4   Suspension from Office................42
Sec. 5   Appointment of the Article VII Arbitrator....43
Sec. 6   Jurisdiction and Authority of the Article VII Arbitrator.....43
Sec. 7   Costs...........................................44
Sec. 8   Internal Remedies........................44

ARTICLE VIII   Removal of Officers and Representatives....45
Sec. 1   Removal of National Officers........45
Sec. 2   Removal of a Base Representative....45
Sec. 3   Removal of an Elected Member of a Negotiating Committee........46
Sec. 4   Removal Petition..........................46
Sec. 5   Retention of Records....................47
Sec. 6   Appeal.........................................47

ARTICLE IX   Administrative and Committee Positions.....48
Sec. 1   Eligibility....................................48
Sec. 2   Nomination and Approval Process....48
Sec. 3   Duration of Appointment..............49
Sec. 4   Division Representatives...............50
Sec. 5   National Coordinators...................50
Sec. 6   National Balloting Committee (NBC)....51
Sec. 7   Budget Committee.......................51
Sec. 8   Other Appointments.....................51
Sec. 9   Vacancy......................................52
Sec. 10  Removal......................................52

# ARTICLE I
# GENERAL

## SECTION 1. NAME:

The name of the organization shall be the Association of Professional Flight Attendants. Whenever the acronym "APFA" is used it shall refer to and mean the Association of Professional Flight Attendants. Whenever the words "union" or "association" are used in this Constitution, they shall refer to and mean the Association of Professional Flight Attendants.

## SECTION 2. OBJECTIVES OF THE APFA:

A.  To operate a non-profit employee-representing association.

B.  To protect the individual and collective rights of the members of the APFA and to promote their professional interest and image.

C.  To establish and to exercise the right of collective bargaining for the purpose of making and maintaining employment agreements covering rates of pay, rules and working conditions for the members of the APFA.

D.  To promptly settle disputes and grievances which may arise between members and their employer.

E.  To determine and negotiate, and continue to seek to improve rates of pay, rules and working conditions, and to maintain uniform principles of seniority and the perpetuation thereof.

F.  To sponsor and support passage of legislation and appropriate regulations which may be beneficial to the Flight Attendant profession.

G.  To sponsor and support regular training and continuing education programs to enhance the professional skills of officers and representatives of the APFA.

H.  To disseminate information to enhance the professional status of the membership.

I.  To levy dues and assessments upon the membership with which to provide the funds necessary to carry on the business and objectives of the APFA, provided however, that increases in dues and the levying of assessments shall be made only in accordance with this Constitution and applicable Federal law.

J.  To purchase, hold, acquire, lease, mortgage and convey real estate and personal property of every kind, nature and description, in any state, the District of Columbia, any territory or possession of the United States and any country for the convenient conduct and execution of the Association's business, including the purchasing,

ARTICLE I – GENERAL

1

ARTICLE X   Negotiating Committees..............53
Sec. 1   Eligibility................................................53
Sec. 2   Definition and Duties.........................53
Sec. 3   Terms...................................................53
Sec. 4   Chair of the Negotiating Committee.....54
Sec. 5   Composition of Negotiating Committee....54
Sec. 6   Vacancy...............................................56
Sec. 7   Removal...............................................56

ARTICLE XI   Contract Ratification and Strike Procedures...................................57
Sec. 1   Ratification Process...........................57
Sec. 2   Strike Procedures.............................58

ARTICLE XII   Affiliations, Mergers, Federations or Charters......................................59

ARTICLE XIII   Savings Clause................................60

leasing and maintaining of equipment, buildings, and improvements which may be necessary, directly or indirectly, in connection with any of the business and objectives of the Association, with the approval of the Executive Committee, subject to approval by the Board of Directors.

K. To do any and all other acts consistent with and in furtherance of the objectives and purposes herein.

## SECTION 3. INSIGNIA:

The official insignia of the APFA shall be:



## SECTION 4. OFFICE LOCATIONS:

The location(s) of the office(s) and headquarters of the APFA shall be determined by the Board of Directors and shall only be changed by a two-thirds (2/3) majority of the Voting Board of Directors.

## SECTION 5. DURATION:

The duration of the APFA shall be perpetual, or until it is dissolved as provided for in this Constitution. In the event of dissolution of the APFA, the National Officers of the Association shall act as agents for the membership and shall dispose of all of the physical assets of the APFA upon directive from the Board of Directors consistent with Federal and State law. All of the liquid assets shall be prorated to the membership on record in good standing of the APFA at the time of such dissolution in proportion to the monies being paid by such members, less any indebtedness, provided that any amounts that may be paid to the APFA for insurance or other benefits shall be dealt with separately and prorated only to those members who contributed to such funds and in proportion to their individual contributions.

## SECTION 6. PARLIAMENTARY LAW:

All questions on parliamentary law and rules of order shall be decided according to the principles set forth in the most current published edition of Robert's Rules of Order, revised, except for those which are expressly modified by this Constitution.

## SECTION 7. DEFINITIONS:

As used in this Constitution, the following words or terms shall mean:

ARTICLE I – GENERAL

2

A. "Annual Convention" or "Special Convention" means a meeting of the APFA Board of Directors wherein the elected Delegates are empowered to elect and/or remove Ad Hoc Members of the Executive Committee.

B. "Base" means one or more airports or co-terminals located within a commonly recognized metropolitan area to which APFA members have been assigned by their employer(s) for administrative purposes and to which members' flying assignments have been allocated.

(1) This Constitution provides for and the APFA Board of Directors shall recognize the following types of bases:

a. A "domestic base" means a base containing an American Airlines domestic operation as defined in K.(1) of this Section 7.

b. An "international base" means a base containing an American Airlines international operation as defined in K.(1) of this Section 7.

c. A "commuter base" means a base containing an American Airlines commuter operation as defined in K.(1) of this Section 7.

(2) A base may include a military operation, as defined in K.(1) of this Section 7 and/or a charter operation, as defined in K.(1) of this Section 7, for representational purposes.

(3) A base may also include one or more "Other Airline (OAL) Operation(s)", as defined in K.(2) of this Section 7, for representational purposes. An OAL Operation shall be assigned to a base(s) by action of the Executive Committee, subject to approval by the Board of Directors.

C. "Delegate" means a Base Chair who has been elected by secret ballot by the membership of a base, or who has been duly elected by virtue of running unopposed, as a representative to the Annual or Special Conventions for the specific purpose of electing and/or removing Ad Hoc Members of the Executive Committee; or a Vice Chair who has been elected by secret ballot by the membership of a base, or who has been duly elected by virtue of running unopposed, to serve as such a representative in the absence of the Base Chair.

D. "Duly Designated Member" means an active member in good standing of the APFA at a meeting or session of the Board of Directors for the purpose of representing for that meeting or session, or for part of that meeting or session, one of the regular Voting Board Members.

ARTICLE I – GENERAL

3

E. "Duty" means an obligation of performance, care or observance which rests upon a person in any position or fiduciary capacity with or as a member of the APFA.

F. "Insignia" means the official emblem of the APFA.

G. "Majority of the Voting Board of Directors" means fifty percent (50%) plus one (1) of the total "Voting Board of Directors" as defined in Article III, Section 3.B.(2) of this Constitution.

H. "May" or "Should" means a discretionary or permissive act or directive.

I. "Meeting" means an assembly of APFA members or officers or representatives for a common purpose. A meeting may consist of one or more sessions.

J. "Must" or "Shall" or "Will" means a word of command which always has a compulsory meaning denoting obligation; imperative and mandatory.

K. "Operation" means a type of flying shared by members of the APFA. This Constitution provides for and the APFA Board of Directors shall recognize the following types of "operations".

(1) "American Airlines (AAL) Operation" means an operation where APFA members are covered by a Collective Bargaining Agreement negotiated by the APFA on behalf of Flight Attendants employed by American Airlines (AAL). Such Collective Bargaining Agreement shall be used to define the following AAL Operations:

   a. "Domestic Operation"
   b. "International Operation"
   c. "Commuter Operation"
   d. "Military (MAC/CRAF) Operation"
   e. "Charter Operation"

(2) "Other Airline (OAL) Operation" means an operation wherein flying is performed by a subsidiary or affiliated airline owned and/or operated by AMR Corporation, and/or flying is performed for or on behalf of American Airlines or AMR Corporation by an independently-owned airline. The Flight Attendant employees of an OAL Operation may be represented by the APFA, but are not covered by a Collective Bargaining Agreement negotiated by the APFA on behalf of Flight Attendants employed by AAL.

L. "Petition" means a written document stating a purpose and carrying the printed names, bases, employee numbers and the corresponding signatures of members in good standing of the APFA.

M. "Privilege" means a benefit or advantage enjoyed by a person in any position or fiduciary capacity with or as a member of the APFA.

N. "Proxy" means a written authorization from one member of the Board of Directors to another, or from one member of the Executive Committee to another, for the purpose of exercising a vote at any meeting.

O. "Responsibility" means an obligation to answer for a duty to act or a failure to act by a person in any position or fiduciary capacity with or as a member of the APFA.

P. "Resume" means a summary of a members achievements or qualifications offered in support of such member's request to be considered for appointment to a position with the APFA.

Q. "Rights" means those powers and/or privileges inherent to a person in any position or fiduciary capacity with or as a member of the APFA.

R. "Satellite" means a location where an airport or co-terminals serve a city outside of, or distanced from, any commonly recognized metropolitan area that is served by an APFA base as defined by this Constitution. Flying assignments undertaken from a satellite location shall be considered a part of a specific operation of a base.

(1) A satellite, as provided in a Collective Bargaining Agreement negotiated by the APFA on behalf of Flight Attendants employed by AAL, may be linked to and considered one of the parts of a base for representational purposes, and/or

(2) A satellite may be linked to and considered one of the parts of the OAL Operation assigned to a base for representational purposes by action of the Executive Committee, subject to approval by the Board of Directors.

S. "Session" means a period of time within any one day during which APFA members are assembled and engaged in the transaction of the business of the APFA.

T. "Subject to" means that a decision is effective when made and will be deemed approved unless and until reversed by the designated body.

U. "Vacancy in the office" or "Vacancy in the position" means the death, resignation, removal or incapacitation of an officer or representative that renders him/her unable to perform the duties of the office or the position.

V. "Willingness to Serve (WTS)" means written notification that a member uses for self-nomination for any elected position or to nominate another member for any elected position.

## SECTION 8. REQUIREMENTS:

A. In order to be elected or appointed to any office or any position with the APFA, any member must be an active member in good standing as defined in Article II, Sections 4.A and 4.B of this Constitution.

B. All APFA officers and representatives shall be required to remain active members in good standing.

C. All APFA officers and representatives shall enforce this Constitution and Collective Bargaining Agreement(s) negotiated by the APFA.

D. All APFA officers and representatives shall carry out the resolutions and/or policy decisions as set forth and established by the Board of Directors.

E. All APFA officers and representatives shall be required to attend and participate in training and continuing education programs to improve the quality of representation for the members of the APFA.

# ARTICLE II
# MEMBERSHIP

## SECTION 1. ELIGIBILITY FOR MEMBERSHIP:

Any person hired as a Flight Attendant by an airline where the APFA is the recognized Bargaining Agency for the Flight Attendant employee group at that airline shall be eligible to join and maintain membership in the APFA as hereinafter provided.

## SECTION 2. OBLIGATIONS OF MEMBERS:

Members of the Association do accept and agree to abide by this Constitution of the APFA as it is in force or as it may be altered, added to, deleted from or amended in accordance with the provisions of this Constitution. Ignorance of this Constitution will not be considered a proper excuse for any violation of the provisions contained herein. Inherent in the rights, privileges, duties and responsibilities of membership in the APFA, is the obligation to responsibly exercise these rights, privileges, duties and responsibilities.

## SECTION 3. BILL OF RIGHTS OF MEMBERS:

A. All members of the APFA shall have the right of free speech, freedom of assembly and freedom to dissent.

B. All members of the APFA shall have access to all administrative and financial reports and records except as provided in Section 5,B,(1) of this Article II.

C. All members of the APFA shall have the right to individual privacy.

D. All members of the APFA shall have the right to due process and equal representation.

E. All members of the APFA shall have full equality of rights and shall not be discriminated against because of national origin, race, religion, creed, age, sex or sexual orientation.

## SECTION 4. CLASSIFICATION OF MEMBERSHIP – ACTIVE:

A. An Active Member is a Flight Attendant who has a dues obligation to the APFA in accordance with this Constitution, except as provided herein.

B. Membership Status– Good Standing:
(1) The rights and privileges of a member in good standing shall include, but not be limited to:
a. attending union meetings;
b. voting on all matters brought before the membership;
c. voting in elections for officers or base representatives of the APFA; and
d. running for an elected position, or holding an elected or appointed position with the APFA.

(2) A member, regardless of flight status, shall be considered in good standing and shall maintain all rights and privileges of the APFA so long as financial obligations are met pursuant to this Article II and Article IV of this Constitution.

(3) A member in good standing will remain in good standing and will be exempt from his/her financial obligation to the APFA when the member is in an unpaid status from his/her employer in excess of thirty (30) consecutive days by:

a. termination by the employer and seeking reinstatement, as provided for in the applicable Collective Bargaining Agreement or through an administrative or judicial proceeding;

b. suspension/withhold by the employer and seeking reinstatement;

c. unpaid sick status;

d. hardship as approved by the Executive Committee or by the Board of Directors;

e. approved military leave of absence; and/or

f. furlough by the employer.

(4) A member in good standing who is on any leave of absence from his/her employer for reasons not listed in (3),a through (3),f above shall remain a member in good standing and shall be dues obligated, but shall not be required to pay dues on a monthly basis. Upon return to payroll, his/her dues obligation shall become payable pursuant to this Article II and Article IV of this Constitution.

C. **Membership Status – Bad Standing:** A member in good standing shall lose the rights, privileges, duties and responsibilities of good standing membership status and shall be considered in bad standing:

(1) should his/her dues obligation be in arrears for more than sixty (60) days; and/or

(2) after a final and binding determination by the Article VII Arbitrator pursuant to the procedures of Article VII of this Constitution, whereby the member's status has been changed to bad standing.

## SECTION 5. CLASSIFICATION OF MEMBERSHIP –INACTIVE:

A. An **Inactive Member** is a person who has no dues obligation to the APFA in accordance with this Constitution, except as provided in (3) below, by virtue of the following:

(1) Retired Members: Those members who are retired from a position as a Flight Attendant with an airline represented by the APFA, and who were members in good standing at the time of their retirement.

(2) Honorary Members: Those members upon whom Honorary Membership has been conferred by the Board of Directors.

(3) Inactive/Dues Obligated Members: Those members who accept a paid position with their employer outside of the Flight Attendant craft and class. Such members shall remain dues obligated, but shall not be required to pay dues on a monthly basis. Upon return to Flight Attendant status, their dues obligation shall become payable pursuant to this Article II and Article IV of this Constitution.

B. Inactive members shall have the right to attend Association meetings and participate in Association activities except as provided in (1) and (2) below.

(1) Inactive members shall not have the right to vote in any Association balloting, be appointed to any Association position, run for any Association office, or inspect the APFA records.

(2) Honorary members and Inactive/Dues Obligated members may be restricted from participation in Association sponsored programs where specific requirements prohibit such participation.

## SECTION 6. MEMBERSHIP CREDENTIALS:

Every member of the APFA shall be provided a membership card and pin. The card shall contain a space for the name of the member, shall carry the signature of an officer or officers, and shall bear the official insignia of the APFA.

# ARTICLE III
## GOVERNMENT OF THE APFA

**SECTION 1. THE APFA CONSTITUTION:**
This Constitution shall be the supreme law of the APFA.

A. This Constitution may be recommended to the membership for alteration, addition, deletion or amendment by:

(1) a two-thirds (2/3) majority of the Voting Board of Directors, or

(2) a petition(s) submitted in accordance with the provisions of this Constitution carrying signatures numbering twenty-five percent (25%) or more of active members in good standing. The office of the Treasurer must, within thirty (30) days following receipt of such petition(s), verify that the names on the petition(s) are of active members in good standing and must issue written certification to the National Balloting Committee (NBC) authorizing a special balloting of the membership to begin no later than thirty (30) days following such certification.

B. An affirmative vote by a majority of those active members in good standing who return valid ballots shall be required for the passage of any proposed alteration, addition, deletion or amendment.

**SECTION 2. GOVERNING BODIES AND POLICIES:**

A. The governmental powers of the APFA shall be vested in the Board of Directors, and the officers and representatives of the APFA in accordance with the provisions of this Constitution. The final control of the APFA shall be vested in the membership.

B. The APFA shall establish an Executive Committee. This Constitution shall confer and vest in the Executive Committee the rights, privileges, duties and responsibilities to act as agent for the Board of Directors in accordance with the provisions of this Constitution.

C. The APFA shall establish a Policy Manual to incorporate those policies, procedures, rules and regulations affecting the governing bodies, officers, representatives and members of the APFA in accordance with this Constitution. The Policy Manual shall include but not be limited to the following: trip removal policy, expense policy, officer salaries, budget policy, headquarters policy, and policies governing conventions and meetings of the Board of Directors and the Executive Committee.

**SECTION 3. BOARD OF DIRECTORS:**

A. The Board of Directors is authorized and empowered to take any and all lawful action consistent with this Constitution to safeguard and protect the APFA, and the rights, privileges, duties and responsibilities of the officers, representatives and members of the APFA. The Board of Directors is authorized to interpret this Constitution and to establish, prescribe and adopt such other policies which may be consistent with this Constitution as required for the direction and management of the affairs of the APFA.

B. Organization:

(1) The Board of Directors shall consist of the President, Vice President, Secretary, Treasurer, and each Base Chair.

(2) The Voting Board of Directors shall consist of each Base Chair.

   a. The President, Vice President, Secretary and Treasurer shall have a voice but no vote at a Board of Directors meeting, except that:

   b. When all voting members are present, and when a vote on an issue by the voting members results in a tie, with no abstentions, the President must cast the deciding vote.

(3) The Delegate(s) shall be the Base Chairs (or in their absence, the Vice Chairs) who have been elected by the membership of their bases to serve as delegates to the Annual or Special Convention(s) with the authority to elect or remove Ad Hoc Members of the Executive Committee.

C. Annual Training: The Board of Directors shall participate in an annual training session.

D. Annual Convention: The Board of Directors shall convene once a year as the Annual Convention of the APFA on a date and at a location determined by the President. The Annual Convention shall be held no earlier than ninety (90) days and no later than fifteen (15) days prior to the expiration of the current fiscal year.

E. Special Meetings/Special Conventions: The Board of Directors may convene for special meetings or special conventions.

(1) A Special Meeting or a Special Convention may be called by the President, or by four (4) members of the Executive Committee, or by a majority of the Voting Board of Directors by written request to the Secretary.

(2) The Special Meeting or the Special Convention must convene no later than fourteen (14) days following receipt by the Secretary of such request.

