IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
ROUBEN MADIKIANS,                       )
                                        )
            Plaintiff,                  )
                                        )    No. 04-cv-12451-JLT
v.                                      )    Judge Joseph L. Tauro
                                        )
ASSOCIATION OF PROFESSIONAL FLIGHT      )
ATTENDANTS ("APFA"), et al.,            )
                                        )
            Defendants                  )
_____)

**PLAINTIFF'S OPPOSITION
TO UNION DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT**

Plaintiff Rouben Madikians submits this opposition to Association of Professional Flight Attendants ("APFA"), Julia Carrigan and Amy Milenkovic's (collectively, "union defendants") motion to dismiss the second amended complaint ("Complaint"). Madikians disagrees with union defendants' arguments, and respectfully requests that union defendants' motion be denied.

FACTS AND BACKGROUND

The facts can be summarized quickly. Plaintiff Madikians initiated a petition for removal against APFA elected-chairperson Carrigan. Complaint ¶¶ 9, 11. He also notified

APFA of Carrigan's actions.  **Exhibit 1**. In retaliation, Carrigan signed a publication (**Def's Motion Exhibit F**) that was distributed with approval of defendant Cox, an agent-employee of AA, to all APFA members.  Id. ¶ 13; **Exhibit 2**.  That publication stated that Madikians had been stalking Carrigan's family and particularly, her minor-child.  Id.  She also publicly stated the same at an APFA national meeting during elections. Id. ¶ 17. And she also filed a police report stating the same.  Id. ¶ 14. Defendant Amy Milenkovic, an APFA representative appointed by Carrigan, participated by telling other employees during scheduled flights that Madikians was a child-stalker.  Id. ¶ 12.

   Madikians informed APFA of the internal conflict between he and Carrigan, and of the defamatory nature of the publication. Id. ¶ 18.  He also notified AA and demanded an investigation into its approval of the publication of which APFA was aware. Id. ¶ 15, **Exhibit 3**. In the end, however, APFA did nothing, Id. ¶ 20, and AA only conducted cursory investigation, Id. ¶ 19; **Exhibit 4**.

   Subsequently, Carrigan repeated the defamatory statements before an audience at a national APFA convention.  Id. ¶ 17. Thereafter, Madikians filed a charge with the Massachusetts Commission Against Discrimination (MCAD) naming APFA, its elected officer Carrigan and representative Milenkovic, as well as AA's agent Cox. Id. ¶ 22.  The MCAD charge alleges that

Defendant Carrigan's statements, and the involvement of the other defendants, were discriminatory as a "classic example of the stereotype predator 'gay' man stalking a child for sexual favors." Id.

<u>ARGUMENTS</u>

Union defendants seek to have the complaint dismissed, Motion pg. 2, or in the alternative, invite this Court to convert their motion into a summary judgment. Motion pg. 2, n. 4.

To grant a dismissal, the Court should construe all allegations as true in favor of Madikians, and determine whether a reading of the complaint fails to justify any recovery under any cognizable theory. <u>Martin v. Applied Cellular Tech., Inc.</u>, 284 F.3d 1, 6 (1st Cir. 2002). "A motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), must be granted if the court determines, after viewing the well-pleaded facts in the light most favorable to the plaintiff, that they can prove no set of facts that would entitle them to relive. <u>Loomis v. Tulip, Inc.</u>, 9 F. Supp. 2d 22, 23 (1998), <u>quoting</u> <u>Lessler v. Little</u>, 857 F.2d 866, 867 (1st Cir. 1988), <u>cert. denied</u>, 489 U.S. 1016 (1989). In the present case, because there are cognizable theories of recovery under the above constraints, union defendants' motion should be denied.

I.  COUNT ONE ALLEGES THAT UNION DEFENDANTS RETALIATED AGAINST PLAINTIFF MADIKIANS BY UTILIZING DEFAMATION IN A POLITICALLY MOTIVATED ATTEMPT TO DISSUADE HIM FROM EXERCISING A PROTECTED ACT, AND THEREBY STATES A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

Union defendants argue that (A) defamation of a union member by an elected union official is an ordinary, accepted – indeed, necessary – part of union politics, and (B) even if not, Madikians suffered no actionable harm and that no right of anyone to sign his petition, to vote or otherwise participate in union affairs were affected.  Def's Motion pg. 6.  Madikians disagrees: defamation is not permitted politically-motivated speech, and such activity directly affects fair politics within a union, and he suffered actionable harm.

A.  **Defamation is not, and cannot be, accepted as part of a union's political activity, and is not protected speech.**

Union defendants' argument that defamation is politically protected speech goes too far: they have confused free debate with statements uttered with actual malice.  Linn v. Plant Guard Workers, 383 U.S. 53, 61 (1966).  On this topic, the Supreme Court was clear:

> … it must be emphasized that malicious libel enjoys no constitutional protection in any context. After all, the labor movement has grown up and must assume ordinary responsibilities. The malicious utterance of defamatory statements in any form cannot be condoned, and unions should adopt procedures calculated to prevent such abuses.

Id. at 63.

Union defendants' rely on Commer to support the proposition that *critical* statements against union officials are not actionable, and we agree.  Commer v. Keller, 64 F. Supp. 2d 266 (S.D.N.Y. 1999); Motion pg. 6-7.  But union defendants' argue that, from Commer, it follows that defamation is a form of critical statements, and to that we disagree. Def's Motion pg. 6-7

Commer is distinguishable on its facts.  In that case, statements were exchanged that were characterized by the court as, "simple name-calling and critical language." Commer at 272. It involved critical statements directed *toward* union officials. Id.  While Commer may justify Madikians petition, it does not justify union defendants' defamation.  Nowhere in Commer was anyone defamed, and certainly none were accused of stalking same-sex minor children.  Complaint ¶ 12-13, 17.

Union defendants' dismiss Fiori as irrelevant; they assert that because it involves union disciplinary proceedings it provides no basis for Madikians' invocation of §101(a)(5). Fiori v. Truck Drivers, 354 F.3d 84 (1st Cir. 2004); Def's Motion pg. 9, n.6.  While Fiori did involve a union official's removal from office, that issue was settled at trial.  See Fiori v. Truck Drivers, 130 F.Supp.2d 150, 152 (2001).  On appeal, however, the issue was that of libel.  Fiori, 354 F.3d at 85. The case stands

for the proposition that defamation interferes with the right to vote:

> {I]t seems to us reasonable, and no stretch at all,
> for a jury using its common sense to conclude that the
> libel likely changed a number of union votes.