F. **Quorum:** In order to conduct the business of the APFA, including business conducted by Teleconference Meeting, a quorum or more must be present. A quorum of the Board of Directors shall consist of two-thirds (2/3) of the total Board of Directors.

G. **Agenda:** There shall be no restrictions on business conducted at any convention or meeting of the Board of Directors provided however, that no business shall be acted upon without:
(1) ten (10) days notice of the agenda in writing to the total Board of Directors prior to such meetings, or
(2) approval by a majority of the Voting Board of Directors who are present at the meeting.

H. When more than a quorum is present at any convention or meeting of the Board of Directors, all issues shall be decided by a majority of the Voting Board of Directors, except as provided for in this Constitution. In the event that only a quorum is present, all issues shall be decided by a two-thirds (2/3) majority vote of the quorum, except as provided for in this Constitution.

I. At any convention or meeting, except as provided for in Section J below, each Base Chair shall be entitled to:
(1) one (1) vote;
(2) issue his/her proxy in writing to another Board member, provided:
  a. The member must be present at the meeting before giving a proxy to another member,
  b. A proxy shall not be exercised when the member is present at the table,
  c. A proxy shall not be exercised in a secret ballot; and
  d. A proxy shall be valid until the conclusion of the day's business;
(3) hold one (1) written proxy.
(4) Each Base Chair may duly designate.
  a. In the event that a Base Chair cannot attend all or part of a Board meeting, the Vice Chair shall attend in his/her absence. Should there be no Vice Chair available to fill the seat of the Base Chair at the Board meeting, the Base Chair shall first designate from the Base Council, then from the base at large.
  b. Such designation shall be in writing, signed by the Base Chair, and given to the Secretary prior to any vote by the designee.
(5) The Vice Chair or designee shall have the same powers as the Base Chair at any convention or meeting except as provided in J of this Section 3.

J. Only for the purposes of electing or removing an Ad Hoc Member of the Executive Committee at the Annual or Special Convention(s), each Delegate, as defined in Article I, Section 7,C of this Constitution and Section 3,B,(3) of this Article III, shall be entitled to:
(1) one (1) vote;
(2) issue his/her proxy in writing to another Delegate, provided that such proxy shall not be exercised when the Delegate is present at the table;
(3) hold one (1) written proxy ; and
(4) in this instance only:
  a. the Delegate issuing the proxy need not be present at the Annual or Special Convention to issue the proxy, and
  b. the proxy may be used only for the secret ballot vote to elect or remove Ad Hoc Members of the Executive Committee.

K. **Minority Report:** Whenever two or more members of the total Board of Directors do not agree with the opinion of the majority on any matter, they shall have the right to submit a written report concerning that matter to the Secretary. The Secretary must then append that minority report to the minutes of the appropriate Board of Directors convention or meeting.

L. **Jurisdiction and Duties:** The Board of Directors shall have the following rights, privileges, duties and responsibilities, and at the Annual Convention must:
(1) set policy for the APFA;
(2) review, and if necessary, modify the APFA Policy Manual;
(3) approve the annual budget;
(4) set annual goals for the APFA;
(5) assign to each Ad Hoc Member of the Executive Committee those Chairs with whom s/he shall maintain regular contact and communication;
(6) determine the number of administrative, committee, and support positions as may be required under Article IX of this Constitution to meet the needs of the membership;
(7) nominate and appoint members of the National Balloting Committee and Budget Committee when appointments are appropriate;
(8) review the base assignment of any OAL Operation or satellite and, when necessary, alter operation or satellite assignments.

While not limited to the following, the Board of Directors may:
(9) review the dues structure of the Association;

(10) override the Executive Committee rejection of a proposed Collective Bargaining Agreement;

(11) establish the Divisions, and the Vice President will assign the Division Representatives,

(12) establish, combine, delete or change the duties, responsibilities and specific job descriptions of administrative, committee and support personnel in accordance with the provisions of Article IX of this Constitution for budgetary or policy reasons, taking into consideration the recommendations of the National Officers;

(13) direct special mailings to the membership;

(14) recognize the accomplishments and achievements of members of the APFA;

(15) give annual awards;

(16) confer Honorary membership;

(17) approve hardship dues forgiveness and review other hardship requests that may be brought before the Board;

(18) appoint special committees;

(19) appoint or change the Article VII Arbitrator or Alternate Article VII Arbitrator(s);

(20) approve Article VII administrative changes;

(21) suspend officers or representatives pursuant to Article VII.

(22) take any and all appropriate action deemed necessary by the Board and in accordance with this Constitution to promote the welfare of the members of the APFA, and this shall include the right to reverse an action or decision of the Executive Committee, National Officers or other representatives, except as provided in this Article III, Section 4,J,11 or Article VII, Section 6,B of this Constitution.

M. The Delegates at the Annual Convention shall nominate and elect Ad Hoc Members of the Executive Committee as terms expire or when a vacancy occurs. At the Annual or Special Convention(s), Delegates may remove Ad Hoc Members and may nominate and elect Ad Hoc Members to fill a vacancy for the balance of the unexpired term.

## SECTION 4. EXECUTIVE COMMITTEE:

A. The Executive Committee shall act as the agent for and on behalf of the Voting Board of Directors, and shall interpret this Constitution, subject to the approval of the Board of Directors.

B. Organization: The Executive Committee shall consist of the President, Vice President, Secretary, Treasurer and five (5) Ad Hoc Members.

C. Quarterly Meetings: The Executive Committee shall convene for the transaction of business at least once each quarter on a date and at a location determined by the President.

D. Special Meetings: The Executive Committee may convene for special meetings.

(1) A Special Meeting of the Executive Committee may be called by the President or by four (4) members of the Executive Committee by request to the Secretary.

(2) The Special Meeting must convene within seven (7) days following receipt by the Secretary of such request.

E. Quorum: In order to conduct the business of the APFA, including business conducted by Teleconference Meeting, a quorum or more must be present. Seven (7) members of the Executive Committee shall constitute a quorum.

F. Agenda: There shall be no restrictions on business conducted at any meeting of the Executive Committee provided however, that no business shall be acted upon without:

(1) three (3) days notice of the agenda in writing to the Executive Committee prior to such meeting, or

(2) approval by a majority of the members of the Executive Committee who are present at the meeting.

G. All issues shall be decided by five (5) or more members of the Executive Committee voting in the affirmative except as provided for in this Constitution.

H. Each member of the Executive Committee shall be entitled to:

(1) one (1) vote;

(2) issue his/her proxy in writing to another member of the Executive Committee, provided:

a. The member must be present at the meeting before giving a proxy to another member,

b. A proxy shall not be exercised when the member is present at the table,

c. A proxy shall not be exercised in a secret ballot;

d. A proxy shall be valid until the conclusion of the agenda's business;

(3) hold one (1) written proxy.

I.  A member of the Executive Committee shall not be entitled to duly designate another person to act for such member at any meeting of the Executive Committee except as provided for in Article VII, Section 4,C of this Constitution.

J.  Ad Hoc Members of the Executive Committee:

(1)  At least sixty (60) days prior to the Annual Convention, the Secretary, via the official publication of the APFA, shall issue a Willingness-to-Serve (WTS) notification to advise the membership that the Delegates will elect Ad Hoc Member(s) of the Executive Committee.  A WTS notification may be returned to the Secretary at any time prior to the Annual Convention for distribution to the Board of Directors.

(2)  Prior to the secret ballot election or removal of Ad Hoc Members at the Annual or Special Convention(s), the Secretary shall read the names of those Base Chairs or Vice Chairs who have been elected as Delegates to the Annual or Special Convention(s) as certified by the National Balloting Committee. The Secretary shall record the names of those Delegates present and/or the names of those Delegates issuing or holding a proxy, as provided for in Section 3,J of this Article III. Only those Delegates recorded by the Secretary may participate in the vote to elect or remove the Ad Hoc Members at that Convention.

(3)  Any member of the Board of Directors may nominate an individual to serve as an Ad Hoc Member. In nominating and electing Ad Hoc Members, the Board shall not be limited to those individuals nominated by WTS notifications.

(4)  Nominations shall be put forward during the first day of the Annual Convention, and elections shall begin on the second day.  At a Special Convention, nominations and elections may take place on the same day. In no event may a Convention adjourn with a vacancy remaining in any position of Ad Hoc Member.

(5)  Ad Hoc Members shall be elected to serve staggered three (3) year terms by a two-thirds (2/3) majority vote of the recorded Delegates by secret ballot. If no candidate receives a two-thirds (2/3) majority vote in the initial balloting, Delegates may nominate additional candidates in accordance with J,(3) above.

(6)  The balloting process for the election or removal of Ad Hoc Members at the Annual or Special Convention(s) shall be conducted by members of the National Balloting Committee.

(7)  Acceptance of a position as an Ad Hoc Member shall constitute acceptance of a position with the APFA for the purposes of this Constitution.  An Ad Hoc Member may perform additional duties as deemed appropriate by the National Officers, the Board of Directors or the Executive Committee so long as such duties do not constitute acceptance of an additional position with the APFA as defined in Section 6 or Section 7 of this Article III, or in Article IX, Sections 4, 5, 6 or 7 of this Constitution.

(8)  Ad Hoc Members shall not be full time salaried positions, but shall be compensated for expenses, pay continuance and/or trip removal in accordance with applicable provisions contained in Article V of this Constitution and in the APFA Policy Manual.

(9)  An Ad Hoc Member may be removed from his/her position only at a Convention by a two-thirds (2/3) majority vote of the recorded Delegates by secret ballot, with or without cause.

(10)  In the event of a vacancy in the position of Ad Hoc Member, or in the event an individual declines the position after the Annual Convention has adjourned, the Executive Committee shall function with a vacancy so long as at least a quorum of the Executive Committee exists until the next Annual or Special Convention. At that Convention, the recorded Delegates shall elect a new Ad Hoc Member to fill the vacancy and complete the balance of the unexpired term.

(11)  Ad Hoc Members shall function, when necessary, as the APFA Grievance Appeal Panel to review decisions of the Grievance Review Committee.

a.  When the Grievance Review Committee decides to withdraw a grievance, such decision may be appealed by the grievant to the Grievance Appeal Panel.

b.  The decision of the Grievance Appeal Panel shall be final and binding and not subject to reversal by the Executive Committee or the Board of Directors.

K. Jurisdiction and Duties: The Executive Committee shall be charged with the rights, privileges, duties, and responsibilities to:

(1) assure compliance with the policies as set forth and established by the Board of Directors;

(2) act on business or matters presented to the Executive Committee by any member of the Board of Directors or by administrative or committee personnel;

(3) communicate on a regular and consistent basis with members of the Board of Directors;

(4) determine the content of annual training for members of the Board of Directors;

(5) confirm or reject the nomination of individuals to serve in the administrative and committee positions as provided in Article IX of this Constitution;

(6) establish special committees and/or task forces which may be deemed necessary to the best interest of the membership;

(7) confirm or reject the nominations of members to other committees as established by this Constitution or as may be established by the Board of Directors;

(8) assign a newly opened OAL Operation or satellite to an existing base subject to confirmation or alteration by the Board of Directors;

(9) confirm the Treasurer's recommendation of the accounting firm to prepare the annual audit;

(10) approve the initiation of litigation prior to commencement of a lawsuit;

(11) take any and all appropriate action deemed necessary by the Executive Committee and in accordance with this Constitution and the resolutions and policy decisions of the Board of Directors to promote the welfare of the members of the APFA, and this shall include the right to reverse an action or decision of the National Officers or other representatives, except as provided in this Article III, Section 4,J.11.

While not limited to the following, the Executive Committee may:

(12) recommend changes to the APFA Policy Manual;

(13) accept a proposed Collective Bargaining Agreement as submitted by the Negotiating Committee for referral to the membership for ratification;

(14) reject a proposed Collective Bargaining Agreement as submitted by the Negotiating Committee;

(15) adjust the budget to meet the unexpected needs of the membership, provided that:
a. such budget adjustment shall require that the Board of Directors be notified of the adjustment within forty-eight (48) hours following the adjournment of the Executive Committee meeting wherein the budget was adjusted, and
b. such adjustment may not reduce any base budget without prior approval by a majority of the Voting Board of Directors;

(16) direct that a special mailing be sent to the membership;

(17) recognize the accomplishments and/or contributions of members and/or representatives of the APFA;

(18) approve hardship dues forgiveness and review other hardship requests that may be brought before the Executive Committee.

(19) order a special Base/Delegate election should a convention be scheduled to convene and there exists at such base a dual vacancy in the positions of Base Chair and Vice Chair, or in the event the base does not have an elected Delegate to the convention. Such special election shall be held in accordance with the procedures provided for in the APFA Policy Manual.

SECTION 5. TELECONFERENCE MEETINGS:
When it becomes necessary for the Board of Directors and/or the Executive Committee to act on urgent or emergency business through the use of a Teleconference Meeting, the following procedures shall apply:

A. The President, or four (4) members of the Executive Committee, or a majority of the Voting Board of Directors may advise the Secretary that a Teleconference Meeting of the Board of Directors is required to conduct the business of the APFA.

B. The President, or four (4) members of the Executive Committee may advise the Secretary that a Teleconference Meeting of the Executive Committee is required to conduct the business of the APFA.

C. The purpose of the Teleconference Meeting must be submitted to the Secretary in writing and any resolution(s) shall include the names of the maker and second.

D. Upon receipt of the request for a Teleconference Meeting, the Secretary shall provide written notification to the Board of Directors or the Executive Committee, as appropriate, that a Teleconference Meeting is to be conducted. Such notification shall include the name(s) of those individual(s) calling the Teleconference Meeting and the complete text of any proposed resolution(s) with the names of the maker and the second. The Secretary shall also specify the date and time when the President will convene the Teleconference Meeting.

E. The Secretary must request written verification of receipt of the notification.

F. The Teleconference Meeting may be conducted as soon as a quorum can be established, but no sooner than all reasonable efforts have been made to notify all Board members or Executive Committee members, as appropriate, that a Teleconference Meeting is to be conducted.

G. The Teleconference Meeting must be conducted no later than the urgent or emergency circumstances dictate, but in no event later than ten (10) days following receipt by the Secretary of the request for the meeting.

H. The Teleconference Meeting shall commence at the time and date specified, provided that a quorum or more must be participatory throughout the meeting. Should the quorum be failed at any time during the course of the Teleconference Meeting, the meeting shall be considered to be adjourned and shall be rescheduled as provided in D of this Section 5.

I. At a Teleconference Meeting of the Board of Directors when more than a quorum is participatory, all issues shall be decided by a majority of the Voting Board of Directors except as provided for in this Constitution. In the event that only a quorum is participatory, all issues shall be decided by a two-thirds (2/3) majority vote of the quorum except as provided for in this Constitution.

J. At a Teleconference Meeting of the Executive Committee five (5) or more members voting in the affirmative shall be required to decide an issue, except as provided for elsewhere in this Constitution.

K. The vote tabulation shall be conducted by the Secretary.

L. Once the vote is completed, the Secretary shall forward to each member of the Board of Directors and the Executive Committee a copy of the tally sheet attached to the resolution(s).

M. All business conducted by a Teleconference Meeting shall become a part of the permanent record of the APFA.

N. Any business conducted by a Teleconference Meeting is subject to reconsideration at the next meeting of the Executive Committee or Board of Directors, as appropriate.

SECTION 6. OFFICERS:
A. Definitions: The National Officers shall be the President, Vice President, Secretary and Treasurer.

B. Duties of the President shall include but not be limited to the following:

(1) The President shall be the chief executive officer of the APFA, and shall conduct the affairs of the APFA in accordance with this Constitution and the resolutions and policy decisions of the Board of Directors and/or the Executive Committee.

(2) The President shall sign any agreements, supervise the activities of the APFA and carry out any duties the Board of Directors and/or the Executive Committee may request, in accordance with this Constitution.

(3) The President shall convene any convention or meeting of the Board of Directors and the Executive Committee. S/he must convene the Board to review any proposed Collective Bargaining Agreement between the APFA and AAL.

(4) The President shall convene any meeting of the OAL Operation Advisory Panel. S/he must convene the Panel to review any proposed Collective Bargaining Agreement between the APFA and an airline other than AAL whose Flight Attendant employees are represented by the APFA.

(5) The President shall act as Chairperson for the Board of Directors, the Executive Committee, the Negotiating Committee and the OAL Operation Advisory Panel. The President shall oversee all other national committees, unless otherwise provided for in this Constitution or by resolution or policy of the Board of Directors or the Executive Committee.

(6) The President shall submit the annual budget to the Board of Directors for approval at the Annual Convention.

(7) The President shall recommend to the Executive Committee all changes in employment and staff requirements and, subject to the approval of the Executive Committee, fix compensation for all agents

and employees of the APFA. The President shall be responsible for the employment, supervision and discharge of all agents and employees of the APFA.

(8) The President shall address an Annual Report to the membership.

(9) The President shall nominate, and the Executive Committee shall confirm or reject, individual active members in good standing to serve as National Coordinators and Appointed Negotiating Team members.

(10) The President shall have the authority to hire, retain or employ general counsel and/or other legal counsel for the APFA, subject to the approval of the Executive Committee.

(11) The President shall direct and coordinate legislative and political initiatives and any lobbying efforts on behalf of the Association to further the objectives of the APFA.

C. **Duties of the Vice President** shall include but not be limited to the following:

(1) The Vice President shall assist the President in the discharge of all duties. In the absence of the President, or should a vacancy occur in the office of President, the Vice President shall perform the duties of the President.

(2) The primary responsibility of the Vice President shall be to oversee the grievance and arbitration process provided for in the Railway Labor Act and the Collective Bargaining Agreement(s) entered into between the APFA and employers.

(3) The Vice President shall serve as the APFA's permanent Chairperson of the Flight Attendant System Board(s) of Adjustment.

(4) The Vice President shall coordinate activities of the System Board(s) of Adjustment with other departments within the APFA.

(5) The Vice President shall nominate, and the Executive Committee shall confirm or reject, individual active members in good standing to serve as Division Representatives.

(6) The Vice President shall determine the specific base assignments of each Division and assign and coordinate the activities of the members appointed to serve as Division Representatives.

(7) The Vice President shall be authorized to hire, retain and employ legal counsel as may be required to provide members with representation in the grievance and arbitration process, subject to the approval of the Executive Committee.

(8) The Vice President shall ensure the training and continuing education of all representatives involved in the grievance and arbitration process.

(9) The Vice President shall coordinate and chair a Grievance Review Committee to oversee the disposition of grievances.

D. **Duties of the Secretary** shall include but not be limited to the following:

(1) The Secretary shall be responsible for all administrative records of the Association.

(2) The Secretary shall cause to be kept an administrative record of all officers, representatives and appointees.

(3) The Secretary shall notify the Board of Directors, the Executive Committee and the OAL Operation Advisory Panel of any convention or meeting.