Id. at 88.

Although Fiori involved an actual vote, the present case involves obtaining signatures of union members in support of removal of a union officer.  Complaint ¶¶ 9-11.  Political retaliation cannot be so narrow as union defendants appear to argue, and a reasonable jury could find that a removal petition is sufficiently akin to a vote to label both activities as political in nature.  If so, then it could be found that Madikians was denied political access in as much as union members were dissuaded from participating in the petition because of the defamation.

Union defendants also refer to Martin H. Malin, Individual Rights Within the Union 71 (1988), as enumerating specific acts deemed too offensive to be within bounds of permitted behavior of a union.  Def's Motion pg. 7.  One such act includes having a dissident arrested.  Id.  Although no one was arrested in the present case, Julian Carrigan did seek police involvement by filing a police report accusing Madikians of stalking her child.  Thus, although Malin, Id., does not list the specific act of Ms.

Carrigan's, a question of fact exists as to whether she exceeded

lawful bounds.

**B.   Madikians has suffered actionable harm through being unable to now perform his duties, that that harm was instigated that the hands of the union, not merely ad hoc retaliation by individual union officers.**

Union defendants argue that discipline in relation to LMRDA

§ 101(a)(5) mandates an "established disciplinary process rather

than ad hoc retaliation by individual union officers."

Breininger v. Sheet Metal Workers Int'l Ass'n, 493 U.S. 67, 91

(1989). That quote is, however, later put modified by the

Court:

> We do not imply that "discipline" may be defined solely by the type of punishment involved, or that a union might be able to circumvent §§ 101(a)(5) and 609 by developing novel forms of penalties different from fines, suspensions, or expulsions. Even respondent acknowledges that a suspension of job referrals through the hiring hall could qualify as "discipline" if it were imposed as a sentence on an individual by a union in order to punish a violation of union rules.

Id. at 92, n. 15.

Indeed, the purpose of the LMRDA is, "to weed out

instances of corruption, venality and breach of trust, and to

preserve the rights of the union members; and to observe high

standards of responsibility and ethical conduct by union

officers in union affairs." Coleman v. Brotherhood Of Ry. &

Steamship Clerks, 228 F. Supp. 276 (1964).

In furtherance of that purpose, "[a]lthough an action pursuant to [LMRDA] § 609 will require a showing that the plaintiff has been "unlawfully disciplined," even in the absence of such discipline a claimant may be entitled to seek redress under section 102 for an "infringement" of LMRDA rights. Finnegan v. Leu, 456 U.S. 431, 439 (1982).  Thus, even if there has been no "unlawful discipline," redress for an infringement is proper.  Id.

Nonetheless, in the present case there has been more than an infringement and ad hoc retaliation.  Madikians has been accused of being a child stalker, and that alone, creates a barrier for him to perform the duties of his employment.  No longer can he assist children on aircraft without undue ridicule, humiliation and accusing eyes of co-workers.  The outrageousness of the accusations has caused him extreme emotional distress, and that too, prevents him from performing his duties.  The accusations were not in good faith, but rather, easily could be found to be malicious.

What's more, they were fully sanctioned by the union. To be clear, there were two separate charges filed by Madikians under Article VII against defendant Carrigan: one filed on February 25, 2004 related to alleged inappropriate trips, holidays, trip-removals and the like of which the Executive Committee. **Exhibit 1**. A second charge was dated March 21, 2004

and related to alleged defamation of Madikians by Carrigan.
**Def's Motion Exhibit D.** As to the February 25th charge, the
Executive Board accepted it as timely and specific, but
apparently rejected it on validity.[1]  <u>See</u> **Exhibit 1**.  Madikians
was verbally informed that the March 21st charge was dismissed
but received no formal rejection.  Nonetheless, it could be
found that the Executive Committee summarily dismissed both
condoning the wrongful acts of Carrigan.

Thus, it cannot be said that there are no cognizable
theories of recovery under the above constraints, and union
defendant's motion should be denied.


II.  COUNTS IV AND V DO STATE A ACTIONABLE CLAIM FOR BREACH OF
     UNION'S DUTY OF FAIR REPRESENTATION AS SUCH A DUTY DID
     EXIST BECAUSE THE UNION STILL HAD A DUTY TO REPRESENT HIM
     EVEN IN THE PRESENCE OF A POSSIBILITY THAT MADIKIANS'
     COULD REPRESENT HIMSELF.

The Federal Bench has long held that a Union owes its
members a duty of fair representation ("DFR").  "A Union
breaches this duty 'only when [its] conduct toward a member of
the collective bargaining unit is arbitrary, discriminatory, or
in bad faith.'"  <u>Miller v. U.S. Postal Service</u>, 985 F.2d 9, 11
(1993), <u>quoting</u> <u>Vaca v. Sipes</u>, 386 U.S. 171, 190 (1967) and

---

[1] The word, "apparently" is used because although the check-boxes
indicate that the charge failed, the text at the bottom states
that the Executive Committee determined that the charge is
valid; the notice is ambiguous.

<u>Williams v. Sea-Land Corp.</u>, 844 F.2d 17, 19 (1st Cir. 1988).
"The Supreme Court explained that a union's actions are
arbitrary "only if, in light of the factual and legal landscape
at the time of the union's actions, the union's behavior is so
far outside a 'wide range of reasonableness' as to be
irrational." <u>Id.</u> at 12 (citations omitted). Thus, it is
reasonable to determine that the union's actions were at least
outside a "wide range of reasonableness," if not also
discriminatory and/or in bad faith.

In union defendants' motion to dismiss, the APFA claims
that Count IV related to its DFR, should be dismissed for three
reasons: (A) to plead a breach of the DFR, the plaintiff must
plead and prove both an employer's violation and a union's
failure to represent the plaintiff as union member, Def's Motion
pg. 11; (B) the collective bargaining agreement ("CBA") allows
for an individual to begin a grievance procedure and since
Madikians failed to start the procedure he is now barred from
complaining that the union failed to represent him; and (C) when
a CBA allows an individual initiative in pursuing a grievance
with his own representative, the union's DFR does not apply.