(4) The Secretary shall cause to be kept a record of all proceedings at any convention or meeting of the Board of Directors, or at any meeting of the Executive Committee and the OAL Operation Advisory Panel.

(5) The Secretary shall submit a written report of all meetings of the Executive Committee and the OAL Operation Advisory Panel to the Board of Directors within fifteen (15) days following such meeting.

(6) The Secretary shall oversee the National Balloting Committee.

(7) The Secretary shall assist the President in the preparation of the Annual Report to the members of the APFA.

(8) The Secretary shall administer Article VII procedures.

(9) The Secretary shall update and ensure distribution of the APFA Policy Manual.

(10) The Secretary shall assist in establishing regular training and continuing education programs for representatives of the APFA, and shall maintain the APFA training records of all representatives.

(11) The Secretary shall ensure that training and reference materials and Association publications and manuals are maintained.

(12) The Secretary shall be responsible for the library of the Association.

(13) The Secretary shall establish and maintain lines of communication between members of the Executive Committee, Base Representatives and all administrative departments and committees.

(14) The Secretary shall convene regular meetings of the APFA administrative and committee personnel.

(15) The Secretary shall assist the Treasurer in the discharge of all duties. Should there be a temporary absence in the office of the Treasurer, the Secretary may perform the duties of the Treasurer.

E. **Duties of the Treasurer** shall include but not be limited to the following:

(1) The Treasurer shall be responsible for the care and custody of the funds and securities of the APFA, receiving all dues, fees and special assessments assigned to the APFA.

(2) The Treasurer shall be responsible for all financial records of the APFA.

(3) The Treasurer shall cause to be kept a record of the APFA's membership so as to show at all times the number of members in each membership status or classification, their respective places of residence, their post office addresses, their base locations and the date when each person became a member of the APFA and/or changed membership status or classification.

(4) The Treasurer shall cause to be kept an individual record of all dues and assessments for each member.

(5) The Treasurer shall oversee the APFA Budget Committee and shall assist in the preparation of the annual budget.

(6) The Treasurer shall advise the Board of Directors and the Executive Committee of any significant change in the financial standing of the APFA.

(7) The Treasurer shall submit a monthly financial report to the Board of Directors and to the Executive Committee as provided for in Article IV, Section 4,C of this Constitution.

(8) The Treasurer shall submit a quarterly financial review to the Board of Directors and to the Executive Committee as provided for in Article IV, Section 4,D of this Constitution.

(9) The Treasurer shall submit with his/her signature all Federal and State Reports required by law.

(10) The Treasurer shall oversee and coordinate ongoing computerization of the APFA headquarters files, records and systems.

(11) The Treasurer shall oversee the daily activities of the APFA headquarters office staff.

(12) The Treasurer shall coordinate the headquarters office staff to ensure assistance is provided to administrative, committee and support personnel.

(13) The Treasurer shall assist the Secretary in the discharge of all duties. Should there be a temporary absence in the office of the Secretary, the Treasurer may perform the duties of the Secretary.

## SECTION 7. BASE COUNCILS/ BASE REPRESENTATIVES:

A. Organization: The Base Council shall consist of the Base Chair, Vice Chair, and Operation Council Representatives (OCRs). When a base contains both an American Airlines Operation and one or more OAL Operations (as defined in Article I, Section 7,K,2 of this Constitution), the Base Council shall also include an OAL Operation Advisory Panel Representative (APR). The members of a Base Council hold positions with the APFA as Base Representatives.

B. Base Representatives shall hold such positions only at the base where they are stationed.

C. The Base Chair and Vice Chair shall be elected by the membership of the base at large.

D. Operation Council Representatives (OCRs) shall be elected by the membership of the operation in which they are stationed. OCRs shall hold such positions only in the operation in which they are stationed. The number of OCRs at each base shall be determined as provided in (1), (2) and (3) below:

(1) Each operation at a base shall be entitled to one OCR for each one hundred (100) members or fraction thereof who are a part of such operation and who are stationed at the base.

(2) Each operation at a satellite location of a base shall be entitled to one OCR for each one hundred (100) members or fraction thereof who are a part of such operation and who are stationed at the satellite location of the base.

(3) Members stationed at any satellite location of a base shall vote for their operation's OCR(s), as provided in paragraph (2) above, independently of those members stationed at the base.

E. The Advisory Panel Representative (APR) shall be elected by the membership of the operation in which he/she is stationed. The APR shall hold such position only from the operation in which he/she is stationed.

F. A Base Chair may appoint an active member in good standing to fill a vacancy on the Base Council to complete the balance of an unexpired term, pursuant to the provisions of Article VI, Section 8 of this Constitution.

G. A Base Chair may appoint additional individuals to assist the Base Council to meet the needs of the membership, however such individuals may not exercise a vote on matters brought before the Base Council.

H. **Duties of the Base Chair** shall include but not be limited to the following:

(1) The Chair shall represent the membership of the base at any convention of the APFA, and if elected by secret ballot vote of the base membership, or if duly elected by virtue of running unopposed, shall be empowered to elect and remove Ad Hoc Members of the Executive Committee.

(2) The Chair shall represent the membership of the base at any other meeting of the Board of Directors.

(3) The Chair shall have the right to investigate all grievances and to take such action at the base as may be necessary for the operation of the APFA.

(4) The Chair shall maintain the base office in order to represent the members at the base and to supervise the activities of the APFA at the base.

(5) The Chair shall have the responsibility for calling, posting notice of and conducting all base and operation meetings, and shall keep the respective members informed of the actions of the APFA.

(6) The Chair shall maintain the APFA bulletin board(s) at the base.

(7) The Chair may establish all local base committees not otherwise established by the Board of Directors, the Executive Committee and/or the National Officers.

(8) The Chair shall provide the Board of Directors and/or the Executive Committee with any information which may be requested and shall carry out all resolutions and/or policy decisions of the Board of Directors and/or Executive Committee.

(9) The Chair should provide a quarterly report to the Executive Committee.

I. **Duties of the Vice Chair** shall include but not be limited to the following:

(1) The Vice Chair shall assist the Chair, the Operation Council Representatives and the Advisory Panel Representative in the discharge of their duties and responsibilities.

(2) In the absence of the Base Chair, or should a vacancy occur in the position of Base Chair, the Vice Chair shall perform the duties of the Chair.

(3) In the absence of the Base Chair, the Vice Chair shall represent the membership of the base at any convention of the APFA, and if elected by secret ballot vote of the base membership, or if duly elected by virtue of running unopposed, shall be empowered to elect and remove Ad Hoc Members of the Executive Committee.

J. **Duties of the Advisory Panel Representative (APR)** shall include but not be limited to the following:

(1) The APR shall assist the Base Chair, Vice Chair and Operation Council Representatives in the discharge of their duties and responsibilities.

(2) The APR shall assist the Base Chair with those aspects of base representation unique to the OAL Operation of the base.

(3) The APR shall represent the OAL Operation of a base at all meetings of the OAL Operation Advisory Panel.

K. **Duties of the Operation Council Representative (OCR)** shall include but not be limited to the following:

(1) The OCR shall assist the Base Chair, Vice Chair and Advisory Panel Representative in the discharge of their duties and responsibilities.

(2) The OCR shall coordinate with the Base Chair in the investigation and filing of grievances.

(3) The OCR shall endeavor to provide expertise in any or all areas of grievance, safety, health, scheduling, contract language and interpretation, professional standards, uniforms, hotel, membership records or other areas deemed appropriate by the Base Chair and/or the Board of Directors and/or Executive Committee.

(4) The OCR shall coordinate activities with appropriate APFA administrative and committee personnel and departments.

## SECTION 8. OAL OPERATION ADVISORY PANEL:

A. Organization: The OAL Operation Advisory Panel shall consist of the Advisory Panel Representatives from the OAL Operation(s) at each base.

B. The Advisory Panel shall meet at least once a year with the National Officers of the APFA to evaluate those issues related to flying performed by APFA members who are part of the OAL Operation(s).

# ARTICLE IV
# FINANCES

## SECTION 1. DUES AND ASSESSMENTS:

A. A member's obligation for dues and assessments shall commence as of the date of his/her eligibility for active membership. All members shall be required to pay dues except as provided in Article II, Section 4,B,(3) and Article II, Section 5,A,(1) and Section 5,A,(2) of this of Constitution.

B. Active members shall be required to pay monthly dues by employer's dues check-off or by individual payment. Dues payment must be received by the Treasurer no later than the end of each calendar month.

C. The Association's dues year shall run concurrently with the fiscal year.

D. In the American Airlines (AAL) Operation, Active Members and Inactive/Dues Obligated Members, including those on probation shall pay dues at the rate of thirty dollars ($30.00) per month to be increased to thirty-five dollars ($35.00) per month effective April 1, 1996.

In the Other Airlines (OAL) Operation, Active Members and Inactive/Dues Obligated Members, including those on probation shall pay dues at the rate of twenty-five dollars ($25.00) per month.

Beginning six (6) months following the completion of the Interest Arbitration process, twenty-five (25) percent of any dues increase ratified by the membership shall be placed in a negotiations, and negotiations-related fund.

E. The Board of Directors shall conduct an annual review of the dues structure of the Association to determine if the structure should be revised, provided that no increase in dues shall be put into effect unless ratified by an affirmative vote by a majority of those active members in good standing who return valid ballots.

F. Assessments may be levied on all Active and Inactive/Dues Obligated members to provide for extraordinary expenses, contingencies and reserves, provided such assessments are first approved by a two-thirds (2/3) majority of the Voting Board of Directors, and subsequently ratified by an affirmative vote by a majority of those active members in good standing who return valid ballots.

## SECTION 2: INITIATION FEE:

A. New members shall pay an initiation fee as determined by the Board of Directors.

B. Honorary members will not be subject to the initiation fee.

## SECTION 3: DELINQUENT DUES, ASSESSMENTS OR INITIATION FEE(S):

A. Required dues, assessments and initiation fee(s) not paid within sixty (60) days of the established billing date will cause a member to be placed in bad standing. The established billing date of said dues and/or assessments shall be noted on all APFA correspondence referencing this subject.

B. Members are subject to discharge for non-payment of dues and/or initiation fee(s), when employed by an airline having a Collective Bargaining Agreement with the APFA that requires the payment of dues and/or initiation fee(s) as a condition of employment.

C. Members returning from an authorized leave from their employer, or members returning to the position of Flight Attendant with their employer after having taken a position outside of the class and craft of Flight Attendant, who are obligated for back dues, initiation fee(s) and/or assessments may set up a payment plan to accommodate their obligation.

(1) The member must execute and sign a promissory note and therein agree to pay all back dues, initiation fee(s) and/or assessments within a period of time not to exceed twice the number of months of back dues owed.

(2) Upon execution of such promissory note, the member shall be considered to be in good standing status, and shall remain in good standing status unless the member fails to pay the monthly installment, or unless the member incurs an additional back dues obligation.

(3) All notes(s) must be executed at least thirty (30) days prior to the balloting date of any APFA election or referendum for the member to be eligible to vote in such election or referendum.

D. Should the APFA establish a bank card acceptance program for the payment of dues, initiation fee(s) and/or assessments, all members shall be eligible to pay dues by this method.

SECTION 4. FINANCIAL PROCEDURES:
A. The fiscal year of the APFA shall be from April 1 to the following March 31.
B. The financial records of the Association shall be audited annually by a Certified Public Accountant (CPA) from an accounting firm recommended by the Treasurer and confirmed by the Executive Committee.
C. The Treasurer shall prepare a monthly financial report that contains:
(1) a statement of all assets, liabilities and fund balance(s);
(2) a statement of income and expenses;
(3) a record of expenditures; and
(4) a record of pay continuance.
D. The Treasurer shall prepare a quarterly financial review that shall include, but not be limited to:

ARTICLE IV – FINANCES   30

(1) the budget analysis for the present and immediate past quarter, and projections for the remainder of the fiscal year;
(2) a statement of all assets, liabilities and fund balance(s); and
(3) the status of reserves and savings.

E. An accountant shall be employed by the APFA and shall report directly to the Treasurer. S/he shall keep an accurate record of all receipts and expenditures of the APFA, and prepare and submit to the Treasurer the following:
(1) all Federal and State reports as required by law;
(2) monthly financial statements; and
(3) the APFA's books for the annual audit by the accounting firm.

F. All bills payable, notes, checks or other negotiable instruments of the APFA shall be made in the name of the Association of Professional Flight Attendants and shall bear the actual signature of two (2) of the following: the President, the Vice President; the Secretary or Treasurer. At least two of the following: the President; the Vice President; the Secretary or Treasurer; may from time to time, transfer such sums of money to administrative accounts, payroll accounts, petty cash accounts, savings/reserve accounts and such other accounts as may be necessary to meet administrative and current obligations of the APFA.

G. No officer, agent or employee of the APFA acting singly or jointly with others shall have the power to make any bills payable, notes, checks, drafts, warrants or negotiable instruments of any description or nature or endorse the same in the name of the APFA or contract or cause to be contracted any debt or liability in the name of or on behalf of the APFA except as expressly prescribed and provided in this Constitution.

SECTION 5. BONDING:
All officers and employees of the APFA shall be bonded in the amounts not less than those provided for and required by applicable Federal law.

SECTION 6. SAVINGS/RESERVES:
The APFA shall adopt a reasonable savings and reserves plan in the name of the Association of Professional Flight Attendants, and such savings/reserves shall be maintained at a reasonable level. The Treasurer shall be charged with administration of financial and fiscal policies as set forth herein, or as may be established by the Board of Directors.

SECTION 7. RETENTION OF RECORDS:
All financial records of the APFA shall be retained in their original form as required by State or Federal law.

ARTICLE IV – FINANCES   31

## ARTICLE V
## EXPENSES AND SALARIES

### SECTION 1. EXPENSES:

Authorized normal expenses incurred by any officer, representative or member while on APFA business shall be reimbursed by the APFA. Allowable expenses shall be established by the Board of Directors and set forth in the APFA Policy Manual.

### SECTION 2. COMPENSATION FOR NATIONAL OFFICERS AND DIVISION REPRESENTATIVES:

The rate or method of compensation for the National Officers and the Division Representatives of the APFA shall be established by the Board of Directors and set forth in the APFA Policy Manual, and may be subject to membership ratification.

### SECTION 3. OTHER COMPENSATION:

The rate or method of other compensation, if any, and/or the policy regarding pay continuance for other APFA representatives shall be established by the Board of Directors and set forth in the APFA Policy Manual.

## ARTICLE VI
## NOMINATIONS AND ELECTIONS

### SECTION 1. NOMINATIONS:

A. Any active member in good standing may self-nominate for any office or elected position with the APFA.

B. Any active member in good standing may nominate another active member in good standing for any office or elected position with the APFA.

C. Any active member in good standing may be nominated by another active member in good standing for any office or elected position with the APFA.

### SECTION 2. WILLINGNESS TO SERVE:

A. The Secretary shall direct the National Ballot Committee (NBC) to mail Willingness-to-Serve notifications to each member.

(1) at least one hundred and thirty-five (135) days prior to the end of the term for National Officers; or

(2) at least ninety-five (95) days prior to the end of the term for Base Representatives; or

(3) at least ninety-five (95) days prior to the balloting date for the Elected members of the Negotiating Committee; or

(4) Not more than fifteen (15) days following the directive of the Secretary when a dual vacancy exists at a base, pursuant to Section 8.C of this Article VI.

B. The Willingness-to-Serve notification for the position of Base Chair shall indicate that a Base Chair will be authorized, by his/her election:

(1) to serve as a Delegate to the Annual or Special Convention(s) for the purpose of electing Ad Hoc Members of the Executive Committee, and

(2) to exercise a vote to remove an individual from the position of Ad Hoc Member of the Executive Committee, should such action be deemed necessary.

The Willingness-to-Serve notification for the position of Vice Chair shall indicate that a Vice Chair will be authorized, by his/her election, to serve as a Delegate pursuant to (1) and (2) above only in the absence of the Base Chair.

C. Willingness-to-Serve notifications must be returned to the APFA by the time and date specified and will be retrieved on that date from the appropriate post office box by members of the NBC. There shall be a thirty (30) day time period to submit Willingness-to-Serve notifications. Willingness-to-Serve notifications received after the time and date specified will not be considered.

## SECTION 3. TERMS OF OFFICE:

A. The term of office for the National Officers shall be for a forty-eight (48) month period.

B. The term of office for the Base Representatives shall be for a twenty-four (24) month period.

C. The terms of office shall commence on the first day of the APFA fiscal year, as appropriate, for all elected officers and representatives, except for elected members of the Negotiating Committee who assume office pursuant to the provisions of Article X, Section 3 of this Constitution.

## SECTION 4. ELIGIBILITY TO VOTE:

A. All active members in good standing of the APFA shall be eligible to vote in the election of the President, Vice President, Secretary and Treasurer.

B. All active members in good standing at each base shall be eligible to vote in the election of their Base Representatives, pursuant to Article III, Section 7 of this Constitution.

C. All active members in good standing in each operation shall be eligible to vote for the Elected Members of the Negotiating Team representing that operation, pursuant to Article X of this Constitution.

D. Any active member in bad standing must arrange to become an active member in good standing not later than the close of business on the fifth (5th) day prior to the time limit for the return of ballots (the Balloting Date) of any election or referendum.

E. The Treasurer shall provide the NBC with the appropriate list of active members in good standing for any election or referendum three (3) days prior to the balloting date of any election or referendum, and only members whose names appear on such list shall be deemed eligible to vote.

## SECTION 5. BALLOTING:

A. All balloting of the membership provided for in this Constitution shall be conducted by secret mail ballot, except that during a strike or lockout, a Collective Bargaining Agreement may be ratified as provided in Article XI, Section 2,E of this Constitution.

B. The NBC shall prepare the official ballot with the names of the candidates or the issue(s) to be decided, and shall indicate thereon a place to vote for any candidate or issue.

C. The ballot for the position of Base Chair shall indicate that a Base Chair will be authorized, by his/her election:

(1) to serve as a Delegate to the Annual or Special Convention(s) for the purpose of electing Ad Hoc Members of the Executive Committee, and

(2) to exercise a vote to remove an individual from the position of Ad Hoc Member of the Executive Committee, should such action be deemed necessary.

The ballot for the position of Vice Chair shall indicate that a Vice Chair will be authorized, by his/her election, to serve as a Delegate pursuant to (1) and (2) above only in the absence of the Base Chair.

D. No later than twenty (20) days after the deadline for the receipt of the Willingness-to-Serve notifications, the ballot containing the names of the candidate(s) to be voted upon shall be mailed to the membership under the supervision of the NBC. The Balloting Date for candidates and/or issues, including run-off elections, shall be thirty (30) days after the mailing of the ballots to the membership.

E. Ballots must be returned to the APFA by the time and date specified and will be retrieved from the appropriate post office box by members of the NBC. Ballots received after the time and date specified shall be considered as void.