APFA is incorrect in its assertion under the Federal
Standard that the DFR does not apply in the present case.

A.  **Employer's Violation and Union's Breach to Satisfy Duty of
     Fair Representation.**

The Plaintiff alleges that the defendant employer, American
Airlines ("AA") violated the collective bargaining agreement
when its agent Cox, acting within the scope of her employment
approved and allowed a publication defaming Madikians to be
distributed via AA's property. Complaint ¶¶ 12-13.  These claims
are intricate because the actors in this matter wear different
hats as employees and union officials.  But even if this is not
a direct violation of the CBA it is at least a statutory and
common law violation: a "complaint sufficiently raises a claim
even if it points to no legal theory or even if it points to the
wrong legal theory as a basis for that claim, as long as relief
is possible under any set of facts that could be established
consistent with the allegations." Morales-Vallellanes v. Potter,
339 F.3d 9, 14, (2003), citing Tolle v. Carrol Touch, Inc., 977
F.2d 1129, 1134 (7th Cir. 1992). "These omissions do, however,
create an ambiguity as to whether [plaintiff's] claims arise
solely under the anti-discrimination clause of the CBA, or
whether plaintiff also intended to plead a cause of action under
Title VII of the Civil Rights Act of 1964." Id. "This query is
not academic--while the protections built into the CBA parallel
those of Title VII, the two remedial schemes contain discrete
exhaustion requirements that may bar their availability to

plaintiff as sources of relief." <u>Id.</u> at 15.  "Therefore, we
believe the more prudent course is to broadly construe the
allegations in plaintiff's amended complaint as alleging a cause
of action under both the CBA and Title VII. <u>See</u> Fed.R.Civ.P.
8(f)(All pleadings shall be so construed as to do substantial
justice.)." <u>Id.</u> (citations omitted).

    Madikians' claim in the earlier counts describing
defamation and violation of anti-discriminatory state laws
parallels <u>Morales-Vallellanes</u>.  As expressed in the foregoing
cited federal case, as long as a plaintiff can show a set of
facts that would entitle him to relief from the CBA or with any
statutory scheme, a motion to dismiss on fails.

    Further, the factual scheme stated in the complaint
coincides with the Federal Court's paradigm illustrated in <u>Vaca
v. Sipes</u>, 386 U.S. 171, 197, (1967).  "The governing principle,
then, is to apportion liability between the employer and the
union according to the damage caused by the fault of each.
Thus, damages attributable solely to the employer's breach of
contract should not be charged to the union, but increases, if
any, in those damages caused by the union's refusal to process
the grievance should not be charged to the employer." <u>Id.</u> at
197-198.  In the present case, Madikians alleges that AA, in a
breach of its contract with APFA, violated statutes and/or

common law torts, facilitated the defamation of the union and

abused his civil rights.

**B.    Clause in Collective Bargaining Agreement allowing for Individual Action and if it exists the Claim for Duty of Fair Representation is Barred.**

APFA argues that because the collective bargaining

agreement allows for individual action, Madikians' claim of the

union's breach of its duty of fair representation is a nullity.

APFA relies on case law not from the First Circuit but from the

Ninth and Seventh.  In contrast to those Circuits, the First

Circuit has held:

> It is undisputed that [plaintiff] Dr. Cabarga did not
> exhaust the grievance remedies provided under the
> [defendant] Fundacion's collective bargaining
> agreement. Ordinarily, an employee must exhaust such
> remedies before instituting a civil action against his
> employer under § 301 of the Labor Relations Management
> Act. The courts have, however, recognized three
> exceptions to this rule. A plaintiff need not exhaust
> such remedies if: the union has the sole power to
> invoke the grievance procedures and the union
> wrongfully refuses to process or perfunctorily handles
> the grievance; resort to the grievance procedures
> would be futile; or the employer repudiates the
> grievance procedures.

Cabarga Cruz v. Fundacion Educativa Ana G. Mendez, Inc, 822 F.2d

188, 192 (1st Cir. 1987) citing Vaca v. Sipes, supra.

The fact that the Plaintiff did not commence a grievance

procedure on his own or even when he is allowed to do so, under

Vaca does not protect the union from a claim it breached its

duty of fair representation:

- 13 -

> However, because these contractual remedies have been
> devised and are often controlled by the union and the
> employer, they may well prove unsatisfactory or
> unworkable for the individual grievant. The problem
> then is to determine under what circumstances the
> individual employee may obtain judicial review of his
> breach-of-contract claim despite his failure to secure
> relief through the contractual remedial procedures.

Glover v. St. Louis-San Francisco Ry. Co., 393 U.S. 324, 330

(1969).

Madikians in his complaint does, however, allege that he took

steps to awaken the union to investigate his problems with both

the union and the employer.  It is clear, when viewing the facts

in the best light for the plaintiff, that any "resort to the

grievance procedures would be futile."   He informed union

president Ward and Executive Committee member Bedwell.  **Exhibit**

**3**.  When Madikians tried to take steps, the union official and

executive committee, with sanctions from the employer, defamed,

ridiculed and violated his rights.   Complaint ¶ 13.

**C.    Count V does state an actionable claim for breach of
       contract**

APFA argues that Count V, Breach of Collective Bargaining

Agreement, should be dismissed on the grounds that it is merely

a disguised duty of fair representation.   In APFA's previous

argument, it stressed that there was no violation of the

contract by the employer thus it was not a breach of the duty of

- 14 -

fair representation.  Now in their description of this count, it argues that it should be dismissed because it fits under the elements of the duty of fair representation.

This count obviously is alternative pleading.  "Such alternative pleading is expressly sanctioned by Fed.R.Civ.P 8, and, even if that defense turns out to be untenable in light of the lower court's findings, we think that it distorts the doctrine of patent misuse to hold that recourse to this method of pleading here vitiated the other Counts of the complaints." United States Gypsum Co. v National Gypsum Co., 352 U.S. 457, 496 (1957).  "This argument fails to adequately take into account a procedural provision, in Federal Rule of Civil Procedure 8(e)(2), that allows parties to take inconsistent positions in their pleadings. Especially at the early stages of litigation, a party's pleading will not be treated as an admission precluding another, inconsistent, pleading." Rodriguez-Suris v. Montesinos, 123 F.3d 10, 20 (1997).