F. Ballots shall be counted in the metropolitan area where the APFA headquarters is located. Ballots may be handled and counted by an independent accounting or balloting firm which has been approved by the Executive Committee and the NBC shall oversee all such balloting for accuracy of procedures.

G. At the conclusion of the vote count, the NBC shall certify the results of the vote for each position. The date of such certification shall be the Canvassing Date. The NBC shall submit this certification in writing to the Secretary. The Secretary shall notify the candidate(s) and/or the membership of the balloting results by the APFA "Hotline" Information tape, by posting on all APFA bulletin boards and in the official APFA publication.

H. In any balloting for National Officer, the candidate receiving the majority of the valid votes cast for an office shall be deemed elected to that office and shall be so notified by the Secretary.

(1) If no candidate receives a majority of the valid votes cast for a national office, the NBC shall, within ten (10) days following the Canvassing Date, prepare and mail to the membership a run-off ballot containing the names of the two (2) candidates receiving the highest number of valid votes.

(2) The candidate receiving the majority of valid votes cast for an office in the runoff election shall be deemed elected to that office and be so notified by the Secretary.

I. In any balloting for Base Representative, the candidate receiving the highest number of valid votes cast for a position shall be deemed elected to that position and be so notified by the Secretary.

J. In the event that a tie exists in the balloting for a Base Representative, a runoff balloting shall be accomplished pursuant to the procedures in H of this Section 5.

K. An issue will be considered ratified by the membership if it receives a plurality of the valid votes cast.

L. All ballots and other election materials, notes and records shall be sealed after being counted and certified as provided for herein, and shall remain in the possession of the Secretary for at least one (1) year from the Balloting Date in accordance with all appropriate time limits required by Federal law.

M. Should the margin of victory in a ballot count be ten percent (10%) or less and in the event a candidate challenges the accuracy of such ballot count in writing to the Secretary within fourteen (14) days following the Canvassing Date, a recount shall occur and the APFA shall assume all related costs. Should the margin of victory be greater than ten percent (10%), the cost related to any such recount shall be borne by the candidate challenging the accuracy of the ballot count.

## SECTION 6. ELECTION CONTEST FOR OFFICE:

A. Only candidates may contest an election for office.

B. The contestant must file a written complaint with the Secretary, directed to the NBC, within fifteen (15) days following the Canvassing Date of the ballots.

C. The NBC shall investigate such complaint, and must render its decision concerning the disposition of such complaint no later than thirty (30) days following the Canvassing Date of the ballots.

D. The contestant may appeal any decision rendered by the NBC to the Executive Committee no later than forty-five (45) days following the Canvassing Date of the ballots.

E. The Executive Committee shall consider such appeal and must render its decision concerning such appeal no later than sixty (60) days following the Canvassing Date of the ballots.

F. Should the NBC or the Executive Committee fail to respond to the contestant in the designated time periods, the contestant will be free to pursue his/her LMRDA rights. In any event, the contestant will have satisfied the internal remedies provisions of the LMRDA following the sixty (60) day period provided for in this Section 6.

## SECTION 7. VACANCY IN OFFICE, NATIONAL OFFICERS:

A. In the event of a vacancy in the office of the President, the Vice President shall assume the office for the balance of the unexpired term.

B. In the event of a vacancy in the office of the Vice President, if the unexpired term from the date of the vacancy is more than eighteen (18) months, a membership election shall be held to fill the vacancy in accordance with the time limits provided in Section 2 and Section 5 of this Article VI. The Board of Directors shall appoint an interim Vice President to serve until the result of the election is known. If the unexpired term of the Vice President is eighteen (18) months or less, the office shall be filled by appointment by the Board of Directors.

C. In the event of a simultaneous vacancy in the office of the President and Vice President, if the unexpired terms from the date of the vacancies are more than eighteen (18) months, a membership election shall be held to fill the vacancies in accordance with the time limits provided in Section 2 and Section 5 of this Article VI. The Board of Directors shall appoint an interim President and an interim Vice President to serve until the results of the elections are known. If the unexpired terms are eighteen (18) months or less, the offices shall be filled by appointments by the Board of Directors.

D. In the event of a vacancy in the offices of Secretary or Treasurer, if the unexpired term from the date of the vacancy is more than eighteen (18) months, a membership election shall be held to fill the vacancy in accordance with the time limits provided in Section 2 and Section 5 of this Article VI. The Board of Directors shall appoint an interim Secretary or Treasurer to serve until the result of the election is known. If the unexpired term of the Secretary or Treasurer is eighteen (18) months or less, the office shall be filled by appointment by the Board of Directors.

E. The term of office of the President, Vice President, Secretary or Treasurer, if elected or appointed under the provisions of B,C or D of this Section 7,

shall commence immediately upon election or appointment and, except for the interim appointments, shall be to complete the balance of the unexpired term.

## SECTION 8. VACANCY IN OFFICE, BASE REPRESENTATIVES:

A. In the event of a vacancy in the position of the Base Chair, the Vice Chair shall assume the position for the balance of the unexpired term.

B. In the event of a vacancy in the position of Vice Chair, if the unexpired term from the date of the vacancy is for more than six (6) months, a membership election shall be held to fill the vacancy in accordance with the time limits provided in Section 2 and Section 5 of this Article VI. If the unexpired term is for six (6) months or less, the position shall be filled for the balance of the unexpired term by an election by the Base Council from among their members.

C. In the event of a simultaneous vacancy in the positions of both the Base Chair and the Vice Chair, creating therefore a dual vacancy, the following procedures shall apply:

(1) Within fifteen (15) days of having been made aware of the dual vacancy, the Secretary shall direct the NBC to mail Willingness-to-Serve notifications for the positions of Base Chair and Vice Chair to all members at the base, provided that the unexpired terms from the date of the vacancy are for more than six (6) months.

(2) In the event of a new base opening, within fifteen (15) days following the first official report date for Flight Attendants assigned to that base by the employer, the Secretary shall direct the NBC to mail Willingness-to-Serve notifications for the positions of Base Chair, Vice Chair, Advisory Panel Representative (if applicable), and Operation Council Representatives to all members at the base, provided that the unexpired terms from the date of the vacancy are for more than six (6) months.

(3) A membership election shall be held to fill the positions in accordance with the time limits provided in Section 2 and Section 5 of this Article VI.

(4) The Executive Committee shall appoint an interim Base Chair until such time as the election process is completed for the Base Representative position(s), or to complete the balance of an unexpired Base Chair term of six (6) months or less.

(5) The term of the Base Representatives, if elected in accordance with the provisions of (1), (2) and (3) above, shall commence immediately upon election and shall be to complete the balance of the unexpired term.

D. In the event that there are no candidates for the position of Base Chair, the Executive Committee may appoint an active member in good standing from that base to be the Base Chair to complete the balance of the unexpired term.

E. In the event a new OAL operation or satellite is opened and assigned to a base, a membership election shall be held to fill the positions of Operation Council Representative(s) and, if applicable, the Advisory Panel Representative (APR) in accordance with the time limits provided in Section 2 and Section 5 of this Article VI, provided that the unexpired terms from the opening of the OAL operation or satellite will be for more than six (6) months. The Base Chair shall appoint interim Operation Council Representatives and, if applicable, an interim APR to complete the balance of the unexpired term(s) of six (6) months or less.

F. In any case, if the unexpired term of any Base Representative is six (6) months or less, the interim appointee shall complete the balance of the unexpired term.

G. If any individual holds a position as Base Chair or Vice Chair other than by either secret ballot vote of the base membership or by having been duly elected by virtue of running unopposed, such individual shall not be considered a Delegate as defined in Article I, Section 7,C and Article III, Section 3,B,(3) of this Constitution. Such Base Chair or Vice Chair shall not be eligible to vote at any convention to elect or remove Ad Hoc Members of the Executive Committee.

H. In the event a convention is scheduled to convene and there exists at a base a dual vacancy in the positions of Base Chair and Vice Chair, or in the event the base does not have a Base Chair or a Vice Chair who is an elected Delegate to the Convention, all reasonable measures shall be taken to afford the members of that base the opportunity to elect a Delegate to the convention.

# ARTICLE VII
# HEARINGS AND
# DISCIPLINARY PROCEDURES

## SECTION 1. GROUNDS FOR CHARGES:

Any member is subject to fine, suspension or expulsion, or suspension from or removal from office, for any of the following acts:

A. Failure to pay dues, assessments or penalties levied by the Association;

B. Advocating, or working toward, the displacement of the APFA as bargaining representative (providing that advocating, or working toward an affiliation, merger or federation of the APFA pursuant to Article XII of this Constitution shall not be grounds for discipline);

C. Willfully acting as a strike breaker during any work stoppage duly authorized by the Association;

(1) Notwithstanding Section 1.C, above (which provides as a grounds for charges "willfully acting as a strike breaker during any work stoppage duly authorized by the Association") APFA shall not process any charge of willfully acting as a strike breaker during the November 1993 strike against American Airlines.

D. Willful violation of a Flight Attendant's Collective Bargaining Agreement;

E. Theft or embezzlement of Association monies or property;

F. Willful violation of an express Article of this Constitution, or of a proper and express written resolution or policy of the Board of Directors or the Executive Committee;

G. Willfully acting in a manner that causes the Association to violate its legal obligations; or

H. Willfully bringing charges without reasonable basis against another member, officer or representative of the Association, should such charges be dismissed for any reason by the Article VII Arbitrator designated herein, or should such charges not be sustained by the Article VII Arbitrator.

## SECTION 2. FILING OF CHARGES:

A. A charge may be filed by any member in good standing. All charges shall be filed with the Secretary and shall be proffered in writing and shall be specific as to the alleged act(s) and/or the Article(s) of this Constitution allegedly violated which constitute the basis of the charge(s).

B. The Secretary shall cause a copy of the charges to be served upon the accused and the accuser within seven (7) days following receipt of the charges. Such notification shall be by registered mail, return receipt requested to their last known addresses, and shall furnish the accused and the accuser a description of all relevant procedures.

C. The Secretary shall send a copy of all charges to the Executive Committee and to the Board of Directors within seven (7) days following his/her receipt of the charges.

D. Time Limits:

(1) Charges based on Section 1,A through Section 1,F of this Article VII must be filed within sixty (60) days after the accuser becomes aware, or reasonably should have become aware, of the alleged offense.

(2) Charges based on Section 1,G of this Article VII may not be filed unless and until it has been determined, in a separate legal proceeding (such as a lawsuit), that the Association has violated its legal obligations, or unless and until the Association settles a legal proceeding brought against it by furnishing substantial relief to an opposing party. Charges based on Section 1,G above must be filed within sixty (60) days after the accuser becomes aware, or reasonably should have become aware, of the completion or settlement of the legal proceeding.

(3) Charges based on Section 1,H of this Article VII must be filed within sixty (60) days following the Article VII Arbitrator's decision which gives rise to such charge(s).

E. The accused and accuser may be represented during Article VII proceedings by any individual; however, the APFA will not compensate either party for attorney's fees.

## SECTION 3. REVIEW OF CHARGES:

At the first regularly scheduled meeting of the Executive Committee following receipt of charges by the Secretary, the Executive Committee shall review the charges for timeliness, specificity and validity.

A. Should the charges be determined to be timely, specific and valid, such charges shall then be forwarded by the Secretary via registered mail, return receipt requested to the Article VII Arbitrator designated herein within seven (7) days following such Executive Committee meeting.

B. Charges deemed untimely by the Executive Committee will be dismissed without appeal.

C. Charges deemed non-specific by the Executive Committee shall be referred back to the accuser. The accuser may resubmit, one time only, such charges to the Secretary for review by the Executive Committee at its next regularly scheduled meeting without affecting the time limits of Section 2,D of this Article VII.

D. Charges may be deemed invalid and dismissed if the Executive Committee determines that the charges address conduct protected by this Constitution and/or by law (including the LMRDA Bill of Rights). Charges may also be deemed invalid and dismissed if they fail to state a proper claim under Section 1 of this Article VII. Should such charges be dismissed as invalid, the accuser may, within seven (7) days following receipt of notification of dismissal by the Executive Committee, appeal to the Article VII Arbitrator designated herein. If the Article VII Arbitrator determines that the charges are valid, s/he shall so advise the Secretary, the accused and the accuser, and the charges will be processed in accordance with this Article VII.

### SECTION 4. SUSPENSION FROM OFFICE:

A. If charges are filed against a national officer or elected representative based on Section 1,B, Section 1,C or Section 1,E of this Article VII, the Board of Directors may determine at any time during the pendency of the charges that the alleged conduct giving rise to the charges threatens the APFA's vital interests. The Voting Board of Directors may then, by two-thirds (2/3) vote, suspend the accused's authority as national officer or elected representative until the threat is removed or the Article VII Arbitrator designated herein resolves the charges, whichever occurs sooner.

B. A national officer or elected representative suspended pursuant to this section shall be entitled, upon demand, to an expedited resolution of the charges, with a decision rendered within thirty (30) days following the Board of Directors Meeting where the officer or elected representative was suspended.

C. If the charges are filed by or against a member of the Executive Committee or the Board of Directors, such member must appoint an alternate member of the Association to participate in the review of the charges as provided in Section 3 of this Article VII and, when necessary, to participate in the vote regarding the suspension of the member of the Executive Committee or Board of Directors as provided in this Section 4.

### SECTION 5. APPOINTMENT OF THE ARTICLE VII ARBITRATOR:

A. The Board of Directors shall appoint an arbitrator to resolve all charges filed under this Article VII. The Article VII Arbitrator, once appointed, shall serve until s/he resigns or until the Board of Directors determines to appoint a new Article VII Arbitrator.

B. The Board of Directors may also appoint one or more alternate Article VII Arbitrators who shall have the authority to hear and decide particular charges when the Article VII Arbitrator is not available.

C. The Article VII Arbitrator and any alternate Article VII Arbitrator(s) shall be a person expert in labor law who is a neutral (such as an academic or professional labor arbitrator), who has experience as a neutral in adjudicating internal labor organization disputes, and who has no other prior or current involvement with the APFA.

### SECTION 6. JURISDICTION AND AUTHORITY OF THE ARTICLE VII ARBITRATOR:

A. The Article VII Arbitrator shall have power to resolve all charges referred to him/her during his/her tenure.

B. The administrative procedures for handling Article VII charges shall be included in the APFA Policy Manual. The Article VII Arbitrator may from time to time propose changes in these administrative procedures, and such changes shall become effective and included in the Policy Manual if they are approved by the Board of Directors. The administrative procedures to be adopted shall be in general compliance with American Arbitration Association rules where practicable, but may not conflict in any respect with the provisions of this Constitution.

C. The Article VII Arbitrator may, on his/her own motion or upon motion filed by the accused, declare that charges are untimely or do not allege a violation cognizable as charges under this Article VII and thus are dismissed without the need for hearing.

D. The Article VII Arbitrator may, on his/her own motion, or upon motion filed by the accused, determine that charges are not sufficiently specific and that they will be dismissed unless the accuser amends them to provide sufficient specificity.

E. The accused may move for summary dismissal of the charges on the ground that the accuser does not have evidence sufficient to sustain the charges and thus there is no need for a full hearing. On receipt of such a motion, the Article VII Arbitrator shall afford the accuser an

## ARTICLE VIII
## REMOVAL OF OFFICERS AND REPRESENTATIVES

### SECTION 1. REMOVAL OF NATIONAL OFFICERS:

The President, Vice President, Secretary or Treasurer may be removed from office by action of the membership.

A. A removal balloting shall be caused to be taken:
   (1) within thirty (30) days following a two-thirds (2/3) majority vote of the Voting Board of Directors, or
   (2) by a petition(s) carrying signatures numbering thirty percent (30%) or more of active members in good standing. The office of the Treasurer must, within thirty (30) days following receipt of such petition(s), verify that the names on the petition(s) are of active members in good standing and must issue written certification to the National Balloting Committee (NBC) authorizing a special balloting of the membership to begin no later than thirty (30) days following such certification.

B. The time limit for the return of the ballots (the Balloting Date) shall be thirty (30) days after the mailing of the ballots.

C. In the event that the removal request is for the Secretary, the Treasurer shall assume the duties of the Secretary for the purposes of this Article VIII. In the event that the removal request is for the Treasurer, the Secretary shall assume the duties of the Treasurer for the purposes of this Article VIII. In the event the removal request is for both the Secretary and the Treasurer, the Executive Committee shall appoint a person or persons to oversee the procedures pursuant to A.(2) of this Section 1.

D. In any removal balloting, an affirmative two-thirds (2/3) majority vote by those active members in good standing who return valid ballots shall be required to remove a National Officer.

### SECTION 2. REMOVAL OF A BASE REPRESENTATIVE:

A. A Base Representative may be removed from office by action of the membership at his/her base.

B. A removal petition carrying signatures numbering two-thirds (2/3) or more of the active members in good standing stationed at the base may be submitted to the Secretary.

ARTICLE VII – REMOVAL OF OFFICERS AND REPRESENTATIVES    45

---

opportunity to identify evidence that would sustain the charges. If the Article VII Arbitrator concludes, following that opportunity, that the accuser does not have evidence sufficient to sustain the charges, the Article VII Arbitrator may grant summary dismissal of the charges.

F. If at any time during the pendency of the charges, the Article VII Arbitrator determines (whether on his/her own motion or the motion of the accused) that the conduct furnishing the basis for the charges is protected by this Constitution and/or by law (including the LMRDA Bill of Rights), the Article VII Arbitrator shall have the authority to dismiss the charges addressed to such protected conduct.

G. No ex-parte communication may be had with the Article VII Arbitrator either by the accused, the accuser or by the APFA, or any member of the APFA except with respect to scheduling, location and like administrative matters.

H. The decision of the Article VII Arbitrator shall be final and binding upon the accused and the accuser.

### SECTION 7. COSTS:

A. Initial costs of the Article VII proceedings shall be borne by the APFA in accordance with the provisions of Article V of this Constitution.

B. In the event a charge is dismissed by the Article VII Arbitrator, or in the event the Article VII Arbitrator does not sustain a charge, up to one-half (½) of the fees and expenses of the Article VII Arbitrator and all administrative costs to the APFA relative to that charge may be levied against the accuser by the APFA upon completion of charge proceedings brought under Section 1.H of this Article VII.

C. In the event the Article VII Arbitrator sustains a charge, costs of the proceedings shall be paid by the APFA and may be offset by a fine levied against the accused in an amount determined by the Arbitrator, if a fine was requested by the accuser.

D. In the event that it becomes necessary to enforce an Article VII Arbitration award through judicial proceedings, attorney's fees for those judicial proceedings may be paid or reimbursed by the APFA to the appropriate party seeking such enforcement.

### SECTION 8. INTERNAL REMEDIES:

Members, officers and representatives shall exhaust internal remedies under this Article VII for a period not to exceed four months prior to taking any legal action against members, officers or representatives of the APFA with respect to matters cognizable as charges under this Article VII.