So simply put, both Count IV and Count V are allowable even though they contradict each other, as pleading in the alternative; a fact admitted implicitly by union defendants' argument.

<u>CONCLUSION</u>

The complaint should not be dismissed because there are cognizable theories for recovery based on the allegations.


                              Respectfully Submitted,
                              Rouben Madikians,
                              By his attorneys,

Dated: 5/2/2005          <u> s/ David D.Nielson        </u>
                         David D. Nielson BBO# 652743
                         15 Cottage Avenue, Ste. 301
                         Quincy, MA 02169
                         (617) 773-6866

                         <u>  s/ Daniel Ciccariello      </u>
                         Daniel Ciccariello BBO# 637529
                         15 Cottage Avenue, Ste. 301
                         Quincy, MA 02169
                         (617) 773-6866



**RETURNED RECEIPT REQUESTED**
**7003 1680 0001 7348 6437**

*Association of Professional Flight Attendants*

March 8, 2004

Rouben Madikians
15 St. George St. Apt. #3
Boston, MA 02118

Dear Rouben:

I am in receipt of your letter dated February 25, 2004 in which you have filed charges against Julia Carrigan.

Per Article VII Section 3 of the APFA Constitution, these charges will be reviewed by the Executive Committee at its next regularly scheduled meeting.

In addition I am furnishing you with a description of all relevant procedures.

Sincerely,

Linda Lanning
APFA Secretary

(2) attachments

cc:    Julia Carrigan
       Executive Committee
       Board of Directors

February 25, 2004

APFA Headquarters
Ms. Linda Lanning, Secretary
1004 West Euless Blvd.,
Euless, TX   76040

Rouben Madikians
Employee # 564126
15 St. George St.  Apt #3
Boston, MA   02118

VIA Certified Mail, Return receipt requested

Dear Ms. Lanning,

I first became aware on December 30, 2003 of several violations of Article 7 committed by our BOS base chairperson, Julia Carrigan.  I am invoking my rights under the APFA Constitution to file Article VII charges, here enclosed.
I specifically request that the APFA take any and all necessary and proper legal action to vindicate and validate my rights under the APFA Constitution and I invoke the jurisdiction of the Executive Committee to these ends.

As a member in good standing of the APFA and pursuant to the APFA Constitution, Article VII - Hearings and Disciplinary Procedures, Section 1, Grounds for Charges, I hereby file formal charges against the following officers and agents of the APFA for violations contained and detailed herein and file this notice of my intent to pursue internal charges under Article VII and all other remedies available to me.

As required by the APFA Constitution, I shall exhaust internal remedies under this Article VII for a period not to exceed four months from the date of this letter prior to taking any legal action with respect to matters cognizable as charges under this Article VII. I specifically request that the Executive Committee take all legally necessary action to vindicate and validate my rights under the APFA Constitution.

I request an expedited hearing of these charges by the Executive Committee and request that you, Ms. Lanning, as Secretary of APFA, arrange for an Emergency Meeting of the Executive Committee to address these charges and that you inform me as soon as possible as to the procedures you intend to follow regarding these charges, and all relevant hearing dates, locations and participants. I request that a notice be circulated to all members in good standing as to the applicable dates of any relevant hearings and proceedings having a connection to these charges and that such proceedings be open to all members in good standing.

I request that you circulate copies of this charging instrument to all members of the Executive Committee and other interested parties as your internal procedures and due process may require.

Sincerely,

Rouben Madikians

During the past three years, Julia Carrigan has consistently removed herself from trips in excess of APFA policy guidelines governing a base the size of Boston. At no time during Julia's tenure have we ever had enough flight attendants (1,000) to warrant a full month of trip removals. In addition, APFA also paid for trip removals for Vice Chair Michelle Brawley, as evidenced in the LM2 figures for 2001 and 2002.

The information below was taken from APFA records and establishes a pattern of trip removals in excess and in violation of the APFA policy manual over the period from January 2001 to October 2003. Julia has had off literally every weekend and holiday for the past three years while being credited with an average of over 90 hours a month. As detailed below, several infractions of the rules governing rip removals have resulted in Julia being trip removed and paid for the whole month while not flying a single day.

It is my contention that Julia has violated:
Article 7 Section 1.E Theft or Embezzlement of Association moneys or properties; and

F.  Willful violation of an express Article of this Constitution or of a proper and express written resolution or policy of the Board of Directors or the Executive Committee;

By ignoring the rules laid out in the APFA Policy Manual and knowingly submitting trip removals for reimbursement to which she is not entitled, Julia has willfully violated Article 7 Section 1E as stated in Paragraph F above.

Furthermore, I contend that Julia is in violation of the regulation contained in the LMRDA (Labor Management Reporting and Disclosure Act of 1959)
In accordance with the LMRDA, Title V – Safeguards for Labor Organizations Fiduciary Responsibility of Labor Organizations.
(29 U.S.C. 501) Sec. 501.(C)
"Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use, or the use of others, any of the monies, funds, securities, property, or other assets of the labor organization of which he is an officer, or by which he is employed, directly or indirectly, shall be fined not more than $10,000 or imprisoned for not more than five years or both."

I submit the following pages as evidence of the violations stated above.

**Feb 2001**,
TTL Hours Credited: 108.09
TTL Removed From: **68.78**

Trips Removed From:
Feb 3, 4          13.23
Feb 10, 11        13.23
Feb 15, 16        12.12
Feb 20, 21        11.55
Feb 23, 24        13.23
Mar 1              6.42          = TTL 68.78

**March 2001**
TTL Hours Credited: 104 +
TTL Removed From: **78.78**

Trips Removed from:
Mar 2              5.36
Mar 3, 4, 5       15.18
Mar 8,9,10        15.18
Mar 14, 15, 16    15.18
Mar 19             6.35
Mar 20.21.22      15.18
Mar 27             6.35          = TTL 78.78

Julia removed herself once again from most of the trips she had on her line and only flew the trips that she had picked up. In the process, she ended up having 18 days off in a row. In return for a full month's trip removal, a representative is obligated to WORK 18 days for APFA.