ARTICLE VII – HEARINGS AND DISCIPLINARY PROCEDURES    44

C. The office of the Treasurer must, within thirty (30) days following receipt of such petition, verify that the names on the petition are of active members in good standing stationed at the base.

D. Eligibility of the membership to sign the removal petition shall be in accordance with eligibility requirements as defined in Article III, Sections 7,C, 7,D or 7,E of this Constitution.

E. Upon verification of a sufficient number of valid signatures on the petition, the Base Representative shall be removed from the position.

## SECTION 3. REMOVAL OF AN ELECTED MEMBER OF A NEGOTIATING COMMITTEE:

An elected member of a negotiating committee may be removed from office by action of the membership.

A. The removal balloting shall be caused to be taken as provided in Section 1 of this Article VIII, except that:

(1) the removal petition must carry signatures numbering thirty percent (30%) of active members in good standing assigned to the operation being represented by the negotiating committee member, and

(2) the removal balloting shall be taken only within the operation being represented by the negotiating committee member.

B. Eligibility of the membership to vote in the removal balloting shall be limited to those members assigned to the operation being represented by the negotiating committee member, as provided in Article X, Section 5 of this Constitution.

## SECTION 4. REMOVAL PETITION:

A. The removal petition must clearly state the name of the officer or representative to be removed at the top of each page of the petition. The words "THIS IS A PETITION TO REMOVE (Name of officer or representative) FROM OFFICE" must be made clearly visible by the use of capital letters at the top and bottom of each page.

B. Each member signing a petition must include the date of signature, and his/her printed name, base, and employee number.

C. A petition to remove a National Officer shall be considered valid for one (1) year from the earliest dated signature or until an election is held for the office in question, whichever is sooner.

D. A petition to remove a Base Representative shall be considered valid for six (6) months from the earliest dated signature or until an election is held for the office in question, whichever is sooner.

E. A petition to remove an elected member of a negotiating committee shall be considered valid for one (1) year from the earliest dated signature or until an election is held for the office in question, whichever is sooner.

## SECTION 5. RETENTION OF RECORDS:

All removal petitions, ballots, balloting materials, notes and records shall be sealed after being verified, counted and certified as provided in this Article VIII. This material shall remain in the possession of the office of the Secretary for at least one (1) year after the removal balloting is conducted in accordance with all appropriate time limits required by Federal law.

## SECTION 6. APPEAL:

An officer or representative removed pursuant to the provisions in this Article shall have no right of appeal, except as to the procedure utilized in the removal balloting.

A. Appeal may be made to the Executive Committee through the office of the Secretary.

B. The Executive Committee shall investigate such appeal and the decision of the Executive Committee with respect to procedure and remedy, if any, shall be legal and binding and not subject to reversal by the Board of Directors.

# ARTICLE IX
## ADMINISTRATIVE AND COMMITTEE POSITIONS

### SECTION 1. ELIGIBILITY:

A. Only active members in good standing shall be considered eligible for nomination under the provisions of this Article.

B. A member nominated for a position as a Division Representative pursuant to Section 4 of this Article IX must have been a member of the APFA for a period of two (2) or more years, and must previously have served in at least one (1) of the appointed or elected positions with the APFA as defined in the APFA Policy Manual.

C. A member nominated for a position as a National Coordinator pursuant to Section 5 of this Article IX must have been a member of the APFA for a period of one (1) or more years, and must previously have served in at least one (1) of the appointed or elected positions with the APFA as defined in the APFA Policy Manual.

### SECTION 2. NOMINATION AND APPROVAL PROCEDURE:

When it is necessary to fill administrative or committee positions as provided for in this Article IX, the following procedures shall apply:

A. Membership Notification:

(1) At least sixty (60) days prior to the Annual Convention, the Treasurer, via the official publication of the APFA, shall advise the membership of the number and type of administrative and committee positions within the APFA contained in the proposed budget for the upcoming fiscal year. Resumes for those positions may be returned to the Secretary at any time prior to the Annual Convention.

(2) The Secretary shall forward to the Executive Committee the names and resumes of those members interested in being considered for the positions of Division Representative or National Coordinator.

(3) The Secretary shall forward to the Board of Directors the names and resumes of those members interested in being considered for positions on the National Balloting Committee (NBC) or the Budget Committee.

B. Nomination and Appointment:

(1) At the Annual Convention, following approval of the budget, the Board of Directors shall nominate and appoint members to serve on the NBC and the Budget Committee. The

Board shall not be limited to nominating and appointing members who returned resumes.

(2) Following the Annual Convention, the Treasurer shall notify the Executive Committee and, if applicable, the newly elected officers, of the number and type of administrative and committee positions approved in the budget for the upcoming fiscal year.

(3) Not later than fifteen (15) days following the start of the fiscal year, the appropriate National Officer shall submit to the Executive Committee for confirmation the name(s) of the nominee(s) for each available position. The officer shall not be limited to nominating members who returned resumes.

(4) Confirmation or rejection of the nomination shall be made by the Executive Committee at its first meeting following the start of the fiscal year. Such confirmation shall be subject to approval by the Board of Directors.

(5) In the event the Executive Committee rejects the nomination of an individual for a given position, the appropriate officer shall submit the name of another nominee for confirmation or rejection by the Executive Committee.

### SECTION 3. DURATION OF APPOINTMENT:

A. Once appointed by the Board of Directors or confirmed by the Executive Committee, as appropriate, a member appointed to an administrative or committee position as provided in this Article IX shall serve for not less than two (2) years in conjunction with the terms of the National Officers, or until his/her successor is appointed, whichever is later.

B. The duration of appointment is subject to elimination of or a reduction in the number of administrative or committee positions caused by action of the Board of Directors at the Annual Convention, except as provided in C below.

C. Once a member has been appointed to a position as a Division Representative, unless appointed as a replacement Division Representative pursuant to Section 9.A of this Article IX, such position may not be eliminated unless and until the individual serving in such position resigns or is removed, or has served a minimum of two (2) years whichever is sooner.

## SECTION 4. DIVISION REPRESENTATIVES:

A. The duties of the Division Representative shall include but shall not be limited to the following:

    (1) The Division Representative shall coordinate with each Chair in his/her Division and assist with those activities as deemed necessary by the Chair which affect interpretation of the Collective Bargaining Agreement(s), grievance procedures and local policies for all operations at the base.

    (2) The Division Representative is responsible for representation of all first level dismissal cases involving Flight Attendants.

    (3) The Division Representative shall assist in the preparation of and/or presentation of cases before the System Board of Adjustment at the direction of the Vice President.

    (4) The Division Representative shall initiate and maintain communication with Company personnel in his/her Division.

    (5) The Division Representative may assist in the training of base representatives when deemed necessary by the Vice President.

    (6) The Division Representative must coordinate all of-his/her duties with the Vice President and/or President of the Association.

B. Number: In no case shall there be less than one (1) Division Representative for each four thousand (4,000) members, or fraction thereof, on the combined system seniority list(s) of all airlines whose Flight Attendant employees are represented by the APFA.

C. Nomination: The Vice President shall nominate members to serve in the positions of Division Representatives.

D. Requirements: Division Representatives must be based in the Division to which they are assigned.

## SECTION 5. NATIONAL COORDINATORS:

A. Definition and Duties: National Coordinators shall organize and oversee the activities of the respective departments and/or committees as established and defined by this Constitution and/or the Board of Directors.

B. National Coordinator positions may include, but shall not be limited to Scheduling, Safety, Health, Injury-on-Duty, Communications, Hotel, Training, Strike and Contract.

C. Nomination: The President shall nominate members to serve in the positions of National Coordinators.

## SECTION 6. NATIONAL BALLOTING COMMITTEE (NBC):

A. Definition and Duties: The National Balloting Committee (NBC) shall oversee all facets of all elections and balloting in accordance with the APFA Constitution and Federal law. The duties of the NBC shall include but not be limited to:

    (1) supervising election and balloting procedures;

    (2) determining eligibility of nominees;

    (3) overseeing the preparation and mailing of ballots;

    (4) determining ballot validity; and

    (5) certifying results of the balloting to the Secretary, with the exception of the contract ratification procedures provided in Article XI, Section 2.E of this Constitution.

B. Number: In no case shall there be fewer than seven (7) members of the NBC.

C. Restriction: Members of the NBC may not hold or run for any other position within the APFA, as defined in this Article IX, Article III, or Article X of this Constitution.

## SECTION 7. BUDGET COMMITTEE:

A. Definition and Duties: The Budget Committee shall, under the authority of the Treasurer, annually review the financial status of the APFA, its goals as established by the Board of Directors, and the projected expenditures for the coming fiscal year. Based on its findings, the Budget Committee shall, with the assistance of the Treasurer, prepare the annual budget pursuant to the Policy Manual of the APFA.

B. Number: In no case shall there be fewer than three (3) members of the Budget Committee.

C. Requirements:

    (1) At least one (1) member of the Budget Committee must be a member of the Voting Board of Directors. The Treasurer may fill one (1) of the remaining positions on the Budget Committee.

    (2) The proposed budget must be completed not less than sixty (60) days prior to the scheduled date of the Annual Convention.

## SECTION 8. OTHER APPOINTMENTS:

A. Nothing in this Article shall limit the ability of the Board of Directors or the Executive Committee to establish other special or temporary committees and/or positions as may be deemed necessary to administer the business of the APFA.

# ARTICLE X
# NEGOTIATING COMMITTEES

## SECTION 1. ELIGIBILITY:

A. Only active members in good standing shall be eligible to serve as appointed or elected members of any Negotiating Committee.

B. Appointed permanent and alternate members of the Negotiating Committee for a Collective Bargaining Agreement negotiated by the APFA on behalf of Flight Attendant employees of AAL must have been a member of the APFA for a period of two (2) or more years, and must previously have served in at least two (2) of the appointed or elected positions with the APFA as defined in the APFA Policy Manual.

C. Appointed permanent and alternate members of a Negotiating Committee for a Collective Bargaining Agreement between the APFA and an airline or airlines other than AAL shall meet the eligibility requirements as defined in the APFA Policy Manual.

D. The members of a Negotiating Committee representing a particular operation must be assigned to that operation.

## SECTION 2. DEFINITION AND DUTIES:

The APFA Negotiating Committee(s) shall be considered standing committee(s) for the purpose of negotiating Collective Bargaining Agreement(s) and further, may be called upon to assist in the resolution of disputes arising from the interpretation of such agreements.

## SECTION 3. TERMS:

A. Members of any Negotiating Committee, both elected and appointed shall assume their duties simultaneously, no earlier than twelve (12) months and no later than six (6) months prior to the amendable date of the respective Collective Bargaining Agreement.

B. Members of a Negotiating Committee appointed and elected to negotiate an initial Collective Bargaining Agreement between the APFA and an airline or airlines other than AAL, shall assume office on a date designated by the Executive Committee, and necessary elections shall be conducted in accordance with the provisions of Article VI of this Constitution.

C. Members of a Negotiating Committee shall continue to hold such positions until their successors have been elected and/or appointed as applicable.

---

B. National Officers may establish and appoint members to special or temporary committees and/or positions as may be deemed necessary to administer the business of the APFA subject to approval by the Executive Committee.

C. Administrative personnel may be authorized by a National Officer to appoint and utilize additional member(s) to act in a special or temporary capacity to support the activities of the various departments and/or committees of the Association.

D. The provisions of Section 2 and Section 3 of this Article IX shall not apply to these special or temporary positions.

## SECTION 9. VACANCY:

A. In the event of a vacancy in the position of Division Representative or National Coordinator, the designated officer shall nominate a replacement to fill the vacant position. Confirmation or rejection of the appointment shall be made by the Executive Committee. Once confirmed, the replacement shall serve until his/her successor is confirmed.

B. In the event of a vacancy on the NBC or the Budget Committee, the Executive Committee shall nominate and appoint an interim replacement member. The interim replacement member shall serve until the next Annual Convention. At that time, the Board shall nominate and appoint a replacement to fill the vacancy and complete the balance of the unexpired appointment.

C. Interim appointments as provided in this Section 9 shall not be subject to the membership notification procedures as provided in Section 2 of this Article IX.

## SECTION 10. REMOVAL:

Any member appointed to a position or committee shall be subject to removal by a two-thirds (2/3) vote of the Executive Committee, except that members of the National Balloting Committee (NBC) and members of the Budget Committee may only be removed by a majority of the Voting Board of Directors.

## SECTION 4. CHAIR OF THE NEGOTIATING COMMITTEE:

A. The President of the APFA shall be the recognized Chair of all APFA Negotiating Committees. The President is empowered to delegate the responsibilities of chairing a meeting of the Negotiating Committee to another individual.

B. The President shall sign and tentatively accept all Collective Bargaining Agreements on behalf of the APFA provided however, that such acceptance shall be confirmed by the Executive Committee or Board of Directors, and ratified by the affected membership as provided for in Article XI, Section 1,D or Section 2,E of this Constitution.

## SECTION 5. COMPOSITION OF NEGOTIATING COMMITTEES:

A. The nominations for all appointed members of any Negotiating Committee as provided in B, C and D of this Section 5, shall be made by the President and confirmed or rejected by the Executive Committee. In the event the Executive Committee rejects the nomination of an individual, the President shall submit the name of another nominee for confirmation or rejection by the Executive Committee.

B. The Composition of the Negotiating Committee for a Collective Bargaining Agreement negotiated by the APFA on behalf of Flight Attendants employed by AAL shall be as follows:

(1) Five (5) permanent members consisting of:
   a. The President;
   b. Two (2) Domestic Operation representatives, one (1) who shall be elected by the membership of the Domestic Operation at large, and one (1) who shall be appointed; and
   c. Two (2) International Operation representatives, one (1) who shall be elected by the membership of the International Operation at large, and one (1) who shall be appointed.

(2) Eight (8) alternate members (alternates), consisting of:
   a. Four (4) alternate Domestic Operation representatives;
      (i) Two (2) of whom shall be elected by the membership of the Domestic Operation at large by virtue of having received the second and third highest number of votes cast and who shall serve as first and second alternates respectively, and
      (ii) Two (2) of whom shall be appointed to serve as first and second alternates, respectively.
   b. Four (4) alternate International Operation representatives;
      (i) Two (2) of whom shall be elected by the membership of the International Operation at large by virtue of having received the second and third highest number of votes cast and who shall serve as first and second alternates respectively, and
      (ii) Two (2) of whom shall be appointed to serve as first and second alternates respectively.

C. In the event that an OAL operation, as defined in Article I, Section 7,K,2 of this Constitution, is covered or is to be covered by a Collective Bargaining Agreement negotiated by the APFA on behalf of the Flight Attendants employed by AAL, the composition of the Negotiating Committee for that Collective Bargaining Agreement, as provided for in B of this Section 5 shall also include:

(1) Two (2) additional permanent members consisting of: one (1) OAL Operation representative who shall be elected by the membership of the OAL Operation at large, and one (1) who shall be appointed; and

(2) Two (2) additional alternate members (alternates) consisting of: one (1) alternate OAL Operation representative who shall be elected by the membership of the OAL Operation at large by virtue of having received the second highest number of votes cast, and one (1) who shall be appointed.

D. The composition of the Negotiating Committee for any Collective Bargaining Agreement between the APFA and an airline or airlines other than AAL, shall be as follows:

(1) Three (3) or more permanent members consisting of:
   a. The President or his/her designee;
   b. One (1) elected representative from each airline covered or to be covered by the applicable Collective Bargaining Agreement, who shall be elected by the membership of that airline at large; and
   c. One (1) appointed representative from each airline covered or to be covered by the applicable Collective Bargaining Agreement.

# ARTICLE XI
## CONTRACT RATIFICATION AND STRIKE PROCEDURES

**SECTION 1. RATIFICATION PROCESS:**

A. A proposed Collective Bargaining Agreement will be submitted to the affected membership for approval only after it has been accepted by a majority vote of the Negotiating Committee and presented to the Executive Committee.

  (1) Should the Executive Committee reject a proposed agreement, the Negotiating Committee shall present the proposed agreement to the Board of Directors.

  (2) The Board of Directors may decide to submit the proposed agreement to the membership for approval.

B. A decision by the Executive Committee, or the Board of Directors of the APFA, to submit a proposed agreement to the membership for approval should not necessarily be construed to be an endorsement of the merits of the proposed agreement.

C. The affected membership shall be given the complete changes to a Collective Bargaining Agreement prior to or at the start of the balloting period.

D. A proposed Collective Bargaining Agreement shall be ratified by an affirmative vote by a majority of those active members in good standing covered by the applicable Agreement who return valid ballots. Members may vote only on those agreements which apply to their respective airline(s), unless covered under a master agreement.

E. Balloting:

  (1) The sole issue to appear on the secret ballot shall be the ratification of the Collective Bargaining Agreement.

  (2) The time limit for the return of ratification ballots (the Balloting Date) shall be not less than thirty (30) days after the mailing of the ballots to the respective membership.

F. Any letters of agreement or side letters entered into between an employer and the APFA during or outside of the Collective Bargaining negotiations which alter the rates of pay, rules, or working conditions for covered Flight Attendant employees shall be subject to ratification by the Executive

(2) Four (4) or more alternate members (alternates), consisting of:

  a. Two (2) elected alternate representatives from each airline covered or to be covered by the applicable Collective Bargaining Agreement, who shall be elected by the membership of that airline at large by virtue of having received the second and third highest number of votes cast, and who shall serve as first and second alternates respectively; and

  b. Two (2) appointed alternate representatives from each airline covered or to be covered by the applicable Collective Bargaining Agreement, who shall be appointed as first and second alternates respectively.

**SECTION 6. VACANCY:**

In the event of a vacancy in the position of a permanent member of a Negotiating Committee, the next alternate member, as provided for in Section 5 of this Article .X, shall assume the duties and responsibilities of a permanent member of the Negotiating Committee.

**SECTION 7. REMOVAL:**

A. An appointed member of a Negotiating Committee may be removed from his/her position by an affirmative two-thirds (2/3) vote of the Executive Committee.

B. An elected member of a Negotiating Committee may be removed from his/her position by the membership as provided in Article VIII, Section 3 of this Constitution, or following the completion of the procedures provided for in Article VII of this Constitution.

Committee. If the Executive Committee determines that the alteration is substantial, such letter of agreement or side letter shall be submitted for ratification to the membership covered by the applicable Agreement pursuant to the procedures outlined in this Article XI.

G. Upon ratification by the membership, a Collective Bargaining Agreement and/or letters of agreement shall be deemed binding.

## SECTION 2. STRIKE PROCEDURES:

A. The Executive Committee or Negotiating Committee may recommend a balloting of the membership to authorize a strike. Any such balloting must be approved by the Board of Directors.

B. A strike shall be authorized only by an affirmative vote by a majority of those active members in good standing covered by the applicable Collective Bargaining Agreement who return valid ballots.