**April 2001**
TTL Hours Credited: 105.25
TTL Removed From: **60.41**

Trips Removed From:
APR 2, 3          12.08
APR 8, 9          12.08
APR 10, 11        12.09
APR 12, 13        12.08
APR 22, 23        12.08          = TTL 60.41

Julia was officer on duty the first week of April during which she was on call from Monday, April 2 to Sunday, April 8. She removed herself from trips on April 1 and April 9 for the 7-day rule, but since she was working from home and NOT out of town, these trip removals for the 7-day rule were inappropriate.
Julia also removed herself from a double trip trade to be at informational picketing in violation of the provision in the Policy Manual forbidding trip trades UP in time for a trip you will be removed from, yet the removal somehow fell through the cracks and was approved by APFA Hdq.

This removal was a violation of:
Section 5.C.9., APFA PAID TRIP REMOVAL/FLIGHT LOSS

Seven (7) Day trip Removal Provision
A trip removal may be authorized to ensure that a member is not required to work AWAY from his/her city of residence for the APFA AND the company for seven (7) consecutive days.

**May 2001**
TTL Hours Credited:  93.29
TTL Removed From: **53.90**

Trips Removed From:
| | | |
|---|---|---|
| May 1 | 5.43 | |
| May 4, 5 | 12.32 | |
| May 9, 10 | 12.32 | |
| May 19, 20 | 11.51 | |
| May 24, 25 | 12.55 | = TTL: 53.90 |

**June 2001**
TTL Hours Credited:  94.58
TTL Removed From: **54.61**

Trips Removed From:
| | | |
|---|---|---|
| June 1, 2 | 12.07 | |
| June 14 15 | 12.05 | |
| June 19, 20 | 12.00 | |
| June 24, 25 | 12.00 | |
| July 1, | 6.29 | = TTL: 54.61 |

Julia removed herself again from her original trips, giving herself every weekend off.

**July 2001**
TTL Hours Credited:  101.10
TTL Removed From: **87.98**

Trips Removed from:
| | | |
|---|---|---|
| July 2 | 5.31 | |
| July 7, 8 | 12.04 | |
| July 10, 11 | 11.49 | |
| July 12, 13 | 12.04 | |
| July 17, 18 | 12.04 | |
| July 23, 24 | 11.49 | |
| July 27, 28 | 12.04 | |
| July 30, 31 | 11.53 | = TTL: 87.98 |

**August 2001**
TTL Hours Credited: 98.37
TTL Removed From: Approx **80.00**

**September 2001**

Julia removed herself from all her original trips and flew just one trip on August 9 and 10, once again giving herself every weekend off. She then removed herself from August 11 through September 10, resulting in her having a month off from having to fly any trips.

**November 2001**
TTL Hours Credited: 91.16
TTL Hours Removed From: **91.16**

Julia had vacation this month but removed herself from EVERYTHING, even an available day on November 2. There was a board meeting on November 29 with a travel day on November 28. Julia charged the union travel time on November 27 and charged vacation payback on that day. The two days before, she charged APFA for vacation payback for supposedly doing union work from home while on vacation.

**December 2001**
TTL Hours Credited: 109.34
TTL Hours Removed From: **86.46**

Julia claimed that she was doing APFA work and removed herself from trips so that she had every weekend and the holidays off. The only APFA work listed was a BOD meeting on December 19 and 20.

**January 2002**
TTL Hours Credited:  90.08
TTL Trips Removed From: **54.29**
TTL Hours Flown: 35.79

Trips Removed From:
Jan 2, 3          12.12
Jan 5, 6          12.12
Jan 9             6.01
Jan 17, 18.19    6.01 x 3
Jan 26, 27        6.01 x 2      = TTL: 54.29

Julia's trip removals in January resulted in her having off until January 10

**February 2002**
TTL Hours Credited: 99.15
TTL Removed From: **73.37**
TTL Hours Flown: 25.78

Trips Removed From:
Jan 31            5.09
Feb 4, 5          10.52
Feb 9, 10         10.35
Feb 11, 12        10.52
Feb 16, 17        10.35
Feb 19, 20, 21 16.19
Feb 23, 24        10.35          = TTL 73.37

**March 2002**
TTL Hours 95.19
TTL Hours Removed From: **57.74**
**Trips Removed From:**
Mar 2,3          11.43
Mar 7, 8          11.43
Mar 20-21        12.02
Mar 22-23        11.43
Mar 27-28        11.43          = TTL: 57.74

The BOD members knew about this month's two day training and the board meeting over a month in advance.  However, Julia deliberately put a double trip trade on her schedule anyway from which she was later removed.  This is another blatant instance of "milking the system" to defraud the APFA.
Per the manual, they are not to pick up any trips during BOD meetings if they know the meeting is taking place.

**April 2002**
TTL Credited:  97.47
TTL Removed From: **39.22**

**Trips Removed From:**
Apr 19, 20, 21                16.06
Apr 25, 26, 27                16.06
Apr 30                7.10        = TTL: 39.22

This was a secondary vacation month.  Not only did she get money from AA for trips removed, which she is entitled to do, but she also charged seven days of vacation payback to APFA which amounted to 1044.96 (149.28 X 7) which she is NOT entitled to do.  The papers she submitted said only "base work" but no one can substantiate exactly what base work she did to justify these removals.  This is clearly using our money in a dishonest and abusive way. April is also a month that Julia goes away…


**May 2002**
TTL Hours Credited: 95.24
TTL Hours Removed From: **47.10**

Trips Removed From:
 May 1, 2        11.39
May 6, 7        12.57
May 11, 12      11.57
May 26, 27      11.57        =TTL: 47.10

This month the only weekend that Julia worked was the weekend she went to Norway to attend a party and pick up an award. Otherwise, she removed herself from all trips over the weekends. She also removed herself from trips so that she would not be working 7 days before and after the trip to Norway, a trip that was NOT required APFA official business.