C. Such strike authorization shall empower the Board of Directors to authorize the President to call a strike in accordance with the Railway Labor Act.

D. Once a strike has commenced, it may be called off by the Board of Directors.

E. During a strike, the procedures for voting on a proposed Collective Bargaining Agreement shall be as follows:

(1) The President shall call system-wide membership meetings for the purpose of voting on a proposed Collective Bargaining Agreement.

(2) The affected membership shall be presented with the complete changes to a Collective Bargaining Agreement prior to the balloting.

(3) The Collective Bargaining Agreement shall be ratified by an affirmative vote by a majority of those members in good standing covered by the Agreement present at the membership meetings who cast valid ballots.

(4) The vote shall be accomplished by secret ballot.

(5) Upon ratification of the Collective Bargaining Agreement, the President shall notify the membership of the conclusion of the strike, and the complete language of the new Agreement shall be provided to the membership.

# ARTICLE XII
## AFFILIATIONS, MERGERS, FEDERATIONS OR CHARTERS

### SECTION 1.

Any action to affiliate, merge or federate the APFA with any other labor organization; or to issue a charter, or to organize an employee group (except as provided in Section 2 of this Article XII) to provide representation to that employee group for the purposes of the Railway Labor Act shall be subject to prior approval by:

A. a two-thirds (2/3) majority of the Executive Committee, and

B. a two-thirds (2/3) majority of the Voting Board of Directors, and

C. an affirmative vote by a majority of those active members in good standing who return valid ballots.

### SECTION 2.

Any action to organize a Flight Attendant employee group that is employed by a subsidiary or affiliated airline owned and/or operated by AMR Corporation, or that is employed by an independently-owned airline that performs flying for or on behalf of American Airlines or AMR Corporation, to provide representation to that employee group for the purposes of the Railway Labor Act shall be subject to prior approval by:

A. a two-thirds (2/3) majority of the Executive Committee, and

B. a two-thirds (2/3) majority of the Voting Board of Directors.

### SECTION 3.

Any agreement to affiliate, merge, federate, issue a charter, or to represent another employee group shall protect and preserve the APFA's right to autonomy in all of its actions; and shall protect and preserve the collective bargaining relationship between American Airlines and the Flight Attendant employees of American Airlines represented by the APFA.

# ARTICLE XIII
## SAVINGS CLAUSE

**SECTION 1.**

Should any part, section, provision or Article of this Constitution be rendered or declared invalid by reason of any existing or subsequently enacted legislation, or by any final decree of a court of competent jurisdiction, such invalidation of such part, section, provision or Article of this Constitution shall not invalidate any remaining portions, which shall continue in full force and effect.

**SECTION 2.**

If any part, section, provision or Article of this Constitution is invalidated as described above, the Executive Committee is empowered, subject to the approval of the Board of Directors, to promptly amend the invalidated part, section, provision or Article to the limited extent necessary to conform to the enacted legislation or final judicial decree which resulted in the invalidation. Any such amendment shall preserve, as nearly as possible consistent with the law, the invalidated part, section, provision or Article.

A.  Such amendment shall become effective when adopted by the Executive Committee and shall remain in effect until the Board of Directors acts as described in B. below.

B.  At the next Annual Convention or at an earlier special meeting of the Board of Directors if one is convened, the Board of Directors shall consider the amendment and shall either:

(1) decide that the amendment or an alternative amendment be submitted to the APFA membership for approval, or

(2) determine that there should be no amendment and that the Constitution shall remain as is, minus the invalidated part, section, provision or Article.

C.  In the event an amendment is sent to the APFA membership for approval, the proposed amendment shall be in effect until the membership approves or rejects it unless the Board of Directors expressly provides otherwise.

60

# AGREEMENT
## November 1, 1998 to November 30, 2004



## Association of Professional
## Flight Attendants



## American Airlines®



EXHIBIT B

261

**ARTICLE 28 – DISPUTE RESOLUTION AND GRIEVANCE PROCEDURES**

A.   **DISPUTE RESOLUTION PROCESS**

    1.   **Purpose**

        **a.**   **Intent.**  The Dispute Resolution Process described herein is intended to create fundamental changes in the method and manner of resolving disputes between the parties, and to facilitate non-adversarial resolution of disputes, wherever possible. This process is applicable to all disputes other than Presidential and Discharge Grievances.

        **b.**   **Implementation/Training.**   To ensure the successful implementation of the Dispute Resolution Process, the Company and the APFA agree that joint Alternative Dispute Resolution/Conflict Resolution training shall be conducted for Company and APFA representatives as soon as practicable after ratification of this Agreement.

        **c.**   **Railway Labor Act.**  Nothing within this Dispute Resolution Process is intended in any way to affect or abridge the rights of any individual under the Railway Labor Act.

    2.   **Types Of Disputes**

        **a.**   **Individual Dispute.**  An individual dispute ("Individual Dispute") is defined as a dispute between a Flight Attendant and the Company involving any action of the Company affecting him/her, except discharge.

        **b.**   **Group Dispute.**  A group dispute ("Group Dispute") is defined as a dispute protesting any action of the Company which affects those specifically named Flight Attendants at the same base and in the same manner, e.g., scheduling or pay matter affecting all Flight Attendants on a specific leg on a specific day. Any APFA representative shall be recognized by the Company as the representative of a specific named group of Flight Attendants at his/her base for the purpose of submitting such dispute. The provisions of this Section A. shall apply to the processing of such Group Disputes.

        **c.**   **Base Dispute.**  A base dispute ("Base Dispute") is defined as a dispute protesting any action of the Company affecting Flight Attendants at the base as a group. The local APFA Chairperson or Acting Base Chairperson, designated by the APFA, shall be recognized by the Company as the representative of Flight Attendants at that base for the purpose of submitting such dispute. The provisions of this Section A. shall apply to the processing of such Base Disputes.

    3.   **Notice of Dispute**

        **a.**   **Filing.**  A Flight Attendant having such a dispute may file an abbreviated, informal document termed a Notice of Dispute (hereinafter referred to as a NOD) in person or through an APFA representative, within ten (10) days,

262

exclusive of Saturdays and Sundays, after becoming aware of such dispute. Such NOD shall be filed with the Manager of Flight Service, or his/her designee. Any and all documents supporting the claim that are in the possession of the Flight Attendant or the APFA representative should be attached to the NOD form at the time of filing.

**b.** **Signature/Authorization.** Such NOD must be signed by the individual Flight Attendant(s) affected who is filing the dispute. If the NOD is submitted through an APFA representative, a signed authorization must be submitted to the Company, designating the APFA as the representative of the Flight Attendant(s) affected with respect to the dispute. Employees covered by this Agreement may be represented at a Dispute Resolution Conference by such person as they may choose and designate, and the Company may be represented by such person as it may designate.

**c.** **Distribution of NOD.** Unless the APFA has filed the NOD on behalf of the Flight Attendant, the Company shall provide a copy of the NOD to the local APFA Chairperson, or Acting Base Chairperson designated by APFA, within five (5) working days of the Company's receipt of the NOD.

**4.** **Initial Informal Attempt to Reach Resolution**

**a.** **Discussion(s)/Initial Exchange of Documents.** After a NOD is filed, the Company, the Flight Attendant(s) and his/her APFA representative should endeavor to discuss and resolve the dispute as soon as possible. The parties will commence the exchange of all documents supporting their respective positions at this point.

**b.** **Resolution.** Should the parties be successful in reaching a resolution to the dispute, the matter shall be considered resolved and no further action shall be taken by the parties on the matter except any action necessary to implement the terms of the resolution reached between the parties. Such resolution shall be summarized on the NOD form and shall be provided to the Flight Attendant and the APFA representative involved, or, if none, to the local APFA Base Chairperson or acting Base Chairperson designated by the APFA.

**c.** **Discussions/Resolution - Off the Record/Non-Precedential.** All matters discussed or decided prior to the Dispute Resolution Conference ("DRC"), including resolutions, shall be off the record and shall have no precedential effect on any other matter or be admissible or relied upon in any other matter. Notwithstanding the foregoing, the parties are not precluded from referring to such a resolution orally and in general terms, and should not refer to specific bases or number of such resolutions reached in other DRCs or initial informal discussions under this procedure.

**5.** **Dispute Resolution Conference**

**a.** **Purpose.** Should the initial attempts to reach resolution be unsuccessful, a meeting hereinafter referred to as a Dispute Resolution Conference ("DRC") shall be scheduled. The purpose of the DRC shall be to attempt to reach an acceptable resolution of the dispute informally.

28-2

263

**b.**      **Scheduling Coordination.**  The scheduling of a DRC shall be coordinated through the Flight Service Base Manager's office at the Flight Attendant's base station.

**c.**      **DRC Held Within 30 Days.**  The DRC shall be held within thirty (30) days following receipt of the NOD at a time and date mutually agreed upon, unless the parties otherwise agree.

**d.**      **Participants at DRC.**  Except as noted below, participants at the DRC shall be limited to the Flight Attendant(s) who filed the NOD, his/her APFA representative, a Company representative and a Facilitator.  In all matters involving an individual Flight Attendant's performance or attendance, or a personal matter, the Flight Attendant shall be present at the DRC.  In all other disputes, such as scheduling, contractual or other policy issues, the Flight Attendant may elect not to attend the DRC and be represented at the DRC by his/her APFA representative.

**e.**      **Summary of Issues.**  Prior to, or at the beginning of the DRC, the Flight Attendant, or his/her APFA representative, shall briefly summarize on the NOD form the matter at issue and the remedy sought.  For Group or Base Disputes, as defined in paragraphs 2.b. and c. above, the APFA representative shall provide this summary on the NOD form.

**f.**      **Facilitator**

**(1)**      **Selection.**  The DRC shall be facilitated by the Flight Service Base Manager or his/her designee, i.e., a peer Flight Service Manager.  The Company shall select the Facilitator, except that any individual who is or was materially involved in the decision and/or the events leading to the NOD shall not be eligible to serve as the Facilitator at the DRC for that NOD.  The Company shall consider the recommendation of the APFA grievance representative in the selection of the Facilitator for a DRC.

**(2)**      **Role.**  The role of the Facilitator shall be non-adversarial. The Facilitator shall assist the parties in fashioning an acceptable resolution to the dispute.

**(3)**      **Discussions with Facilitator - Off the Record/Non-Precedential.**  The Facilitator shall review all of the documents exchanged and presented by the parties, and provide the parties with an opportunity to openly discuss the dispute.  All matters discussed  or decided at the DRC, including recommendations, whether  accepted or rejected, and resolutions, shall be off the record and shall have no precedential effect on any other matter or be admissible or relied upon in any other matter. Notwithstanding the foregoing, the parties are not precluded from referring to such a resolution or accepted recommendation orally and in general terms, and should not refer to specific bases or number of such resolutions or accepted recommendations reached in other DRCs or initial informal discussions under this procedure.

28-3

264

**g.    Document Exchange.** At the DRC, the parties shall exchange all documents not previously exchanged supporting their respective positions. This exchange should continue throughout the process as documents become known to any of the parties, until such time as the dispute is finally resolved in accordance with this Agreement. For confidentiality purposes, and, at the option of either party, all names and other identifying information may be expunged from any documents exchanged.

**h.    Resolution**

(1)    If an agreement resolving the matter in dispute is reached by the parties during the DRC, the Facilitator shall summarize the agreement on the NOD form.

(2)    All participants at the DRC shall sign the agreement.

(3)    The dispute shall be considered resolved and no further action shall be taken by the parties on the matter except any action necessary to implement the terms of the agreement reached between the parties.

(4)    The Company shall provide a copy of the completed NOD form to the Flight Attendant and the APFA representative involved, or, if none, to the local APFA Base Chairperson or acting Base Chairperson designated by the APFA.

**i.    Failure to Resolve/Facilitator's Recommendation**

(1)    If no agreement resolving the matter in dispute is reached by the parties during the DRC, the Facilitator shall issue a written, non-binding recommendation.

(2)    The recommendation shall be issued as a separate document apart from the NOD form.

(3)    The Facilitator shall issue the recommendation at the conclusion of the DRC, unless otherwise agreed to by the parties, and in no event shall the recommendation be issued later than three (3) working days following the conclusion of the DRC.

(4)    A copy of the recommendation, when issued, shall be provided to the Flight Attendant(s), and to both the Company and the APFA locally.

**j.    Acceptance of Facilitator's Recommendation - Notification/Confirmation**

(1)    The Flight Attendant(s), or the APFA representative, as applicable, shall have five (5) days exclusive of Saturdays and Sundays, from receipt of the Facilitator's recommendation to notify the Flight Service Base Manager, or his/her designee, that the recommendation is accepted.

28-4

265

(2)    In the case of an Individual or Group Dispute, the Flight Attendant(s) shall notify the Flight Service Base Manager, or his/her designee, of his/her acceptance by:

(a)    signing the recommendation form indicating his/her acceptance and returning the completed form to the Flight Service Base Manger, or his/her designee;

(b)    orally notifying the Flight Service Base Manager, or his/her designee, either in person or by telephone; or

(c)    authorizing his/her APFA representative to communicate to the Flight Service Base Manager, or his/her designee, his/her acceptance either orally or in writing.

(3)    In the case of a Base Dispute, the APFA representative shall notify the Flight Service Base Manager, or his/her designee, by:

(a)    signing the recommendation form indicating his/her acceptance and returning the completed form to the Flight Service Base Manager, or his/her designee; or,

(b)    orally notifying the Flight Service Base Manager, or his/her designee, either in person or by telephone.

(4)    In all cases, the acceptance must be communicated within five (5) days, exclusive of Saturdays and Sundays, from receipt of the Facilitator's recommendation. In all cases where the Flight Attendant, or the APFA representative, as applicable, has communicated his/her acceptance orally, such acceptance must be confirmed in writing to the Flight Service Base Manager, or his/her designee.

(5)    Once acceptance is received, the NOD shall be considered resolved and no further action shall be taken by the parties on the matter except any action necessary to implement the terms of the recommendation.

(6)    A copy of the signed recommendation form and acceptance of the recommendation shall be provided by the Flight Service Base Manager, or his/her designee, to each of the parties, and to the APFA representative involved, or, if none, to the local APFA Chairperson or Acting Base Chairperson designated by the APFA.

**k.    Rejection of Facilitator's Recommendation - Notification/ Confirmation**

(1)    In the case of an Individual or Group Dispute, the Flight Attendant(s) shall notify the Flight Service Base Manager, or his/her designee, of his/her rejection by:

28-5

266

(a)     signing the recommendation form indicating his/her rejection and returning the completed form to the Flight Service Base Manager, or his/her designee;

(b)     orally notifying the Flight Service Base Manager, or his/her designee, either in person or by telephone; or,

(c)     authorizing his/her APFA representative to communicate to the Flight Service Base Manager, or his/her designee, his/her rejection either orally or in writing.

(2)     In the case of a Base Dispute, the APFA Representative shall notify the Flight Service Base Manager, or his/her designee, of his/her rejection by:

(a)     signing the recommendation form indicating his/her designee, of his/her rejection and returning the completed form to the Flight Service Base Manager, or his/her designee; or

(b)     orally notifying the Flight Service Base Manager, or his/her designee, either in person or by telephone.

(3)     In the event the Flight Attendant or APFA Representative, as applicable, provides no response within ten (10) days, exclusive of Saturdays and Sundays, following receipt of the recommendation, the recommendation shall be deemed rejected and dispute may be submitted to the System Board for adjudication.

(4)     In any case where a recommendation has been rejected, the Company shall provide a copy of the signed rejected recommendation to APFA Headquarters within five (5) working days of receipt; or, if no written response is forthcoming within ten (10) days, exclusive of Saturdays and Sundays, from issuance of the recommendation, the Company shall notify APFA Headquarters in writing, within five (5) working days, that such recommendation has been deemed rejected.

(5)     In all cases where a recommendation has been rejected, for record keeping purposes, the Flight Attendant(s) or the APFA Representative, as applicable, shall submit a signed copy of such rejection within thirty (30) days following receipt of the recommendation.

**6.     Submission to System Board.** Once the recommendation has been rejected, the NOD may be submitted as a grievance to the System Board of Adjustment, as provided for in Article 29 of this Agreement. The submission of a dispute to the System Board of Adjustment must be made within thirty (30) days of APFA Headquarters' receipt of the rejected recommendation. The submission to the System Board of Adjustment shall include a formal and specific grievance statement, including the matter at issue and the remedy sought, the NOD, and a copy of all documents exchanged to date.

**7.     Conversion of Individual, Group and Base Disputes to Presidential Grievances.** At any time after a NOD is filed in accordance with Section A of this Article,

28-6

267

and prior to submission to the System Board of Adjustment, APFA may determine that a particular dispute involves a contractual or a policy issue which cannot be resolved at a local level and should be converted to a Presidential Grievance. In such case, a formal and specific statement of grievance shall be filed, and the dispute processed in accordance with the Presidential Grievance procedures detailed herein. The Company may recommend that a NOD is appropriate for conversion to a Presidential Grievance, and the APFA shall consider the Company's recommendation.

**B.      DISCHARGE/PRESIDENTIAL GRIEVANCES**

    **1.      Discharge**

        **a.      Notification of Discharge/Request for Investigation and Hearing.** A Flight Attendant shall not be discharged from the service of the Company without written notification of such action which shall contain the precise charges, nor without an investigation and hearing thereon, provided that such Flight Attendant makes written request for such investigation and hearing within ten (10) days, exclusive of Saturdays and Sundays, after receipt of notification. A copy of such discharge will be sent to the APFA Base Chairperson and the APFA Division Representative, simultaneously, with employee notification, unless the employee being discharged requests otherwise.

            **(1)      Hearing Officer.** Such written request for an investigation and hearing shall be addressed to, and such hearing conducted by, the Managing Director, Flight Service, or his/her designee.

            **(2)      Investigation and Hearing Held Within 10 Days.** Such investigation and hearing shall be held within ten (10) days, exclusive of Saturdays and Sundays, of the receipt of the Flight Attendant's written request therefor.

        **b.      Hearing.** At the hearing, both parties shall present an explanation of their respective positions by describing the evidence and setting forth their arguments. The Company shall present its explanation first. Should either party desire to call a witness or witnesses to give testimony in support of his/her respective position, such witness shall be subject to questioning by the other party.

        **c.      Document Exchange.** Documents supporting the respective positions of the parties may be exchanged at the hearing at the option of either party. For confidentiality purposes, and, at the option of either party, all names and other identifying information may be expunged from any documents exchanged.

        **d.      Decision.** The official conducting the hearing shall render a decision as soon as possible but no later than ten (10) days, exclusive of Saturdays and Sundays, after the close of such hearing.

        **e.      Appeal.** If the decision of the Managing Director, Flight Service, or his/her designee, is not satisfactory to the Flight Attendant, the matter may be appealed to the American Airlines Flight Attendant System Board of Adjustment as provided for in Article 29 of this Agreement provided said appeal must be

268

submitted within thirty (30) days of receipt of the decision of the Managing Director, Flight Service, or his/her designee.