**June 2002**
TTL Hours Credited:  94.57
TTL Removed From: **80.71:**

Jun 3, 4        11.57
Jun 7, 8        11.57
Jun 11, 12      11.57
Jun 16, 17      11.46
Jun 22, 23      11.54
Jun 26, 27      11.46 (double trip trade for a tree dedication)
Jun 29, 30      11.54

**July 2002**
TTL Hours Credited: 109.10
TTL Removed From: **77.50**
July 6, 7              14.48
July 12, 13, 14        21.30
July 19, 20, 21        21.30
July 26, 27, 28        20.42        = TTL: 77.50

**February 2003**
TTL Hours Credited: 72.06
TTL Hours Removed From: **72.06**
Actual hours Flown **0**

**April 2003**
TTL Hours Credited 97.19
TTL Hours Removed From: **97.19**
TTL Hours Flown **0**

Julia removed herself from the entire month, but only after she built her line up to almost 100 hours. Over the Easter school Holiday, by her own admission, she and her family went on a trip to San Diego. Despite padding her schedule with an extra 25 hours and removing herself for the whole month, she failed to return phone calls from members anxious for answers about the restructuring proposal and sent out virtually NO information during the re-vote fiasco that followed. Julia billed APFA for expenses that were incurred during her trip to San Diego. These expenses are NOT covered under the Policy Manual guidelines because she was not required to be in San Diego on official APFA business. It was her choice to be there

**May 2003**
TTL Hours Credited 92.39
TTL Hours Removed **40.18**
TTL Hours Flown: 52.21

**July 2003**
TTL hours Credited 109.29
TTL hours removed **45.37**
TTL hours flown 63.92

These removals allowed Julia to have a string of days off (in this case, 11) in a row and every weekend.

**August 2003**
Julia did not fly from August 22 to September 16 resulting in twenty-six days off from the end of summer through the first week of the school year.

**September 2003**

September was a reserve month for Julia, but she managed to avoid reserve for the most part by removing herself until the 16th of the month and then flying only one turn and one two day trip during the remainder of the month.

**October 2003**
TTL Hours Credited 106.52
TTL Hours Removed From: **34.53**

Julia had EPT training in OCT, but she made no attempt to attend a termination hearing for a domestic f/a. She did not even return the terminated f/as phone call until AFTER she had been terminated, even though Julia was paid 2052.52 for trip removals in OCT.

# APFA
# QUARTERLY EXECUTIVE COMMITTEE MEETING
# MARCH 24, 2004

Y=Yes
N=No
P=Pass
A=Abstain
N/A=Absent
PXY = Proxy Vote

**Resolution Tally Sheet**

**Resolution:**   #2

**Maker:**       Lanning

**Second:**      St. Michel

**Date:**        3/24/04

**Time:**        1235

| | Yes | No | Pass | Abs | N/A |
|---|---|---|---|---|---|
| Lenny Aurigemma | √ | | | | |
| Ted Bedwell | √ | | | | |
| Kim Boyett | √ | | | | |
| Mario St. Michel | √ | | | | |
| Cheryl Walters | √ | | | | |
| Treasurer | √ | | | | |
| Secretary | √ | | | | |
| Vice President | √ | | | | |
| President | √ | | | | |

YES:   9        NO:            ABSTAIN:            ABSENT:

Status:     PASSED: (√)     FAILED: ( )     TABLED: ( )     WITHDRAWN: ( )

**WHEREAS**, the APFA Constitution, Article VII, Section 3, requires that the APFA Executive Committee review Article VII charges for timeliness, specificity and validity; and

**WHEREAS**, the APFA Constitution, Article VII, Section 2.D.(1), provides that charges based on Sections 1.A. through 1.F. of Article VII must be filed within sixty (60) days after the accuser becomes aware, or reasonably should have become aware, of the alleged offense; and

**WHEREAS**, a charge filed by Rouben Madikians against BOS base chairperson Julia Carrigan, dated February 25, 2004, states that Mr. Madikians first became aware on December 30, 2003 of alleged violations by Ms. Carrigan of Article VII of the Constitution.

**THEREFORE BE IT RESOLVED**, that the charge filed by Rouben Madikians is timely.

# APFA
# QUARTERLY EXECUTIVE COMMITTEE MEETING
# MARCH 24, 2004

Y=Yes
N=No
P=Pass
A=Abstain
N/A=Absent
PXY = Proxy Vote

**Resolution Tally Sheet**

**Resolution:** #3

**Maker:** Lanning

**Second:** Boyett

**Date:** 3/24/04

**Time:** 1236

| | Yes | No | Pass | Abs | N/A |
|---|---|---|---|---|---|
| Lenny Aurigemma | √ | | | | |
| Ted Bedwell | √ | | | | |
| Kim Boyett | √ | | | | |
| Mario St. Michel | √ | | | | |
| Cheryl Walters | √ | | | | |
| Treasurer | √ | | | | |
| Secretary | √ | | | | |
| Vice President | √ | | | | |
| President | √ | | | | |

YES: 9    NO:    ABSTAIN:    ABSENT:

**Status:**    PASSED: (√)    FAILED: ( )    TABLED: ( )    WITHDRAWN: ( )

**WHEREAS,** the APFA Constitution, Article VII, Section 3, requires that the APFA Executive Committee review Article VII charges for timeliness, specificity and validity; and

**WHEREAS,** a charge filed by Rouben Madikians against BOS base chairperson Julia Carrigan, dated February 25, 2004, states that Mr. Madikians first became aware on December 30, 2003 of alleged violations by Ms. Carrigan of Article VII of the Constitution, and specifically violation of Article VII, Section 1.E.and 1.F. of the APFA Constitution, and additionally asserts that such conduct constitutes a violation of Section 501 (C) of the Labor Management Reporting and Disclosure Act of 1959.