    **f.**    **Withhold from Service.**  A Flight Attendant may be held out of service by the Company pending such investigation, hearing and the appeals therefrom.

    **g.**    **Exoneration**

        **(1)**    **Reinstatement.**  If, as a result of any hearing or appeal therefrom, as provided herein, a Flight Attendant is exonerated, s/he shall, if s/he has been held out of service, be reinstated without loss of seniority and shall be paid for such time lost in an amount which s/he would have ordinarily earned had s/he been continued in service during such period.

        **(2)**    **Personnel Record.**  If, as a result of any hearing, or appeal therefrom, as provided herein, the Flight Attendant shall be exonerated, the personnel record shall be cleared of the charges.

**2.**    **Presidential Grievances**

    **a.**    **Filing.**  The President of the APFA may protest, in writing, to the Vice President, Employee Relations, of the Company any action of the Company or any alleged misapplication or misinterpretation of this Agreement within forty-five (45) days after such alleged action, misapplication or misinterpretation has been ascertained.

    **b.**    **Decision.**  The Vice President of Employee Relations shall evaluate such grievance and render a decision, in writing, within twenty (20) days after it has been received.

    **c.**    **Appeal.**  If the decision of the Vice President, Employee Relations is not satisfactory, an appeal may be made, in writing, within twenty (20) days to the System Board of Adjustment, as provided in Article 29 of this Agreement.

**3.**    **General**

    **a.**    **Failure to Appeal Within Time Limits.**  If any decision made by the Company under the provisions of this Article is not appealed by the Flight Attendant(s) affected within the time limits prescribed herein for such appeals, the decision of the Company shall become final and binding.

    **b.**    **Time Limits.**  It is agreed by the parties hereto that the periods of time for hearings, decisions and appeals, established in this Article, shall be considered as maximum periods of time and that when hearings, decisions and appeals can be handled in a period of time less than the maximum time stipulated, every effort will be made to expedite such cases.

    **c.**    **Stenographic Reports.**  When it is mutually agreed that a stenographic report is to be taken of the investigation and hearing, in whole or in

269

part, the cost will be borne equally by both parties to the dispute. In the event it is not mutually agreed that a stenographic report of the proceedings shall be taken, any written record available taken of such investigation and hearing shall be furnished to the other party to the dispute upon request, provided that the cost of such written record so requested shall be borne equally by both parties to the dispute.

d.      **Representation at Hearings.**   Employees covered by this Agreement may be represented at hearings by such person or persons as they may choose and designate, and the Company may be represented by such person or persons as it may designate. Evidence may be presented either orally or in writing, or both, and through witnesses.

e.      **Grievance Matters to be in Writing.**   All matters handled under the procedure provided for in paragraph B. of this Article shall be in writing and shall be signed by the employee or a representative designated by him/her, and all decisions shall be in writing.

f.      **Representatives/Witnesses.**   When, under the operation of this Agreement, a Flight Attendant is chosen to act as the representative of, or witness for, another Flight Attendant against whom charges have been preferred, such Flight Attendant shall, when the requirements of the service permit, be given leave of absence of a time sufficient to permit him/her to appear as such representative or witness.

g.      **Submission to the System Board.**   All submissions to the System Board of Adjustment shall be made in accordance with the provisions of Article 29 of this Agreement.

February 26, 2004

APFA Headquarters
Ms. Linda Lanning, Secretary
1004 West Euless Blvd.,
Euless, TX   76040


Rouben Madikians
Employee # 564126
15 St. George St.   Apt #3
Boston, MA   02118


VIA Certified Mail, Return receipt requested


Dear Ms. Lanning,

I first became aware on December 30, 2003 of several violations of Article 7 committed by our BOS base chairperson, Julia Carrigan.  I am invoking my rights under the APFA Constitution to file Article VII charges, here enclosed.
I specifically request that the APFA take any and all necessary and proper legal action to vindicate and validate my rights under the APFA Constitution and I invoke the jurisdiction of the Executive Committee to these ends.

As a member in good standing of the APFA and pursuant to the APFA Constitution, Article VII - Hearings and Disciplinary Procedures, Section 1, Grounds for Charges, I hereby file formal charges against the following officers and agents of the APFA for violations contained and detailed herein and file this notice of my intent to pursue internal charges under Article VII and all other remedies available to me.

As required by the APFA Constitution, I shall exhaust internal remedies under this Article VII for a period not to exceed four months from the date of this letter prior to taking any legal action with respect to matters cognizable as charges under this Article VII. I specifically request that the Executive Committee take all legally necessary action to vindicate and validate my rights under the APFA Constitution.

I request an expedited hearing of these charges by the Executive Committee and request that you, Ms. Lanning, as Secretary of APFA, arrange for an Emergency Meeting of the Executive Committee to address these charges and that you inform me as soon as possible as to the procedures you intend to follow regarding these charges, and all relevant hearing dates, locations and participants. I request that a notice be circulated to all members in good standing as to the applicable dates of any relevant hearings and proceedings having a connection to these charges and that such proceedings be open to all members in good standing.

I request that you circulate copies of this charging instrument to all members of the Executive Committee and other interested parties as your internal procedures and due process may require.

Sincerely,

Rouben Madikians

**EXHIBIT C**

During the past three years, Julia Carrigan has consistently removed herself from trips in excess of APFA policy guidelines governing a base the size of Boston. At no time during Julia's tenure have we ever had enough flight attendants (1,000) to warrant a full month of trip removals. In addition, APFA also paid for trip removals for Vice Chair Michelle Brawley, as evidenced in the LM2 figures for 2001 and 2002.

The information below was taken from APFA records and establishes a pattern of trip removals in excess and in violation of the APFA policy manual over the period from January 2001 to October 2003. Julia has had off literally every weekend and holiday for the past three years while being credited with an average of over 90 hours a month. As detailed below, several infractions of the rules governing rip removals have resulted in Julia being trip removed and paid for the whole month while not flying a single day.

It is my contention that Julia has violated:
Article 7 Section 1.E Theft or Embezzlement of Association moneys or properties; and

F. Willful violation of an express Article of this Constitution or of a proper and express written resolution or policy of the Board of Directors or the Executive Committee;

By ignoring the rules laid out in the APFA Policy Manual and knowingly submitting trip removals for reimbursement to which she is not entitled, Julia has willfully violated Article 7 Section 1E as stated in Paragraph F above.

Furthermore, I contend that Julia is in violation of the regulation contained in the LMRDA (Labor Management Reporting and Disclosure Act of 1959)
In accordance with the LMRDA, Title V – Safeguards for Labor Organizations Fiduciary Responsibility of Labor Organizations.
(29 U.S.C. 501) Sec. 501.(C)
"Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use, or the use of others, any of the monies, funds, securities, property, or other assets of the labor organization of which he is an officer, or by which he is employed, directly or indirectly, shall be fined not more than $10,000 or imprisoned for not more than five years or both."

I submit the following pages as evidence of the violations stated above.

**Feb 2001,**
TTL Hours Credited: 108.09
TTL Removed From: **68.78**

Trips Removed From:
| | |
|---|---|
| Feb 3, 4 | 13.23 |
| Feb 10, 11 | 13.23 |
| Feb 15, 16 | 12.12 |
| Feb 20, 21 | 11.55 |
| Feb 23, 24 | 13.23 |
| Mar 1 | 6.42 |

= TTL 68.78

**March 2001**
TTL Hours Credited: 104 +
TTL Removed From: **78.78**

Trips Removed from:
| | |
|---|---|
| Mar 2 | 5.36 |
| Mar 3, 4, 5 | 15.18 |
| Mar 8,9,10 | 15.18 |
| Mar 14, 15, 16 | 15.18 |
| Mar 19 | 6.35 |
| Mar 20.21.22 | 15.18 |
| Mar 27 | 6.35 |

= TTL 78.78

Julia removed herself once again from most of the trips she had on her line and only flew the trips that she had picked up. In the process, she ended up having 18 days off in a row. In return for a full month's trip removal, a representative is obligated to WORK 18 days for APFA.

**April 2001**
TTL Hours Credited: 105.25
TTL Removed From: **60.41**

Trips Removed From:
| | |
|---|---|
| APR 2, 3 | 12.08 |
| APR 8, 9 | 12.08 |
| APR 10, 11 | 12.09 |
| APR 12, 13 | 12.08 |
| APR 22, 23 | 12.08 |

= TTL 60.41

Julia was officer on duty the first week of April during which she was on call from Monday, April 2 to Sunday, April 8. She removed herself from trips on April 1 and April 9 for the 7-day rule, but since she was working from home and NOT out of town, these trip removals for the 7-day rule were inappropriate.

Julia also removed herself from a double trip trade to be at informational picketing in violation of the provision in the Policy Manual forbidding trip trades UP in time for a trip you will be removed from, yet the removal somehow fell through the cracks and was approved by APFA Hdq.

This removal was a violation of:
Section 5.C.9., APFA PAID TRIP REMOVAL/FLIGHT LOSS

**Seven (7) Day trip Removal Provision**
A trip removal may be authorized to ensure that a member is not required to work AWAY from his/her city of residence for the APFA AND the company for seven (7) consecutive days.

**May 2001**
TTL Hours Credited: 93.29
TTL Removed From: **53.90**

Trips Removed From:
| | |
|---|---|
| May 1 | 5.43 |
| May 4, 5 | 12.32 |
| May 9, 10 | 12.32 |
| May 19, 20 | 11.51 |
| May 24, 25 | 12.55 |

= TTL: 53.90

**June 2001**
TTL Hours Credited: 94.58
TTL Removed From: **54.61**

Trips Removed From:
| | |
|---|---|
| June 1, 2 | 12.07 |
| June 14 15 | 12.05 |
| June 19, 20 | 12.00 |
| June 24, 25 | 12.00 |
| July 1, | 6.29 |

= TTL: 54.61

Julia removed herself again from her original trips, giving herself every weekend off.

**July 2001**
TTL Hours Credited: 101.10
TTL Removed From: **87.98**

Trips Removed from:
| | |
|---|---|
| July 2 | 5.31 |
| July 7, 8 | 12.04 |
| July 10, 11 | 11.49 |
| July 12, 13 | 12.04 |
| July 17, 18 | 12.04 |
| July 23, 24 | 11.49 |
| July 27, 28 | 12.04 |
| July 30, 31 | 11.53 |

= TTL: 87.98

**August 2001**
TTL Hours Credited: 98.37
TTL Removed From: Approx **80.00**

**September 2001**

Julia removed herself from all her original trips and flew just one trip on August 9 and 10, once again giving herself every weekend off. She then removed herself from August 11 through September 10, resulting in her having a month off from having to fly any trips.

**November 2001**
TTL Hours Credited: 91.16
TTL Hours Removed From: 91.16

Julia had vacation this month but removed herself from EVERYTHING, even an available day on November 2. There was a board meeting on November 28 with a travel day on November 28. Julia charged the union travel time on November 27 and charged vacation payback on that day. The two days before, she charged APFA for vacation payback for supposedly doing union work from home while on vacation.

**December 2001**
TTL Hours Credited: 109.34
TTL Hours Removed From: 88.46

Julia claimed that she was doing APFA work and removed herself from trips so that she had every weekend and the holidays off. The only APFA work listed was a BOD meeting on December 19 and 20.

**January 2002**
TTL Hours Credited:  90.08
TTL Trips Removed From: **54.29**
TTL Hours Flown: 35.79

Trips Removed From:
Jan 2, 3          12.12
Jan 5, 6          12.12
Jan 9              6.01
Jan 17, 18.19     6.01 x 3
Jan 26, 27        6.01 x 2      = TTL: 54.29

Julia's trip removals in January resulted in her having off until January 10

**February 2002**
TTL Hours Credited: 99.15
TTL Removed From: **73.37**
TTL Hours Flown: 25.78

Trips Removed From:
Jan 31            5.09
Feb 4, 5          10.52
Feb 9, 10         10.35
Feb 11, 12        10.52
Feb 16, 17        10.35
Feb 19, 20, 21    16.19
Feb 23, 24        10.35        = TTL 73.37

**March 2002**
TTL Hours 95.19
TTL Hours Removed From: **57.74**
**Trips Removed From:**
Mar 2,3           11.43
Mar 7, 8          11.43
Mar 20-21         12.02
Mar 22-23         11.43
Mar 27-28         11.43        = TTL: 57.74

The BOD members knew about this month's two day training and the board meeting over a month in advance.  However, Julia deliberately put a double trip trade on her schedule anyway from which she was later removed.  This is another blatant instance of "milking the system" to defraud the APFA.

Per the manual, they are not to pick up any trips during BOD meetings if they know the meeting is taking place.

**April 2002**
TTL Credited:  97.47
TTL Removed From: **39.22**

**Trips Removed From:**
Apr 19, 20, 21                16.06
Apr 25, 26, 27                16.06
Apr 30                    7.10            = TTL: 39.22

This was a secondary vacation month.  Not only did she get money from AA for trips removed, which she is entitled to do, but she also charged seven days of vacation payback to APFA which amounted to 1044.96 (149.28 X 7) which she is NOT entitled to do.  The papers she submitted said only "base work" but no one can substantiate exactly what base work she did to justify these removals.  This is clearly using our money in a dishonest and abusive way. April is also a month that Julia goes away...

**May 2002**
TTL Hours Credited: 95.24
TTL Hours Removed From: **47.10**

**Trips Removed From:**
 May 1, 2        11.39
May 6, 7        12.57
May 11, 12      11.57
May 26, 27      11.57            =TTL: 47.10

This month the only weekend that Julia worked was the weekend she went to Norway to attend a party and pick up an award. Otherwise, she removed herself from all trips over the weekends. She also removed herself from trips so that she would not be working 7 days before and after the trip to Norway, a trip that was NOT required APFA official business.

**June 2002**
TTL Hours Credited:  94.57
TTL Removed From: **80.71:**

Jun 3, 4        11.57
Jun 7, 8        11.57
Jun 11, 12      11.57
Jun 16, 17      11.46
Jun 22, 23      11.54
Jun 26, 27      11.46 (double trip trade for a tree dedication)
Jun 29, 30      11.54

**July 2002**
TTL Hours Credited: 109.10
TTL Removed From: **77.50**
July 6, 7            14.48
July 12, 13, 14      21.30
July 19, 20, 21      21.30
July 26, 27, 28      20.42        = TTL: 77.50

**February 2003**
TTL Hours Credited: 72.06
TTL Hours Removed From: 72.06
Actual hours Flown 0

**April 2003**
TTL Hours Credited 97.19
TTL Hours Removed From: 97.19
TTL Hours Flown 0

Julia removed herself from the entire month, but only after she built her line up to almost 100 hours. Over the Easter school Holiday, by her own admission, she and her family went on a trip to San Diego. Despite padding her schedule with an extra 25 hours and removing herself for the whole month, she failed to return phone calls from members anxious for answers about the restructuring proposal and sent out virtually NO information during the re-vote fiasco that followed. Julia billed APFA for expenses that were incurred during her trip to San Diego. These expenses are NOT covered under the Policy Manual guidelines because she was not required to be in San Diego on official APFA business. It was her choice to be there

**May 2003**
TTL Hours Credited 92.39
TTL Hours Removed 40.18
TTL Hours Flown: 52.21

**July 2003**
TTL hours Credited 109.29
TTL hours removed 45.37
TTL hours flown 63.92

These removals allowed Julia to have a string of days off (in this case, 11) in a row and every weekend.

**August 2003**
Julia did not fly from August 22 to September 16 resulting in twenty-six days off from the end of summer through the first week of the school year.

**September 2003**

September was a reserve month for Julia, but she managed to avoid reserve for the most part by removing herself until the 16th of the month and then flying only one turn and one two day trip during the remainder of the month.

**October 2003**
TTL Hours Credited 106.52
TTL Hours Removed From: 34.53

Julia had EPT training in OCT, but she made no attempt to attend a termination hearing for a domestic f/a. She did not even return the terminated f/as phone call until AFTER she had been terminated, even though Julia was paid 2052.52 for trip removals in OCT.

March 21, 2004

APFA Headquarters
Ms. Linda Lanning, Secretary
1004 West Euless Blvd.,
Euless, TX   76040

Rouben Madikians
Employee # 564126
15 St. George St.   Apt #3
Boston, MA   02118

VIA Certified Mail, Return receipt requested

Dear Ms. Lanning,

I first became aware on February 4, 2004 of actions taken by our BOS base chairperson, Julia Carrigan which violated my rights under the APFA constitution.  I hereby invoke my rights as a member in good standing of APFA to file formal charges contained and detailed herein and pursuant to the APFA Constitution, Article VII – Hearings and Disciplinary Procedures, Section 1, Grounds for Charges against Julia Carrigan as an officer and agent of APFA.

I specifically request that the APFA take any and all necessary and proper legal action to vindicate and validate my rights under the APFA Constitution and I invoke the jurisdiction of the Executive Committee to these ends.

I specifically request that the Executive Committee take all legally necessary action to vindicate and validate my rights under the APFA Constitution.

I request an expedited hearing of these charges by the Executive Committee and request that you, Ms. Lanning, as Secretary of APFA, arrange for an Emergency Meeting of the Executive Committee to address these charges and that you inform me as soon as possible as to the procedures you intend to follow regarding these charges, and all relevant hearing dates, locations and participants.

I request that you circulate copies of this charging instrument to all members of the Executive Committee and other interested parties as your internal procedures and due process may require.

Sincerely,

Rouben Madikians

EXHIBIT D

On February 4, 2004, I received several telephone calls from fellow flight attendants informing me that a Base Brief had been placed in all Domestic Flight Attendants' mailboxes at the BOS base. The author of this Base Brief was Julia Carrigan, BOS Domestic Base Chair. The calls I received were from people who were disturbed that two pages of the 5-page Base Brief were devoted to defaming me and accusing me of being a malicious flight attendant "spreading lies, gossip, and major distortion of the facts," as well as invading Julia's and her family's personal life." She went so far as to claim that I am guilty of stalking her and her family, in particular, her son, and to allege that I "will stop at nothing to destroy" her, and that I have "stated as much." This Base Brief was printed on APFA letterhead and stated that it was "AN OFFICIAL APFA PUBLICATION" which means it was paid for by APFA funds i.e. my dues money.

Article 1, Section 2. lists the OBJECTIVES OF THE APFA.

2B. To protect the individual and collective rights of the members of the APFA and to promote their professional interest and image.

And

2H. To disseminate information to enhance the professional status of the membership.

And

2K. To do any and all other acts consistent with and in furtherance of the objectives and purposes herein.

Publishing this Base Brief was a deliberate attack undertaken against me by Julia Carrigan in retaliation for exercising my rights under the APFA Constitution to seek her removal from office by circulating a petition at the BOS base. By printing a personal attack in an official APFA publication, Julia Carrigan did harm my reputation, my professional interest and my image in violation of Article 1 Section 2B, which directs her to "protect the individual and collective rights of the members of APFA and to promote their professional interest and image."