**THEREFORE BE IT RESOLVED,** that the charge filed by Rouben Madikians is sufficiently specific.

# APFA
# QUARTERLY EXECUTIVE COMMITTEE MEETING
## MARCH 24, 2004

Y=Yes
N=No
P=Pass
A=Abstain
N/A=Absent
PXY = Proxy Vote

**Resolution Tally Sheet**

**Resolution:**  #4

**Maker:**  Lanning

**Second:**  St. Michel

**Date:**  3/24/04

**Time:**  1239

| | Yes | No | Pass | Abs | N/A |
|---|---|---|---|---|---|
| **Lenny Aurigemma** | | √ | | | |
| **Ted Bedwell** | | √ | | | |
| **Kim Boyett** | | √ | | | |
| **Mario St. Michel** | | √ | | | |
| **Cheryl Walters** | | √ | | | |
| **Treasurer** | | √ | | | |
| **Secretary** | | √ | | | |
| **Vice President** | | √ | | | |
| **President** | | √ | | | |

YES:          NO:  9          ABSTAIN:          ABSENT:

**Status:**   PASSED: ( )    FAILED: (√)    TABLED: ( )    WITHDRAWN: ( )

**WHEREAS,** the APFA Constitution, Article VII, Section 3, requires that the APFA Executive Committee review Article VII charges for timeliness, specificity and validity; and

**WHEREAS,** the APFA Constitution, Article VII, Section 3.D., provides that charges may be deemed invalid and dismissed by the Executive Committee if it determines that the charges address conduct protected by the APFA Constitution and/or by law (including the LMRDA Bill of Rights), or that charges fail to state a proper claim under Section 1 of Article VII; and

**WHEREAS,** a charge filed by Rouben Madikians against BOS base chairperson Julia Carrigan, dated February 25, 2004, states that Mr. Madikians first became aware on December 30, 2003 of alleged violations by Ms. Carrigan of Article VII of the Constitution, consisting of Ms. Carrigan taking off weekends and holidays while being credited with an average of over 90 hours a month, failing to work 18 days for APFA in months in which she was removed from trips, improperly utilizing "the 7-day rule," improperly using trip-trades in conjunction with trip removals for APFA business, taking trip removals for activities that were not required APFA official business, and not attending a termination hearing for a flight attendant during a month in which she had trip removals, and Mr. Madikians charges that such actions constitute "theft or embezzlement of Association moneys or properties" in violation of Article VII, Section 1.E. of the APFA Constitution and, "by ignoring the rules laid out in the APFA Policy Manual and knowingly submitting trip removals for reimbursement to which she is not entitled," a willful violation of Article VII, Section 1.E. and therefore also a violation of Article VII, Section 1.F. of the APFA Constitution, and additionally asserts that such conduct constitutes a violation of Section 501 (C) of the Labor Management Reporting and Disclosure Act of 1959.

**THEREFORE BE IT RESOLVED,** that the Executive Committee determines that the charge filed by Rouben Madikians is valid.

Jetnet Home    My Jetnet    News    Benefits & Pay    Policies & Procedures    Careers    Travel    Employee Progra

**Policies & Procedures**

Employee Policy Guide

TRIP Book

Drug and Alcohol Policy

Safety, Security and
Environmental

Web Reference

People Reduction
Information

FMLA Status

*Saturday, S*

# Bulletin Boards

We provide company bulletin boards in work areas to post important company information. This may include company policies and bulletins, local announcements, Jetwire or administrative messages and anything that is required to be posted by federal, state or local laws. In addition, bulletin boards may be provided to allow employees to post items of general personal interest.

Use good judgement when posting material that advertises the sale of personal property or services. Some information is not permitted on company bulletin boards, such as messages containing religious, political or controversial issues or material that contains false or libelous remarks about American, a colleague, organization or event.

These same standards apply to electronic bulletin boards or Sabre star records.

Union groups that currently represent AA employees may also communicate information about their union to its members, using separate bulleting boards. As with company bulletin boards, good judgement should be used when posting material:

- Approved items are outlined in the collective bargaining agreement and may include notices of union meetings, recreational, social or business affairs. Notices of union election, appointments and results of elections are also allowed - as well as system board awards and opinions. Information not meeting these criteria will be removed.

- Any union communications should bear the official seal of the union or the signature of a union representative.

- Untrue information or libelous remarks about AA or any employee are prohibited. Postings should not contain anything defamatory or of a personal nature, attacking the company or its representatives.

**Other Article**
- Company R Parking (2/1
- AMR Comp Shipments Discount (5/
- HDQ/Admin Code (6/4/20
- Emergency Plans (3/31/2
- Flight Manu
- Guidelines f Records (9/2
- iPayables (9
- Payroll or In Processing
- Print Servic Bowes (6/16/
- Requesting Space (9/29/

378 / 1109 / 7530

©2004 American Airlines, Inc. All rights reserved.    Use Agreem

February 15, 2003

To: Kelley Cox Boston Base Manager
From: Rouben Madikians, Boston Domestic Flight Attendant

RE: Winter 2004 Domestic APFA Base Brief

Ms. Cox,

On December 23, 2003, I met with you to inform you of my intention of starting a
petition to remove Julia Carrigan, APFA Boston Domestic Chair, from office. I also told
you that I would be going to APFA Headquarters in DFW on December 30 to examine
the records pertaining to Julia's expenses and trip removals. Prior to meeting with you, I
also informed Julia of my intentions and asked her for an explanation regarding some
perceived improprieties on her part and was told that it was "none of my damned
business." I then advised Julia that I would be seeking her removal from office and she
told me, "You do what you have to do and I'll do what I have to do."

My efforts to gather signatures on the petition were met with a very negative response
from Ms. Carrigan and her friends, which I expected. However, I did not expect that the
repercussions would include false and defamatory allegations against me which I began
to hear almost immediately through the grapevine via fellow flight attendants. I was sick
to my stomach when I heard that Amy Milenkovic, a professional standards rep.
appointed by Julia Carrigan, had gone so far as to announce to the 767 crew working Flt.
25 on Feb 1 that I had been stalking Julia's son. When the person who told me this
challenged Amy on the truthfulness of her statement, Amy told her, "Well it's true, and
you can tell Rouben I said that." Certainly, Ms. Cox, you were aware of both the support
and opposition this petition generated at the base, since Boston is a very small crew base
and you also have line flight attendants working in the Flight Service office.