Two of the five pages of the Base Brief were devoted to disparaging me and other APFA members who disagree with the way Julia conducts APFA business. Julia used the flight attendant mailboxes to distribute false and prejudicial information about me and other APFA members in good standing, and in so doing, violated Article 1 Section 2H, which requires information disseminated to enhance the professional status of the membership.

The publication of the Winter 2004 Base Brief and the distribution of this brief not only caused me and those other APFA members to be perceived in a negative way which harmed our reputation and professional image, but also violated our rights under Article II Section 3 of the APFA Constitution.

As stated in Article II Section 3 BILL OF RIGHTS OF MEMBERS:
    A.  All members of the APFA shall have the right of free speech, freedom of assembly and freedom to dissent.

My attempt to exercise my right of free speech and my freedom to dissent were met with a defamatory and retaliatory campaign waged against me by Julia Carrigan in violation of Article II Section 3.

Furthermore, Julia Carrigan used APFA funds to publish a base brief that was, for the most part, a self-serving document intended to discredit and defame me in retaliation for my questioning her job performance. This misuse of APFA funds to further her own personal agenda can be construed as theft of Association monies and also violates the Labor Management and Reporting and Disclosure Act (LMRDA) of 1959, specifically

**TITLE V-SAFEGUARDS FOR LABOR ORGANIZATIONS**

**Fiduciary Responsibility of Officers of Labor Organizations**

(29 U.S.C. 501)

SEC. 501. (a) The officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group. It is, therefore, the duty of each such person, taking into account the special problems and functions of a labor organization, to hold its money and property solely for the benefit of the organization and its members and to manage, invest, and expend the same in accordance with

refrain from dealing with such organization as an adverse party or in behalf of an adverse party in any matter connected with his duties and from holding or acquiring any pecuniary or personal interest which conflicts with the interests of such organization, and to account to the organization for any profit received by him in whatever capacity in connection with transactions conducted by him or under his direction on behalf of the organization. A general exculpatory provision in the constitution and bylaws of such a labor organization or a general exculpatory resolution of a governing body purporting to relieve any such person of liability for breach of the duties declared by this section shall be void as against public policy.

 (c) Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use, or the use of another, any of the moneys, funds, securities, property, or other assets of a labor organization of which he is an officer, or by which he is employed, directly or indirectly, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

Whereas

Article VII Section 1. GROUNDS FOR CHARGES states:

Any member is subject to fine, suspension or expulsion, or suspension from or removal from office, for any of the following acts:

F. Willful violation of an express Article of this Constitution, or of a proper and express written resolution or policy of the Board of Directors or the Exectuive Committee;

And whereas

Julia Carrigan has violated several express Articles of the Constitution and the proper and express written policy of the Board of Directors as outlined and detailed in the infractions listed above;

In accordance with Article VII Section 1, I hereby ask for the expulsion from or removal from office of Julia Carrigan and any other fine or suspension the Executive Committee may deem appropriate.



## Association of Professional Flight Attendants

### Office of the Secretary

June 10, 2004


Julia Carrigan
20 Chestnut St
Charlestown, MA  02129-6192

**CERTIFIED MAIL NO: 7003 1680 0001 7348 7427**
**RETURN RECEIPT REQUESTED**

RE:    DISPOSITION OF ARTICLE VII CHARGE (S)

Dear Julia:

This letter is to advise you that the Article VII charges filed against you by APFA member Rouben Madikians on February 25, 2004, have been dismissed because the accuser APFA member Rouben Madikians failed to appeal the determination of the APFA Executive Committee regarding their charge(s).

All charges, correspondence and documentation received by my office concerning the allegations against you will be placed in a closed file and retained in the records of the APFA.

Sincerely,

Greg Hildreth

cc:    Accuser APFA Member Rouben Madikians
       APFA Board of Directors
       APFA Executive Committee
       APFA Article VII file

**EXHIBIT E**

**APFA Headquarters**
Local 817-540-0108
Natl. 1-800-395-2732
Fax 817-540-2077

**APFA BASE BRIEF**
Association of Professional Flight Attendants
1004 West Euless Boulevard
Euless. Texas 76040

APFA Voice Mail Extenstion
BOS Chair: 8432
BOS VChair: 8452
Professional Standards Rep: 8602

Winter, 2004

It has been quite a while since our last base brief. It seems like as soon as something is written, there is a change. Please remember that anything from APF A that is put into your f/a mailbox must be approved by both APF A headquarters and AA management.

**<u>Minimum Layover Rest Break:</u>** We are continuing to solicit copies of the heinous trips that we are now flying. Thank you to all who continue to copy us in and please continue to submit your HI3's with your written comments. If you have a particularly gruesome trip, please either place a copy of your HI 3 in the APF A lockbox in ops, or you can go to www.apfa.org. There is an electronic form that can be easily filled out: These trips and the lack of layover rest are affecting our health, safety, paychecks, and quality of life. We need to continue to document the negative impact that these trips have on us in order to make any changes!

**<u>APFA Website and Contract:</u>** I receive phone calls every day from f/a's asking about legalities. Please carry your contract and a copy of the restructuring agreement with you. (If you can't interpret it, now that's a different story!) You can also access them from Jetnet. Go to the Flight Service website, click on Resources, and then on to the APFA link. Now, if you are sitting in ops wondering about legalities, you can go straight to the contract!

**<u>Reassignments:</u>** Here is a reminder of the definition of a reassignment: Legal, Available, and your trip operated. ill order to qualify for RA pay, you must have been legal for your trip, you must be available to take your trip, and your trip must have operated. If all of the above are satisfied and you are assigned to another trip, then you should be pay protected.

**<u>Reschedules:</u>** If you are a high time flyer with 100 hours, did you know that you can be rescheduled? As long as there is another trip on your schedule that could be removed to bring you back to 100 hours or less, then it's legal. However, if you were flying your last trip of the month, you could not be rescheduled to more than 100 hours.
If you are RA'd or RSK'd, there is no "back before noon" rule for line f/a's. This rule only applies for a reserve on a DFP, unless we are at Step 8 in the Order of Open Time. A line f/a can be flown into a DFP as long as there is time later in the month to replace that DFP.

**<u>Notification:</u>** Notification of a RA/RSK can come from ACARS or an agent/manager meeting the flight. If it is the latter, they can only tell YOU to call crew tracking. They do not have the ability to RA/RSK you. If the RA/RSK comes from ACARS, the crew or designated f/a must be notified by the cockpit. The message can only pertain to that day's flying and to a RA/RSK only.

**EXHIBIT F**

**13/15 Legalities:** Pursuant to changes in Article 7 .K.1, we can now be scheduled to 13 hours with a max of 15 hours if the departure falls between the hours of 0600-1759. If the departure falls outside of those hours, then the original contractual hours apply. Also, under the new language, the rescheduled hours are the same as the scheduled hours, (0600-1759), which is 13 hours.

**Reserve:** I know many of us have been placed back on reserve after a nice lengthy break
and there are a lot of questions. There is a good amount of info in HIDIR, which can help take away some of the second-guessing that we all do! But a few quick tidbits:
* Please make sure to bid some reserve selections if you are on the backup list and conversely, make sure to bid some lines selections in case you are able to hold off reserve!
*If you are returning from VC and have a carryover trip into your RSV month, you will be legal for assignment 75 minutes after the scheduled arrival of your VC removed trip.
*Crew Schedule CAN try to contact you during your 12 hour rest; however, you do NOT have to be available or return their call until your 12 hour rest is up. You CANNOT be charged with a TM if you are not available during your rest break.
* If your entire rest break falls over the time you have to call the tape, then you have an obligation to call crew schedule to tell them that you will not be calling the tape, but you will be available at the end of your rest break
*If you are assigned to Standby duty, you must be legal to fly. You cannot be assigned SB just to board an aircraft. .
*** And last but not least, please remember your voice is being recorded, even while you are on hold. So speak loudly! ***

**Professional Standards:** Many thanks to our professional standards reps- Amy Milenkovic and Barbara Bowen. They provide an invaluable service to the f/a' s at our base and we are all very fortunate to have their assistance. If you are called by one of them, please know that they are only trying to help. The f/a calling them has made an effort to correct a problem without management involvement. By not responding to a call from them, you are thwarting the process and frustrating your fellow co-workers, possibly forcing them to take the issue to AA management! !

**Dues Arrears:** APF A members who are in dues arrears cannot vote in any election or **have their signature counted on a petition.** Please don't let others make decisions for you!

**737 Staffing:** We are in the process of gathering documentation regarding the staffing changes made to the 737 flying. Here in Boston, we realize the difficulty when trying to complete the service, especially when working a transcon with only 3 f/a' s. Make sure all sequences that are staffed with 3 f/a' s are put in the APF A lockbox, so we can assist any future action taken by APF A with our documentation! Also note- when working a transcon with only 3 f/a's, the #4 is required to work in F/C, regardless of the load! If you are lucky enough to have a #3, they are to remain in first class on all transcons until their service is completed. Lately there has been confusion on this, resulting in some crew conflict. When in doubt, refer to the 737 Station Assignment Chart, pg 1.1.

**Family Leave Update:**  As a result of the Family Leave Presidential Grievance, which was successfully arbitrated by the APFA, the eligibility threshold for qualifying for FMLA (Family Leave) has been changed. from 720 "on duty hours", to 504 "paid productive hours. Paid productive hours consist of trips flown, EPT's, sick make-up, special assignment, available days, and reserve days. Paid productive hours do NOT include sick, vacation, or IOD hours, which is consistent with the national FMLA law. If you were previously denied FMLA, due to insufficient hours, or did not submit a FMLA request because of insufficient hours, you absence may now qualify retroactively.
If you believe you may now be eligible for FMLA for a past absence, go to www.flight service.com. First click on "resources", then "AMR medical", then "Begin family leave reconsideration process". This screen will show all your absences from October 22, 2001 through November 30, 2002. You may submit any absence that has a green check mark under the Eligible column. Click on "Submit Absence" to begin the process. AA Medical did not save any medical documentation for FMLA requests denied during this time period, so you will have to resubmit all documents. If you are unable to obtain your medical documentation, you should click on "Declaration for Family Leave (for absences which began between Oct. 22, 2001 and Nov. 30, 2002)". If using the declaration form, you MUST attach your confirmation printout from the "submit absence" screen, and fax it to AA Medical, for your retroactive FMLA request to be considered.
To determine if you are eligible for FMLA for a current absence, click on "view paid productive hours" from the "AMR medical" screen. This screen will show month by month, your paid productive hours, and whether or not you are currently eligible for FMLA. -you can also download the FMLA request forms from the "AMR medical" screen.
If you have received any corrective action regarding attendance from AA, and are approved for a retroactive FMLA, follow up with your FSM to ensure the corrective action is removed. If you have any further questions, please feel free to contact Kirsten Smith. We have asked Kirsten to take charge of this project, because she has vast knowledge and experience on this subject. Kirsten has been our Maternity Rep. in Boston for over 10 years, and we owe her a debt of gratitude. We also thank her for writing this part of this base brief: You can reach Kirsten at (508) 690-2301.

**Congratulations!**  Now on to some good news for a change! Michelle (Brawley) Ferragamo and her husband Domenic are the proud parents of a beautiful baby boy, Michael. Mother and son are doing great, and appreciate all the cards, gifts, and well wishes that have been sent! Contrary to rumor, Michelle is planning a return later this spring to her position as our base Vice Chair. Michelle and I confer several times a week and as always, she provides me with invaluable assistance. She also will be attending the BOD Convention with me next month.

**Annual Board of Directors Convention**  We are very pleased to announce that APFA's Annual Board of Directors' Convention will be held in Boston, March 1-5, at the Omni Parker House. We are honored to be the host city, and are excited at the opportunity this affords our own FAs to attend. Jennifer McCauley and I have been lobbying for this for 6 years now! We hope you will take this opportunity to attend at least some portion of

the meetings. Although we do spend some time in "off the record" / confidential sessions (due to lawsuits and other legal issues), this is a great chance to meet other APFA representatives, hear the latest issues being discussed, see how policy is made, and how Board Meetings are conducted. Please remember you must be a member in good standing to attend this meeting.

I am now writing to you to discuss some very personal issues, and am doing so with a very heavy heart. After more than 6 years of working as either the BOS Vice Chair or as BOS Chairperson, I find myself in the unenviable position of having to defend myself from vicious, personal attacks and blatant lies about how I conduct APF A business, specifically regarding APF A trip removals.

First, I'd like to thank my family, friends and all the flight attendants who have supported me, especially those with whom I've had political differences but have stood by me and offered their support despite those differences. At least once a day, I speak to someone who is outraged by the actions of this very small group of malicious flight attendants. They are part of the reason for this letter, and I will no longer stand by and pretend this smear campaign will stop if I take the high road and say nothing. They have gone too far now, attacking my integrity and stalking my family's whereabouts.

It is alleged by this group that I am abusing the APF A's trip removal policy. The person(s) responsible for spreading these accusations has been given unlimited access to the policy manual (which spells out the rules for trip removals), the National Officers and the APFA accountants and records, and have been unable to find this so-called abuse. Despite this, he/she persists in trying to remove me from office by ignoring the facts and the policy manual, and by spreading lies, gossip, and major distortion of the facts, not to mention invading my, and my family's, personal life. Thankfully, many of you have called, not only to express your outrage about this person(s)' tactics, but to ask questions and learn the truth. Once the policy is explained and the reality of my job is made clear to the caller, their reaction is usually one of disbelief and anger about the misinformation they've been fed, followed by a plea for me to do something about this.

The APFA'S Policy Manual states: "Any representative who is removed from 1 or more days of flight assignment on a trip-by-trip basis shall, under normal circumstances, have a minimum obligation to the APF A to perform work for a period of time at least equal to the number of days encompassed by the trip removal(s)." It goes on to further state: "Such work may or may not be performed on the actual day(s) encompassed by the trip removal(s)." In other words, if I am removed from 8 days of flying during the course of a month, I must perform at LEAST 8 days of work for the APF A. There has never been a month where I haven't upheld this obligation. In fact, I exceed it, working on my DFPs, DOs, layovers, and occasionally VC days. All my expense reports, time sheets, and trip removals must and have been approved by at least one National Officer. I also have been fiscally careful with our base budget (your union dues), coming in $10,000 under budget last year.

Many of you have undoubtedly heard about my personal trip to San Diego this past April. To clarify a few lies, I was trip removed for almost the entire month due to the fact that we had a large amount of base work AS WELL AS constant teleconferences and meetings surrounding the possible bankruptcy and concessions. Some people have

complained that I was not available to answer their phone calls, but I can assure you that with the help of my cell phone, my messages were checked quite often and calls were returned *to those who left messages.* The message on my answering machine made mention of the fact that reps at HDQ were available if immediate help was necessary. This is also the case when I am flying my trips. Much of my time in SAN was spent in my hotel room on teleconference. This was somewhat expected due to the daily dramas that were occurring surrounding the bankruptcy and concessions, and is well documented by my phone bills. Once a Board Meeting was announced, I left my family in San Diego to attend a meeting in DFW. So yes, I was in SAN with my family, and I was removed from a trip while I was there, but I was doing union work before, during and after my trip, and more than exceeded the policy manual requirements.

I apologize to those who are disinterested in this explanation and could care less about this destructive gossip, but I have stood by for too long while a certain group of malcontents, with their own self-serving agenda, have questioned my integrity and spread rumors and lies in an attempt to destroy my reputation. I'm not sure if it is the petition for my removal, which is based on false premises, that finally pushed me to defend myself, or the fact that a fellow "anonymous" f/a called Corporate Security to report me for travel abuse, in an attempt to have me terminated. This must be their way of "doing better" union work. I really think the final straw came when this person( s) started tracking my whereabouts through my son's activities. There is a name for this kind of behavior- it's called stalking! Obviously, this person(s) will stop at nothing to destroy me- and they've stated as much. Well I'm not going to take it anymore. In an obvious attempt to discredit me, you have heard where I spend all my weekends, and about all my outside activities. I'm not going to apologize for having a life outside APFA I attempt to work Monday through Fridays, usually 8:30-5:00, and take the weekends off. Of course, I check my messages and I am available 24/7 in case of emergency, to flight service as well as to APFA. I think it is unreasonable to expect me to work all week and then fly my trips on the weekends. It is almost impossible to take time off during the workweek. That's when flight service conducts their business, and when most flight attendants call us with issues. It is also when most f/a's prefer to have their meetings with FSMs scheduled.

It is appalling to me that the "Monday Morning Quarterbacks" who didn't have the time, energy or guts to run for my position 10 months ago, now feel they can "do it better." I would love to have the luxury of having all the difficult, stressful and heart-wrenching decisions already made so that I could just waltz in, take over and carry on as if I would have done things differently. I have been duly elected in the past 4 elections I have entered because no one else has ever "stepped up to the plate" to do the work. I stand by the decisions I have made, my voting record, and the daily work I do for the base.

My term runs through March, 2005, and I will, to the best of my ability, fulfill that obligation. I am by 40 means perfect, however, I have always been hardworking, honest, ethical and fiscally responsible with your dues. And I plan on continuing to represent you and this entire base with your best interests always at the forefront!

In Unity and Sincerely,
Julia Carrigan

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                       )
ROUBEN MADIKIANS,                      )
                                       )
            Plaintiff,                 )
                                       )
v.                                     )    No. 1:04-cv-12451-JLT
                                       )    Judge Joseph L. Tauro
AMERICAN AIRLINES ASSOCIATION          )
OF PROFESSIONAL FLIGHT                 )
ATTENDANTS ("APFA"), et al.,           )
                                       )
            Defendants.                )
_____)
```

<u>DECLARATION OF BRETT DURKIN</u>

I, Brett Durkin, declare as follows:

1.   I am Vice President of the Association of Professional Flight Attendants ("APFA").  In that capacity it is my responsibility to oversee the grievance and arbitration process provided for in the collective bargaining agreement between APFA and American Airlines ("AA").

2.   APFA maintains a computerized data base, known as the System Board of Adjustment data base, which tracks grievances filed by or on behalf of members of the bargaining unit APFA represents.  Any grievance or Notice of Dispute that a bargaining unit member asked an APFA representative to file under the APFA-AA collective bargaining agreement would, except in very unusual circumstances, be tracked in this data base.

**EXHIBIT G**

3.    On or about March 11, 2005, a search of the System Board of Adjustment data base was made at my direction for any grievance or Notice of Dispute filed in the name of Rouben Madikians.  The search disclosed no grievance or Notice of Dispute ever being filed by or on behalf of Mr. Madikians.

I declare under penalty of perjury that the foregoing is true and correct and is based on my personal knowledge.

Executed at Euliss, Texas, this 29th day of March, 2005.


_____/s/ Brett Durkin____
         Brett Durkin