Despite knowing all this, you still decided to approve the Winter, 2004 Base brief, which
states on its letterhead is "an official APFA publication" (See attached base brief.) and
which Julia then placed in every domestic flight attendant's company mailbox. It was
also freely available in operations and the flight crew lounge for reading by BOS
International and out of base flight attendants as well. This base brief was nothing more
than a thinly veiled attempt by Julia to destroy my reputation in retaliation for exercising
my right to seek her removal under the APFA constitution. In it, she accused me of
stalking her family, in particular, her son. Although I was not named in the base brief,
there could be no doubt about the identity of the person she was referring to, as verbal
accusations which did identify me by name had already been circulated by her and her
friends for weeks beforehand.

Wednesday afternoon, February 4, several people phoned me to say that Julia had moved
beyond rumor and attacked me in writing using her official position as base chair to
directly access every flight attendant at the base via their company mailbox. I made a

special trip to the airport to pick up a copy. I then called you to ask why you would approve that communication when it so clearly went beyond the scope of job related information to libel me as guilty of criminal behavior i.e., stalking. What made it even worse was the fact that YOU, Ms. Cox, as the American Airlines manager who approved it, appeared to be not only endorsing and supporting Julia Carrigan's untrue accusations, but condoning her harassment of me. (Please refer to the last sentence of the first paragraph which states, "Please remember that anything from APFA that is put into your f/a mailbox must be approved by both APFA Headquarters and **AA management**") Without any proof whatsoever, or even asking for my side, you approved this retaliatory attack on my character by Julia simply because it was printed on APFA letterhead. Although you had the final authority to reject the content of this brief as inappropriate, you chose instead to give it your stamp of approval.

I reprint the following from the American Airlines policy guide regarding unlawful harassment:

*Manager Responsibility*
*Every member of management is responsible for ensuring that no discrimination or unlawful harassment occurs within his/her area. Failure to take appropriate action, tolerance of and/or participation in discrimination or harassment may result in disciplinary action up to and including termination. We must all assure this is a workplace free of harassment and managers have a unique responsibility for upholding this policy.*

*If you receive a complaint, or have reason to believe such conduct is occurring:*

- *Assure the employee that there will be an immediate <u>confidential</u> investigation and that the company will not retaliate against the employee for resisting harassment or making a complaint of discrimination or harassment.*

- *Report the complaint immediately to Management Advisory Services.*

- *Management Advisory Services will assist you in the proper procedures for obtaining the information necessary to conduct a proper and thorough investigation.*

- *Offer the employee the opportunity to bring a peer witness to any investigation meetings, according to the applicable collective bargaining agreement or company policy.*

*As a member of management you have a responsibility to take appropriate action against offensive behavior, even if the employee does not wish to complain.*

Ms. Cox, I feel you have clearly ignored the Manager Responsibility, first by allowing Ms. Carrigan to use the company mailboxes for the purpose of retaliation and to make utterly false accusations against me, and second by your failure and refusal to follow the proper procedures outlined above after I brought this situation to your attention.  When I contacted you on February 12, 2004, your response was to advise me to seek legal advice.

I also asked if I could write something to refute Ms. Carrigan's lies and place it in the flight attendant mailboxes and you said that I could not do that unless it was on APFA letterhead.  Since I hold no office at APFA, there is no possibility that I would be allowed to print anything on APFA stationery.  Since you allowed Ms. Carrigan to overstep her authority and engage in personal attacks in an official APFA communiqué, this is clearly discrimination, as you have denied me the same opportunity to speak directly to the flight attendants that you willingly afforded Ms. Carrigan.

In the past week two weeks I have suffered extreme mental anguish and emotional distress and my work environment has become so intolerable that I have been forced to call in sick because I have been unable to eat or sleep.  I have had a hard time dealing with the reactions of my coworkers who have not only heard the rumors but also read in Ms. Carrigan's base brief that I am a "child stalker," (behavior which constitutes criminal conduct in Massachusetts punishable by up to five years in prison.)  I have found it necessary to see a therapist and have also spent over a thousand dollars retaining legal counsel - which you told me was my only option.

Rouben Madikians
564126


Enclosure: Winter 2004 Base Brief

cc: Lauri Curtis, Vice President Flight Service
    John Tiliacos, Eastern Regional Manager
    Donna Snepp, Managing Director Flight Service
    Gerard Arpey, President and CEO AMR Corporation
    Susan Oliver, Senior Vice President Human Resources
    John Ward, President Association of Professional Flight Attendants
    Ted Bedwell, Ad Hoc Member Executive Committee APFA
    Kenneth Reisman, Esq.

To Lori Curtis
From Rouben Madikians

Dear Ms. Curtis:

It has been over four months since I spoke with your secretary, who told me at that time that I would be receiving a call from you. I am disappointed that you could not find time in your schedule to discuss the intolerable situation I continue to find myself in due to events which took place in February. Please allow me to refresh your memory regarding my situation.

I was falsely and maliciously accused by the APFA base chair in Boston of being a child stalker. These horrible allegations were printed in an APFA Base Brief which was then placed in every flight attendant's company mailbox. The Base Brief boldly stated that nothing that wasn't officially endorsed by both APFA and American Airlines Flight Service could be placed in the AA mailboxes, thereby giving the impression that the accusations must be true or the Base Brief could not have been distributed.

When I brought this situation to Kelley Cox's attention, she took no action whatsoever. She also denied my request for a retraction and told me to seek legal advice. I then filed a complaint with Human Resources. A "thorough investigation" was supposed to be carried out, however, it has been over four months and there is still no resolution. As a result of this harassment, I cannot bear to deal with the negative reactions of my co-workers, so I have been unable to work at the job I love. I have been deprived of my salary and have depleted my savings to meet my expenses. I have also been under the care of a mental health professional for emotional damage I have suffered as a result of this situation and my inability to sleep.

I am well aware that there are people who hold the homophobic belief that gay men prey on young boys. As an openly gay man in his forties, I am both distressed and shocked that American Airlines has been complicit in perpetuating this stereotype by failing to take the necessary steps to end the harassment of me.

Ms. Curtis, I am imploring you to take swift action to bring this situation to an end. I have been drained physically, emotionally, and financially and I am asking you to please come to my aid. I would very much like to receive your reply and I thank you in advance.

Sincerely,

Rouben Madikians